**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| TEXAS A&M QUEER EMPOWERMENT COUNCIL,<br><br>        Plaintiff,<br><br>   v.<br><br>WILLIAM "BILL" MAHOMES, ROBERT L. ALBRITTON, DAVID C. BAGGETT, JOHN W. BELLINGER, JAMES R. "RANDY" BROOKS, JAY GRAHAM, MICHAEL A. "MIKE" HERNANDEZ III, MICHAEL J. PLANK, SAM TORN, and CAGE SAWYERS in their official capacities as members of the Board of Regents of the Texas A&M University System;<br><br>JOHN SHARP, in his official capacity as Chancellor of the Texas A&M University System, and<br><br>MARK A. WELSH III, in his official capacity as President of Texas A&M University,<br><br>        Defendants. | CASE NO. 4:25-cv-992<br><br><br>**VERIFIED COMPLAINT**<br>**FOR CIVIL RIGHTS VIOLATIONS** |

# INTRODUCTION

1.      At Texas A&M University, students can take to the stage to put on or perform nearly any genre or style of show, song, comedy routine, musical, or dance they might imagine—except drag.

2.      On Friday, February 28, 2025, Texas A&M's Board of Regents ordered Texas A&M Chancellor John Sharp and President Mark Welsh to immediately cancel any planned drag show on any Texas A&M University System campus.

3.      Ignoring the First Amendment's strict prohibition against viewpoint discrimination, the Board was not coy about its motives. The Board declared its opposition to the "gender ideology" it believes drag shows "promote," and announced that drag shows conflict with its "values" because they perceive drag shows to "parody" and "demean[]" women through "mockery" and "objectification."

4.      The Board's target is *Draggieland*, an annual student-funded drag show set to take place on the evening of March 27, 2025.

5.      Plaintiff Queer Empowerment Council, a student organization, has successfully organized and hosted *Draggieland*, now in its sixth year. The event is popular, selling out the 750-seat Rudder Theatre at Texas A&M.

6.      The campus of a public university is uniquely designed to facilitate the robust exchange of ideas, whether through lecture, newspaper, or performance. That is why officials cannot suppress student expression just because they believe it is not in "good taste" or falls short of "conventions of decency." *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam).

7.     The Board's cancellation of *Draggieland* and prohibition of all drag shows violates two fundamental principles of the First Amendment. On campus or off, officials who cancel a future stage performance impose a prior restraint, the most pernicious form of censorship. *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975). And in suppressing speech because it "promotes gender ideology," the Board members explicitly embrace the viewpoint discrimination forbidden by the First Amendment, targeting speech due to its perceived ideology. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995) (viewpoint discrimination occurs when the "specific motivating ideology" of the speaker is a rationale for the regulation).

8.     The Queer Empowerment Council brings this urgent action to prevent Texas A&M's leadership from deploying a viewpoint discriminatory prior restraint to silence the recognized student organization's March 27, 2025, show, and to vindicate its First Amendment right to put on drag shows in the future.

## JURISDICTION AND VENUE

9.     This action raises federal questions under the First and Fourteenth Amendments of the United States Constitution. The Queer Empowerment Council brings this action under 42 U.S.C. §§ 1983 and 1988, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

10.     This Court has subject matter jurisdiction over the Queer Empowerment Council's claims under 28 U.S.C. §§ 1331 and 1343 and may exercise supplemental jurisdiction over the Council's claims under the Texas Open Meetings Act pursuant to 28 U.S.C. § 1367.

11.     Venue in this court is proper under 28 U.S.C. § 1391(b)(1) because some of the Defendants reside in this district and all Defendants are residents of Texas. Venue in this court is also proper under 28 U.S.C. § 1391(b)(2) because all claims arise out of actions that occurred in this district.

*Plaintiff Queer Empowerment Council*

12.     Plaintiff Texas A&M Queer Empowerment Council (the "Queer Empower-ment Council") is a recognized student organization at Texas A&M University.

13.     The Queer Empowerment Council's mission is to foster unity among LGBTQ+ organizations on campus, and to serve as a resource for LGBTQ+ students, creating spaces that empower individuals regardless of their gender identity or sexual orientation.

14.     To further its mission, the Queer Empowerment Council hosts regular events that are not supported or organized by the university administration, including The Coming Out Monologues, an annual event where students share and listen to queer stories and experiences in front of an accepting audience; the Rainbow Resource Fair, connecting students with on- and off-campus LGBTQ+ friendly organizations and groups; and Lavender Graduation, an annual celebration that recognizes and affirms LGBTQ+ graduates and their loved ones.

15.     The Queer Empowerment Council's main annual event is *Draggieland*, a pageant-style performance.

16.     The Queer Empowerment Council exclusively funds *Draggieland* 2025. The student group utilizes proceeds from the event to fund its other expressive activities throughout the year. It does not receive any funds from Texas A&M for *Draggieland* 2025.

*The Defendants*

17.     Defendant William "Bill" Mahomes, sued in his official capacity, is a member of and serves as Chairman of the Board of Regents of the Texas A&M University System, a governmental entity under the laws of the State of Texas.

18.     Defendant Robert L. Albritton, sued in his official capacity, is a member of and serves as Vice Chairman of the Board of Regents of the Texas A&M University System.

19.     Defendants David C. Baggett, John W. Bellinger, James R. "Randy" Brooks, Jay Graham, Michael A. "Mike" Hernandez III, Michael J. Plank, Cage Sawyers, and Sam Torn are members of the Board of Regents of the Texas A&M University System. They are sued in their official capacities.

20.     Defendants Mahomes, Albritton, Baggett, Bellinger, Brooks, Graham, Hernandez, Plank, Sawyers, and Torn are collectively referred to as the "Board Defendants."

21.     The Board Defendants are authorized by the State of Texas to "make bylaws, rules, and regulations [they] deem[] necessary and proper for the government of the university system and its institutions, agencies, and services." Tex. Educ. Code § 85.21(a).

22.     Defendant John Sharp, sued in his official capacity, is the Chancellor of the Texas A&M University System. As Chancellor, Sharp is the chief executive officer of the Texas A&M University System, endowed with the authority to "do all things necessary" to ensure the "general management and success of the system," including delegating such duties to subordinate system members. Tex. A&M Univ. Sys., Sys. Pol'y 02.02, Office of the Chancellor §§ 2.1, .2 (Aug. 26, 2021), https://policies.tamus.edu/02-02.pdf.

23.     Defendant Gen. (Ret.) Mark A. Welsh III, sued in his official capacity, is the President of Texas A&M University. As President, Welsh is responsible for administering Texas A&M University and supervising all student programs and services. Tex. A&M Univ. Sys., Sys. Pol'y 02.05, *Presidents of Sys. Member Univs.* (Aug. 26, 2021), https://policies.tamus.edu/02-05.pdf.

24.     At all relevant times, each Defendant acted under color of state law.

## FACTUAL ALLEGATIONS

***By policy and practice, Texas A&M University makes campus theaters available for use by student organizations.***

25.     Texas A&M University Policy No. 08.99.99.M1 (the Texas A&M "Expressive Activity on Campus" policy) provides that students are permitted, "subject to reasonable time, place, and manner restrictions, to engage in expressive activities on campus," broadly defining "campus" to reach both outdoor areas and "buildings." Tex. A&M Pol'y 08.99.99.M1, Definition of "Campus" & Rule 1.1 (June 25, 2024), https://rules-saps.tamu.edu/PDFs/08.99.99.M1.pdf.

26.     The "Expressive Activity on Campus" policy requires that any reasonable time, place, and manner restriction be "narrowly tailored to serve a significant institutional interest" and use "clear, published, content-neutral, and viewpoint-neutral criteria." *Id.* at Definition of "Reasonable time, place, and manner restrictions."

27.     The Expressive Activity on Campus policy prohibits the university from denying a student organization "any benefit generally available to other student organizations … on the basis of a political, … philosophical, [or] ideological … viewpoint." *Id.* at Rule 1.3.

28.     The University established the Rudder Theatre Complex, which includes the Rudder Theatre and Rudder Auditorium, to enable artistic expression on campus, such as movies, operas, and theatrical events.

29.     As a historian of Texas A&M history explained, the Theater Complex, in conjunction with the Memorial Student Center, is intended to "expose students to what they weren't getting in the classroom," providing a "knowledge of art and other cultural areas like symphonies, ballet, and Broadway shows" through "a place where [students] would gain exposure to diverse political thoughts and viewpoints different from their own." Tiarra Drisker, Tex. A&M

Found., *History in the Heart of Campus* (May 14, 2024), https://www.txamfoundation.com/News/History-in-the-Heart-of-Campus.aspx.

30.     Texas A&M University makes the venues in its Rudder Theatre Complex available for use by recognized student organizations like the Queer Empowerment Council.

31.     With the sponsorship of any registered student organization, or any academic or administrative unit, any member of the public can also hold events in the Rudder Theatre Complex's venues.

32.     When a student organization requests use of the Rudder Theatre, Texas A&M University's Division of Student Affairs presents them with a list of potential "Event Type[s]," including banquets, career fairs, ceremonies, dances, conferences, meetings, "Performance/Show/Tryouts," receptions, and socials.

33.     The Rudder Theatre Complex provides a list of rules and guidelines for student organizers, stating that the "primary goal is to ensure you have a great show!" Tex. A&M Univ., University Center & Special Events, Rudder Theatre Complex, https://ucenter.tamu.edu/wp-content/uploads/2021/04/Special-Performance-Rules-and-Guidelines-for-Initialing.pdf.

34.     The list of rules and guidelines provides viewpoint- and content-neutral regulations for use of venues in the Rudder Theatre Complex.

35.     Texas A&M University does not have a written policy imposing any content-based limits on student organizations' use of venues in the Rudder Theatre Complex.

36.     Texas A&M University promotes Rudder Theatre as suitable for "events such as Broadway productions, concerts, variety shows, movies, lectures, conferences, commencement ceremonies, and recitals." Tex. A&M Univ., University Center & Special Events, Rudder Theatre, https://rtc.ucenter.tamu.edu/spaces/theatre/#uc-facility-nav.

37. In practice, students' use of venues in the Rudder Theatre Complex is consistent with the university's policies and characterizations of the intended purposes of these spaces.

38. For example, the Rudder Theatre and Auditorium have hosted or are scheduled to host:

a. Performances of the musical "Chicago," boasting "mature themes," on February 18–19, 2025;

b. The annual "Miss Black & Gold" scholarship pageant for young women, hosted by a fraternity, most recently held on January 25, 2025;

c. A panel of Christian students and faculty, hosted by the Texas A&M Christian Faculty Network, with the aim of inviting "non-Christian friends so that real conversation can take place" on February 23, 2025;

d. A get-out-the-vote appearance by Beto O'Rourke and Democratic candidates for office, sponsored by a student organization, the Aggie Democrats, in the Rudder Theatre on September 19, 2024;

e. A speech by conservative activist Charlie Kirk at the invitation of a student organization, Turning Point USA, on April 22, 2025;

f. A speech by conservative commentator Ben Shapiro at the invitation of a student organization, the Texas A&M Young Americans for Freedom, denouncing "transgressivism" by the LGBTQ+ community, on November 1, 2022;

g. Performances of *The Cher Show*, a musical featuring three women performing Cher songs in risqué costumes, on April 2–3, 2025;

h. A performance of *HADESTOWN*, a musical with "mature themes," on March 3–4, 2025;

i. Performances of *Rent*, a musical, on February 16-17, 2022;

j. A Brazilian pianist in concert with the Brazos Valley Symphony Orchestra on March 2, 2025;

k. A South Korean pop music group, Young Posse, in concert in the Rudder Auditorium on March 20, 2025;

l. A production of Swan Lake, produced by a recognized student organization, on April 5, 2025;

m. A production of Rodgers and Hammerstein's *Oklahoma!*, produced by a recognized student organization, on April 12, 2025;

n. Jazz ensembles on April 13, 2025;

o. Musicians performing "moving traditional Zen pieces" and ensemble music on April 17, 2025;

p. A comedy show by the "Tiny Meat Gang" in the Rudder Theatre on October 23, 2019; and

q. An improvisational comedy show by "Freudian Slip," an improvisational comedy troupe putting on an improv show of games and audience participation, on March 24, 2023.

***The student-organized* Draggieland*'s successful performances.***

39. *Draggieland*, a mashup of "drag" and "Aggieland" is a drag performance that Queer Empowerment Council currently organizes and holds annually at the Rudder Theatre.

40. During *Draggieland*, competitors—frequently including community members and students—participate in a pageant to try to win the title of "Queen/King of *Draggieland*."

41. *Draggieland* has themes, around which each performer can design their planned performances.

42. *Draggieland* performers choose costumes, deciding what clothes to put on, what makeup to wear, and how to style their hair.

43. *Draggieland* performers put clothes *on*; they are not nude or partially-nude.

44. *Draggieland* performers frequently, but not always, make clothing choices to deliberately contrast with their expected gender presentation.

45. *Draggieland* performers also select the songs, dance routine, and lighting to advance the chosen theme.

46. Some *Draggieland* performers also choose other talents to perform as part of their performance.

47. *Draggieland* performers then discuss what drag means to them in conversation with the host.

48.     In advance of the annual *Draggieland* performance, the student organizers appoint judges and hold auditions of prospective performers.

49.     The student organizers also hire a host (or multiple hosts) for *Draggieland*.

50.     A student showrunner and their team then work with the *Draggieland* performers to help coordinate their performances, ensuring that each performance is unique.

51.     In advance of the *Draggieland* 2025 performance, the student organizers planned to hold two rehearsals.

52.     The rehearsals allow the student organizers, performers, and host to familiarize themselves with the layout of the theatre and to identify potential problems they might encounter during the *Draggieland* performance.

53.     The rehearsals allow the performers to put finishing touches on their planned performances, including selecting lighting.

54.     Students organized and hosted the first *Draggieland* event in February 2020 in the Rudder Theatre.

55.     In 2020 and 2021, Texas A&M sponsored *Draggieland*.

56.     *Draggieland* has repeatedly sold out the 750-seat Rudder Theatre.

57.     On information and belief, no member of the campus community has ever filed a Title IX complaint concerning *Draggieland*.

58.     In 2021, administrators decided that the university would no longer sponsor *Draggieland*.

59.     Because of the loss of sponsorship, student organizers were denied access to the proceeds raised from the 2020 and 2021 *Draggieland* events.

60. Then-Vice President for Student Affairs Gen. Joe Ramirez informed the student government that the university had recognized that *Draggieland* "had been successful for the previous two years from a financial perspective, and as a result, I made a decision to say, 'OK, we've been successful, let's let a student organization host it.'" Coby Scrudder, *VPSA Ramirez addresses recent Draggieland, Fish Camp decisions at Student Senate*, The Battalion (Apr. 14, 2022), https://thebatt.com/news/vpsa-ramirez-addresses-recent-draggieland-fish-camp-decisions-at-student-senate.

61. In response to a media inquiry about its decision to discontinue sponsoring *Draggieland*, Texas A&M University asserted in February 2022 that the university would not "disallow" student performances and that if "a student organization wants to host an event, they are more than welcome to do so as long as they go through the proper protocols." Julia Potts, *Taking say away from students*, The Battalion (Feb. 17, 2022), https://thebatt.com/news/taking-say-away-from-students.

62. In response to an April 2022 letter from the Foundation for Individual Rights in Education (FIRE) seeking clarification about the ramifications of its withdrawal from sponsoring the event, Texas A&M University System asserted that it was "well-aware of its First Amendment obligations to student and student organizations." Letter from Jerry M. Brown, Managing Counsel for Student Affairs and Special Projects, Texas A&M University System to Anne Marie Tamburro, Program Officer, FIRE (May 17, 2022) (on file).

63. The Queer Empowerment Council was formally established in March 2023 in response to the university administration's decision to cease its own support for *Draggieland*.

64. Since then, the Queer Empowerment Council has expanded to also organize other student events that the university administration no longer organized or supported.

65. The Queer Empowerment Council privately funds *Draggieland* 2025, using funds from ticket sales from past performances, and from private donors.

66. *Draggieland* 2025 does not receive funding from any governmental source, including federal, state, local, or university sources.

67. The Queer Empowerment Council pays for the use of resources involved in *Draggieland*, including the theatre staff, rental of stage equipment, and the presence of campus police officers.

68. The Queer Empowerment Council depends on the proceeds raised by its annual *Draggieland* show because the proceeds are used to fund the organization's other annual events, which have free admission for attendees.

69. Like other genres of stage theater, drag performances are inherently expressive.

70. The context of drag shows—a stage, lighting, sound, choreography, makeup, and costume—provides cues that alert viewers to the performance's expressive nature.

71. *Draggieland* is important to the LGBTQ+ members of the Texas A&M community, serving as a celebration of self-expression, inclusivity, and queer culture.

72. *Draggieland* provides a way for students to express messages supporting the LGBTQ+ community.

73. Likewise, it allows students to embrace their identities, express challenges to societal norms (including norms relating to gender and sexuality), and educate the broader university community about LGBTQ+ culture.

**Draggieland** *2025 has long been scheduled to take place at Rudder Theatre on March 27, 2025.*

74.     On May 28, 2024, the Queer Empowerment Council submitted a request to book Rudder Theatre to host *Draggieland* on March 27, 2025, and two rehearsal performances that same month.

75.     On October 15, 2024, Texas A&M University provided a bill of estimated costs for the Queer Empowerment Council's use of the Rudder Theatre for the *Draggieland* rehearsals and performance, including the Rudder Theatre staff (including stage managers, lighting technicians, sound technicians, projectionists, and stage hands), rental of drapes for the stage, rental of stage equipment, a fire alarm technician, and the presence of campus police officers.

76.     On October 23, 2024, Shanna Wright, the Manager of Special Events for Texas A&M University's Rudder Theatre Complex, sent the Queer Empowerment Council an email confirming the group's reservation of the Rudder Theatre for the *Draggieland* performance on March 27, 2025, and its reservation of the Rudder Theatre space for rehearsals on March 6 and 26, 2025.

77.     By February 28, 2025, *Draggieland* was listed as "Approved" by Texas A&M University and *Draggieland* tickets were made available on the Rudder Theatre website.

78.     The Queer Empowerment Council invested considerable time, energy, and resources in promoting *Draggieland*'s date, time, and location.

79.     *Draggieland* was scheduled for March 27, 2025, at 7:30 p.m. in the evening.

*The Texas A&M System's Board of Regents abruptly bans* **Draggieland** *and other drag shows.*

80.     At noon on February 28, 2025, the Texas A&M University System Board of Regents held a special meeting by telephone.

81.     On information and belief, the Board Defendants failed to provide public notice of the meeting until the day before the meeting.

82.     During the meeting, the Board Defendants adopted a "Resolution Regarding Certain Public Events on the Campuses of Universities in The Texas A&M University System," a true and correct copy of which is attached as **Exhibit 1** (the "Drag Ban Resolution").

83.     The Drag Ban Resolution asserts that the Board Defendants believe "Drag Show Events" are contrary to the institution's "values" because they are "meant to parody" women, that drag shows "demean[] women," and that they are "likely to create or contribute to a hostile environment for women" because they "involve the mockery or objectification of women." Ex. 1, at 1.

84.     To justify the ban, the Drag Ban Resolution invokes an Executive Order issued by President Trump on January 20, 2025, entitled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." *Id.* at 2. *See generally* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) (the "Gender Ideology Extremism Executive Order"), *available at* https://www.federalregister.gov/documents/2025/01/30/2025-02090/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal.

85.     The Drag Ban Resolution asserts that the Gender Ideology Extremism Executive Order prohibits the use of federal funds to "promote gender ideology." Ex. 1, at 2.

86.     The Drag Ban Resolution asserts that because Texas A&M receives unidentified federal funding, "the use of facilities at the Universities for Drag Show Events may be considered promotion of gender ideology in violation of the Executive Order." *Id.*

87.    The Drag Ban Resolution directs Chancellor Sharp and President Welsh to immediately "cancel any upcoming Drag Show Events." *Id.*

88.    That afternoon, Chancellor Sharp issued a memorandum, a true and correct copy of which is attached as **Exhibit 2**, to the presidents of Texas A&M University System institutions.

89.    In his memorandum, Chancellor Sharp directed President Welsh "to take actions to cancel any 'Drag Show Events'" and to "take prompt action to implement the directives" in the Drag Ban Resolution. Ex. 2.

90.    That same afternoon, Interim Associate Vice President Thomas W. Reber sent the Queer Empowerment Council an email notifying them that because the Board had adopted the Drag Ban Resolution, "your event, Draggieland 2025, will not be permitted on campus."

91.    When Defendants canceled *Draggieland*, the Queer Empowerment Council had already sold tickets to the event.

### INJURIES TO PLAINTIFF

92.    Defendants' imposition of the Drag Ban Resolution and abrupt cancellation of *Draggieland* are causing immediate, practical, and irreparable harm to the Queer Empowerment Council's First Amendment rights.

93.    The Queer Empowerment Council is a political and social advocacy organization led by undergraduate and graduate students who pay tuition and student fees to Texas A&M University. The First Amendment, the State of Texas, and the University itself promise these students the ability to use campus venues for expressive activities without viewpoint- or content-based restrictions. *See, e.g.*, Tex. Educ. Code § 51.9315(g) (campus free speech statute prohibiting public universities from denying student organizations "any benefit generally available to other student organizations … on the basis of a political, religious, philosophical, ideological, or

15

academic viewpoint expressed by the organization or of any expressive activities of the organization").

94.    Under the Drag Ban Resolution, university officials are denying the Queer Empowerment Council access to spaces made available to organizations expressing a variety of viewpoints, including groups that criticize "gender ideology."

95.    In ejecting the Queer Empowerment Council's drag performance from the campus, Defendants frustrate the Council's ability to communicate its message to the very campus community it serves. And in doing so, Defendants send the message that the Queer Empowerment Council's viewpoints are uniquely unwelcome at this public university.

96.    Defendants' censorship is causing immediate practical harm to the Queer Empowerment Council because by canceling the March 27 *Draggieland* event, Defendants have frustrated the Council's ability to put on the event.

97.    Because Defendants' actions have rendered uncertain the date, time, and location of the event, the Queer Empowerment Council may not be able to ensure that each of their chosen performers will be available on an alternative date and time.

98.    Irreparable harm is occurring now. Because the Queer Empowerment Council cannot be certain as to whether they will be able to use their campus theatre, the Council's students must spend time and resources to prepare for both an on-campus performance *and* an off-campus performance. To prepare an alternative event, the Council—a volunteer group of university students without an abundance of either money or time—must seek out new venues, negotiate with venue owners and vendors, and prepare two different shows: one on-campus and one off.

99.    Defendant's abrupt cancellation of *Draggieland* also endangers the Queer Empowerment Council's other organizing. Because *Draggieland* is the principal fundraising

vehicle for the student organization, the Queer Empowerment Council may be unable to fund its other annual events due to Defendants' cancellation of *Draggieland*. There is no guarantee of securing a venue and vendors off-campus, let alone a local venue comparable in size to the Rudder Theatre.

100.    Even if the Queer Empowerment Council can secure an alternative venue, their ability to promote and sell (or re-sell) tickets to the event will have been harmed by Defendants' abrupt cancellation of *Draggieland*.

101.    Moreover, the Queer Empowerment Council's very purpose is to convey messages to the Texas A&M campus community. By ejecting the Queer Empowerment Council from the Texas A&M campus, Defendants are inhibiting the organization from fulfilling its core, expressive function.

102.    The irreparable harm to the Queer Empowerment Council will peak on March 26 and 27, 2025, when the Queer Empowerment Council is denied access to the Rudder Theatre stage for rehearsal and performance of *Draggieland*.

**FIRST CAUSE OF ACTION**
**First Amendment Violation (Injunctive and Declaratory Relief)**
**Freedom of Speech — Viewpoint and Content Discrimination**
**(42 U.S.C. § 1983)**
**(Against all Defendants in their official capacities)**

103.    Plaintiff Queer Empowerment Council re-alleges and re-incorporates paragraphs 1–102 as though fully set forth herein.

104.    Because drag shows are expressive conduct, the First Amendment protects them.

105.    Just as the First Amendment strongly protects other expression at public universities and colleges, it protects drag shows on those campuses.

106.    By policy and practice, Texas A&M University has established Rudder Theatre as a designated public forum for student expression.

107.    Rudder Theatre is a forum generally open for use by student groups.

108.    The Queer Empowerment Council is among the intended class of users of the forum because the Council is a recognized student organization.

109.    Rudder Theatre is suitable for drag performances like *Draggieland*.

110.    By excluding *Draggieland* and other drag shows from Rudder Theatre (and other campus forums) because of the show's anticipated viewpoint and content, the Drag Ban Resolution violates the First Amendment.

111.    The Drag Ban Resolution is a viewpoint-discriminatory regulation of expression because it censors drag performances based on the message, viewpoint, or ideology expressed— real or perceived.

112.    Defendants' subjective evaluation about what expression is offensive, appropriate, or objectionable is not a viewpoint-neutral basis on which to restrict student expression and violates the First Amendment.

113.    The Board Defendants engaged in unconstitutional viewpoint discrimination by prohibiting the Queer Empowerment Council from putting on a drag show because they disagree with the expressive message of the show and believe it is offensive.

114.    Chancellor Sharp and President Welsh are engaging in unconstitutional viewpoint discrimination by enforcing the Drag Ban Resolution.

115.    Viewpoint discrimination is presumptively unconstitutional and is forbidden in any designated public forum, limited public forum, or nonpublic forum.

116.    As a viewpoint-discriminatory regulation, the Drag Ban Resolution is subject to, and fails, strict scrutiny.

117.     The Drag Ban Resolution, and its enforcement, also violate the First Amendment by discriminating against the content of *Draggieland*.

118.     Because the Queer Empowerment Council is of the class of persons for whom Rudder Theatre is established, the content-based regulation on their speech is subject to, and fails, strict scrutiny.

119.     The Drag Ban Resolution does not serve a compelling state interest.

120.     The Board Defendants' prediction that the Queer Empowerment Council's speech may cause a "hostile environment" or "demeans women" is not a compelling state interest because it is not supported by a factual basis rendering the interest real and not merely conjectural.

121.     The Board Defendants' stated desire to comply with an executive order is not a compelling interest because the order concerns only federal funding and does not apply to student-funded shows.

122.     The Drag Ban Resolution defies the state public policy, enshrined in statute, of safeguarding freedom of expression on state university campuses. Tex. Educ. Code § 51.9315(g) (prohibiting denial of benefits to student organizations based on viewpoint or expressive activity).

123.     The Drag Ban Resolution is not narrowly tailored to meet a compelling state interest.

124.     For example and without limitation, the Drag Ban Resolution is overinclusive because it prohibits speech in an indoor, ticketed event even when it is not subjectively offensive to its audience.

125.     The Drag Ban Resolution is also overinclusive because it prohibits speech that is not "pervasive," prohibiting a single performance in an indoor, ticketed event.

126. The Drag Ban Resolution is also overinclusive because it prohibits speech that, because it is far removed from the university's educational functions, cannot so undermine and detract from an educational experience that a student is effectively denied access to university resources.

127. The Drag Ban Resolution is overinclusive because hostile environment harassment has a narrow legal definition that cannot be stretched to reach a once-a-year ticketed performance held in an indoor space where attendance is voluntary and willful.

128. Even if the definition of hostile environment harassment could be stretched to reach this performance, determining whether the expression surpassed that exacting threshold can only be made after it occurs and cannot justify a prior restraint on speech.

129. For example, and without limitation, the Drag Ban Resolution is underinclusive because it prohibits only the "mockery" of women, but not men.

130. The Drag Ban Resolution is underinclusive because it prohibits only drag performances, but not other speech that "might" create a hostile environment.

131. The Drag Ban Resolution fails strict scrutiny in all cases and has no constitutional applications.

132. The Queer Empowerment Council has no adequate legal, administrative, or other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to its First Amendment rights from Defendants' unconstitutional viewpoint and content discrimination.

133. The Queer Empowerment Council requires a temporary restraining order, preliminary injunctive relief, and permanent injunctive relief to protect its fundamental expressive rights from ongoing irreparable harm.

134. Defendants have taken no steps to halt their viewpoint- and content-based censorship of the Queer Empowerment Council's expressive rights, and there is an ongoing and substantial threat that they will enforce the Drag Ban Resolution now and in the future.

135. The Queer Empowerment Council is likely to succeed on the merits of its claims. Moreover, there is substantial public interest in ensuring Defendants cease engaging in viewpoint-based restriction and censorship of speech on Texas's college campuses, where the "vigilant protection of constitutional freedoms is nowhere more vital." *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

136. Because a justiciable controversy exists over Defendants' viewpoint-based discrimination against the Queer Empowerment Council's protected expression, the Queer Empowerment Council also seeks declaratory relief against Defendants. A judgment declaring that the Council's speech is protected and that the Drag Ban Resolution violates the First Amendment will further resolve and clarify the parties' legal relationship.

## SECOND CAUSE OF ACTION
### First Amendment Violation (Injunctive and Declaratory Relief)
### Freedom of Speech — Prior Restraint
### (42 U.S.C. § 1983)
### (Against all Defendants in their official capacities)

137. Plaintiff Queer Empowerment Council re-alleges and re-incorporates paragraphs 1–136 as though fully set forth herein.

138. Defendants have excluded Queer Empowerment Council from speaking in a campus public forum before the speech ever occurred, based on Defendants' prediction and perception that *Draggieland* "promotes gender ideology," "demeans women," and may lead to a "hostile environment for women."

139. In doing so, Defendants have imposed an unconstitutional prior restraint.

140.    Prior restraints are presumptively unconstitutional. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

141.    The First Amendment bars the government from banning speech before it can be heard.

142.    A university administrator may not restrict student expression before it occurs based on their prediction of its content and consequences. *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984) (citing *Univ. of S. Miss. Chapter of Miss. C.L. Union v. Univ. of S. Miss.*, 452 F.2d 564, 566 (5th Cir. 1971)).

143.    The Drag Ban Resolution provides no narrow, objective, and definite standards to guide administrators in granting or denying access to campus public forums.

144.    Instead, the Drag Ban Resolution's imposition of a blanket ban on "Drag Show Events" is a viewpoint- and content-based prior restraint on speech, that grants administrators unfettered authority to block protected expression from campus forums.

145.    For instance, the Drag Ban Resolution expressly requires event registration staff and administrators to consider whether a planned event, including *Draggieland*, will employ "exaggerated female make up" or "involve sexualized, vulgar or lewd conduct" or "conduct that demeans women."

146.    Being a prior restraint, the Drag Ban Resolution infringes on and chills the Queer Empowerment Council's First Amendment right to schedule, plan, and hold expressive events and activities on campus.

147.    These viewpoint- and content-based prior restraints unconstitutionally deny the Queer Empowerment Council's access to campus forums.

148.    Texas A&M also provides no procedural safeguards, such as providing student organizations with an administrative avenue of appeal or means by which student organizations may contest a decision to deny expressive activity based on its content or message.

149.    The Queer Empowerment Council has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to its First Amendment right to use campus forums for First Amendment activity.

150.    Defendants have taken no steps to remove the ongoing prior restraint on the Queer Empowerment Council's expressive rights, and there is an ongoing and substantial threat that they will enforce the Drag Ban Resolution now and in the future.

151.    The Queer Empowerment Council requires a temporary restraining order, preliminary injunctive relief, and permanent injunctive relief to protect its fundamental expressive rights from ongoing irreparable harm.

152.    Absent injunctive relief and declaratory relief enjoining Defendants from imposing an impermissible prior restraint on speech, these public university officials will continue to violate the constitutional rights of Texas A&M's students, including the Queer Empowerment Council and its members.

153.    The Queer Empowerment Council is likely to succeed on the merits of its claims. Moreover, there is substantial public interest in ensuring Defendants cease engaging in viewpoint- and content-based prior restraints on speech.

154.    Because a justiciable controversy exists over Defendants imposing a prior restraint on the Queer Empowerment Council's ability to use campus public forums for First Amendment expressive activity, the Council also seeks declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

**THIRD CAUSE OF ACTION**
**Texas Open Meetings Act**
**Injunction Voiding Actions Taken at Feb. 28, 2025 Meeting**
**(Tex. Gov't Code §§ 551.141, 551.142)**
**(Against the Board Defendants in their official capacities)**

155.  Plaintiff Queer Empowerment Council re-alleges and re-incorporates paragraphs 1–154 as though fully set forth herein.

156.  The Board of Regents of the Texas A&M University System is a governmental body subject to the Texas Open Meetings Act, Tex. Gov't Code §§ 551.001 to .146.

157.  The Texas Open Meetings Act required the Board of Regents to post notice of a meeting online at least 72 hours before the scheduled time of the meeting. *Id.* § 551.043.

158.  On information and belief, the Board of Regents posted the notice of its February 28, 2025, special meeting on February 27, 2025.

159.  Specifically, the metadata in the agenda of the February 28, 2025, meeting indicates that the document was created on February 27, 2025.

160.  The agenda of the February 28, 2025, meeting does not identify an emergency or urgent public necessity justifying inadequate notice. *See id.* § 551.045.

161.  On February 28, 2025, the Board of Regents held a special meeting, violating the Texas Open Meetings Act due to inadequate public notice.

162.  Any "action taken by a governmental body in violation of" the Texas Open Meetings Act "is voidable." *Id.* § 552.141.

163.  Texas Government Code § 551.142(a) provides that any interested person "may bring an action by mandamus or injunction to … reverse a violation" of the Open Meetings Act "by members of a governmental body."

164.    The Queer Empowerment Council is interested in the Board of Regents' special meeting at which it adopted the Drag Ban Resolution given its impact on the Council's speech, activities, and advocacy.

165.    The Queer Empowerment Council brings this cause of action against the members of the Board of Regents to void their adoption of the Drag Ban Resolution at the February 28, 2025, special meeting of the Board of Regents.

166.    The Queer Empowerment Council is entitled to its costs of litigation and reasonable attorneys' fees in connection with this cause of action. *Id.* § 551.142(b).

## PRAYER FOR RELIEF

For these reasons, Plaintiff Queer Empowerment Council respectfully asks this Court to:

a)  Issue a temporary restraining order prohibiting Defendants and their agents, officials, servants, employees, and persons acting in concert with them, from enforcing the Drag Ban Resolution (or any other viewpoint- or content-discriminatory reason) to cancel the March 27, 2025 performance of *Draggieland*, or otherwise canceling the March 27, 2025 performance of *Draggieland*, or any rehearsal in advance of the March 27 performance, on the basis of the viewpoint or content of *Draggieland*;

b)  Enter a preliminary and permanent injunction enjoining Defendants and their agents, officials, servants, employees, and persons acting in concert with them, from enforcing the Drag Ban Resolution;

c)  Enter a judgment declaring that the Drag Ban Resolution violates the First and Fourteenth Amendments of the United States Constitution;

d) Enter a judgment declaring that the actions taken by Defendants canceling *Draggieland* and prohibiting drag shows violated the Queer Empowerment Council's constitutional rights;

e) Enter an injunction voiding any action taken during the February 28, 2025, meeting of the Board Defendants;

f) Award attorneys' fees, statutory fees, and costs under 42 U.S.C. § 1988 and Tex. Gov't Code § 551.142(b); and

g) Grant such other and further relief as the Court may deem just and proper.

Dated: March 5, 2025

Respectfully submitted,

/s/ JT Morris
JT Morris (Tex. Bar No. 24094444; S.D. Tex. Bar No. 3163670)
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)
(215) 717-3473
700 Pennsylvania Ave., Suite 340
Washington, D.C. 20003
jt.morris@thefire.org

Adam Steinbaugh (Cal. Bar No. 304829)*
Jeffrey D. Zeman (Penn. Bar No. P328570)*
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION (FIRE)
510 Walnut St., Suite 900
Philadelphia, PA 19106
adam@thefire.org
jeff.zeman@thefire.org

*Pro hac vice motion forthcoming*

**Attorneys for Plaintiff**
**Texas A&M Queer Empowerment Council**

## VERIFICATION OF ALEXSANDRIA "ALEX" GONCE

Pursuant to 28 U.S.C. § 1746, I, ALEXSANDRIA "ALEX" GONCE, declare as follows:

1.     I am the Events Chair and Treasurer of the Texas A&M Queer Empowerment Council, the plaintiff in this action.

2.     I am an officer of the Texas A&M Queer Empowerment Council and am authorized by the organization to act on its behalf.

3.     I have read the foregoing Verified Complaint for Civil Rights Violations.

4.     I have personal knowledge of the factual allegations in paragraphs 1-3, 5, 12-16, 25-58, 60-61, 63-80, 82-102 of the Verified Complaint and know them to be true.

5.     I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on March 5, 2025.

*Alexsandria Gonce*
Alexsandria "Alex" Gonce