**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| TEXAS A&M QUEER EMPOWERMENT COUNCIL, | |
| *Plaintiff*, | Civil Case No. 4:25-cv-992 |
| v. | |
| WILLIAM "BILL" MAHOMES, ROBERT L. ALBRITTON, DAVID C. BAGGETT, JOHN W. BELLINGER, JAMES R. "RANDY" BROOKS, JAY GRAHAM, MICHAEL A. "MIKE" HERNANDEZ III, MICHAEL J. PLANK, SAM TORN, CAGE SAWYERS, JOHN SHARP, and MARK A. WELSH III, in their official capacities, | |
| *Defendants*. | |

**PLAINTIFF'S MOTION FOR A**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ...................................................................................................3

    Texas A&M makes Rudder Theatre available to student organizations for
    expressive purposes. ..................................................................................................3

    Student-created *Draggieland* repeatedly sells out the 750-seat Rudder Theatre. ..............4

    The Texas A&M System's Board of Regents abruptly bans drag shows, despite
    *Draggieland* 2025 having long been approved. ................................................................5

ARGUMENT .......................................................................................................................7

    I.     Plaintiff Is Likely to Succeed on the Merits Because the Drag Ban Is a
             Viewpoint-Based Ban and Prior Restraint. ..........................................................7

          A.     The First Amendment protects drag performances. ...................................7

          B.     The Drag Ban is quintessential viewpoint discrimination..........................9

          C.     The Drag Ban is an unconstitutional prior restraint, highlighting why
                    this Court's swift intervention is vital. ......................................................13

          D.     The Drag Ban cannot survive strict scrutiny. ...........................................15

    II.    Without an Immediate Temporary Restraining Order, Plaintiff Will Suffer
             Irreparable Harm to Its First Amendment Freedoms. ...........................................18

    III.   Ensuring Public Universities Do Not Stifle Campus Expression on a
             Viewpoint-Discriminatory Basis Is Vital to the Public Interest. ...........................19

    IV.   The Court Should Waive a Bond Requirement. ....................................................19

    V.    A TRO Is Necessary and Justified........................................................................20

CONCLUSION ..................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ...................................................................................11

*Ark. Educ. Television Comm'n v. Forbes,*
    523 U.S. 666 (1998) ...................................................................................12

*Christian Legal Soc'y v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ..................................................................3, 19

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.,*
    636 F.2d 1084 (5th Cir. Unit B 1981) ........................................................19

*Cohen v. California,*
    403 U.S. 15 (1971) .....................................................................................18

*Davis v. Monroe County Bd. of Educ.,*
    526 U.S. 629 (1999) ...................................................................................16

*DeJohn v. Temple Univ.,*
    537 F.3d 301 (3d Cir. 2008) ......................................................................17

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................................3, 18

*Gay Student Servs. v. Tex. A&M Univ.,*
    737 F.2d 1317 (5th Cir. 1984) ...................................................................13

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of*
    *Alameda County,*
    415 U.S. 423 (1974) ...................................................................................20

*Healy v. James,*
    408 U.S. 169 (1972) ..............................................................................2, 9, 19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
    515 U.S. 557 (1995) .....................................................................................9

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
    993 F.2d 389 (4th Cir. 1993) ...................................................................9, 11

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952) .....................................................................................8

*Just. for All v. Faulkner*,
    410 F.3d 760 (5th Cir. 2005) ...........................................................................12

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
    584 U.S. 617 (2018) .........................................................................................8

*Matal v. Tam*,
    582 U.S. 218 (2017) ............................................................................11, 12, 15

*Miller v. California*,
    413 U.S. 15 (1973) .........................................................................................13

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) .......................................................................................13

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................................................19

*Norma Kristie, Inc. v. City of Oklahoma City*,
    572 F.Supp. 88 (W.D. Okla. 1983) ...................................................................7

*Papish v. Bd. of Curators of the Univ. of Mo.*,
    410 U.S. 667 (1973) ..............................................................................9, 10, 17

*Pro-Life Cougars v. Univ. of Houston*,
    259 F.Supp.2d 575 (S.D. Tex. 2003) ..........................................................12, 14

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ...................................................................................7, 17

*Robinson v. Hunt County*,
    921 F.3d 440 (5th Cir. 2019) ..........................................................................11

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) ...........................................................................................2

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ....................................................................................2, 10

*S. Utah Drag Stars v. City of St. George*,
    677 F.Supp.3d 1252 (D. Utah 2023) .................................................................7

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001) ...........................................................................15

*Schacht v. United States*,
    398 U.S. 58 (1970) .........................................................................................8

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ........................................................................................................passim

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ...................................................................................................2, 9, 19

*Shuttlesworth v. City of Birmingham*,
    394 U.S. 147 (1969) ...............................................................................................................13

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...............................................................................................................15

*Spectrum WT v. Wendler*,
    693 F.Supp.3d 689 (N.D. Tex. 2023) ......................................................................................2

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) .........................................................................................14, 16

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) ............................................................................................3, 19

*Texas v. Johnson*,
    491 U.S. 397 (1989) ...........................................................................................................7, 8

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ...............................................................................................................17

*Widmar v. Vincent*,
    454 U.S. 263 (1981) .........................................................................................................12, 15

*Woodlands Pride, Inc. v. Paxton*,
    694 F.Supp.3d 820 (S.D. Tex. 2023) ...............................................................................2, 7, 8

## Statutes

Tex. Educ. Code
    § 51.9315(g) ........................................................................................................................3, 19

## Other Authorities

Exec. Order No. 14,168,
    90 Fed. Reg. 8615 (Jan. 20, 2025)....................................................................................6, 16

## INTRODUCTION

Under our Constitution, public universities cannot ban student expression simply because they disagree with the message. Yet last week, the Texas A&M Board of Regents purported to do just that, banishing drag performances from campus because they might "promote" an "ideology" the Regents find offensive. Verified Compl. ¶ 82, Ex. 1. Without this Court's swift intervention, the Board of Regents' attack on the First Amendment will soon silence a student group's protected expression.

For years, Plaintiff Queer Empowerment Council has exercised its unquestionable First Amendment right to organize, fund, and host an annual drag show, *Draggieland*, in venues open for student performances at Texas A&M University–College Station. *Id.* ¶¶ 25–39, 55–56. The recognized student group has been preparing to host *Draggieland* again at the Rudder Theatre on Texas A&M's campus on the evening of March 27, 2025. *Id.* ¶¶ 74–79. Campus staff readily approved the group's reservation months ago. *Id.* ¶¶ 76–77.

But on February 28, the Texas A&M System Board of Regents took aim at *Draggieland*, passing a resolution banning drag shows from campus venues ("Drag Ban"). *Id.* ¶¶ 80–87, Ex. 1. The Regents left no doubt about their motives, insisting that drag performance "promote[s] gender ideology" and "demeans women." *Id.* ¶ 82, Ex. 1. They did so despite the First Amendment's bar against public universities wrapping censorship in concerns about controversy, offense, or opposing ideologies. In no event can the Drag Ban survive constitutional scrutiny.

With *Draggieland* just three weeks away, urgent judicial relief is the only constitutional safety net for the Council and the First Amendment at Texas A&M. Thus, the Council asks the Court to grant a temporary restraining order until the Court can rule on a preliminary injunction, preserving the status quo and preventing irreparable harm to the Council's right to host

1

*Draggieland* in Rudder Theatre on the evening of March 27. In the alternative, the Council asks the Court to expedite and grant a preliminary injunction against enforcing the Drag Ban before March 27. The Court should do so because the Council meets each requirement for immediate injunctive relief.

*First*, because both viewpoint discrimination and prior restraints violate the First Amendment, the Council is likely to succeed on the merits. Drag shows, like any stage performance, are protected expression, as Judge Hittner recently reaffirmed. *Woodlands Pride, Inc. v. Paxton*, 694 F.Supp.3d 820, 842–44 (S.D. Tex. 2023).[1] And First Amendment protection for drag performance is just as strong on public university campuses like Texas A&M, where the First Amendment is "nowhere more vital." *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

By targeting drag shows because they "promote gender ideology" and "demean women," the Drag Ban violates the First Amendment's bar against viewpoint discrimination. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828–29 (1995). Likewise, by banning *Draggieland* before it even hits the stage, the Drag Ban is a blatantly unconstitutional prior restraint that cannot survive strict scrutiny. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553–54 (1975).

*Second*, the Drag Ban is irreparably harming the Council. Verified Compl. ¶¶ 92–102. Any "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)

---

[1] Judge Hittner rejected a contemporaneous, outlier holding from the Northern District of Texas that doubted whether the First Amendment protects drag performance. *Woodlands Pride*, 694 F.Supp.3d at 844 (discussing *Spectrum WT v. Wendler*, 693 F.Supp.3d 689 (N.D. Tex. 2023)). In *Spectrum WT*, a West Texas A&M University student group is suing the university's president, the Texas A&M Board of Regents, and Chancellor Sharp for a distinct drag show ban at West Texas A&M. Both *Spectrum WT* and *Woodlands Pride* are pending appeal. *Spectrum WT v. Wendler*, No. 23-10994 (5th Cir. argued Apr. 29, 2024); *Woodlands Pride, Inc. v. Paxton*, No. 23-20480 (5th Cir. argued Oct. 9, 2024). The Board of Regents are not part of the *Spectrum WT* appeal, as the district court found plaintiffs had no standing to sue the Board and the plaintiffs did not appeal that issue. Counsel for Spectrum WT represents Queer Empowerment Council here.

(quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Further, if the registered student organization cannot exercise its First Amendment rights on March 27, it will suffer even greater irreparable injury to its core mission of advocating for the LGBTQ+ community at Texas A&M. Verified Compl. ¶¶ 99–102.

*Third*, "injunctions protecting First Amendment rights are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quoting *Christian Legal Soc'y v. Walker,* 453 F.3d 853, 859 (7th Cir. 2006)). That includes enjoining censorship at public universities, where the First Amendment prevails over campus officials' favored views. The Texas Legislature would agree, having adopted a campus free speech law that forbids universities from limiting student organizations' expression based on viewpoint. Tex. Educ. Code § 51.9315(g).

To restore the First Amendment at Texas A&M and prevent immediate irreparable harm, the Council asks the Court to grant a temporary restraining order preventing Defendants from canceling the March 27 *Draggieland* performance and a preliminary injunction prohibiting future enforcement of the Drag Ban.

## STATEMENT OF FACTS

***Texas A&M makes Rudder Theatre available to student organizations for expressive purposes.***

Texas A&M University opens performance and event venues in its Rudder Theatre Complex for use by recognized student organizations. Verified Compl. ¶¶ 25–30. These include the Rudder Theatre, one of the venues inside the Rudder Theatre Complex. *Id.* ¶¶ 28–30. These venues supplement the classrooms on campus, providing students with spaces to present their own artistic, cultural, and political events—where students can "gain exposure to diverse political thoughts and viewpoints different from their own." *Id.* ¶¶ 28–29. Tracking its "Expressive Activity on Campus" policy, *id.* ¶¶ 26–27, the University provides content-neutral regulations for using the

3

Rudder Theatre, *id.* ¶¶ 33–34. And it places no limit on content or subject matter. *Id.* ¶¶ 33–35. In fact, the University holds Rudder Theatre out as suitable for "events such as Broadway productions, concerts, variety shows, movies, lectures, conferences, commencement ceremonies, and recitals." *Id.* ¶ 36.

Past and upcoming events in the Rudder Theatre Complex venues include performances of the Broadway musicals *Chicago* and *Hadestown*, each employing "mature themes," and *The Cher Show*, featuring women in risqué costumes. *Id.* ¶ 38(a), (g), (h). Students also use the Rudder Theatre to hold an annual "Miss Black & Gold" women's pageant. *Id.* ¶ 38(b). Students and community members seeking entertainment can attend concerts (whether by a jazz ensemble, South Korean pop group, or Brazilian pianist), musical theatre (including student productions of *Swan Lake* and *Oklahoma!*), or comedy shows. *Id.* ¶ 38. And student organizations use it to host religious and political meetings, like an appearance by commentator Ben Shapiro, who denounced "transgressivism" by the LGBTQ+ community during his speech. *Id.* ¶ 38(c)–(f).

### *Student-created* **Draggieland** *repeatedly sells out the 750-seat Rudder Theatre.*

*Draggieland*—a fusion of the words "drag" and "Aggieland"—is a drag performance that Queer Empowerment Council holds annually at the Rudder Theatre. *Id.* ¶ 39. *Draggieland*, a themed event, features performers who don clothing and makeup that often, but not always, runs counter to their expected gender identity. *Id.* ¶¶ 41–44. They perform choreographed routines set to music and lighting, advancing a chosen theme. *Id.* ¶ 45. After their performance, the host interviews them about what drag and LGBTQ+ culture means to them. *Id.* ¶ 47.

Crafting *Draggieland* requires significant preparation. Students appoint judges and hold auditions of prospective performers and collaborate on costume, performance, set, and lighting design. *Id.* ¶¶ 41–45, 48–53. Students hold two rehearsals so the participants can familiarize

themselves with the layout of the theatre and identify potential problems they might encounter during the performance. *Id.* ¶¶ 51–53.

*Draggieland* is an important expressive event for the Council and the LGBTQ+ members of the Texas A&M community. *Id.* ¶¶ 71–73. *Draggieland* allows students to embrace their identities, to engage in expression transgressing societal norms (including norms relating to gender and sexuality), and to educate the broader community about LGBTQ+ culture. *Id.* ¶ 73. Since the first-annual *Draggieland* in February 2020, the show has repeatedly sold out the 750-seat Rudder Theatre. *Id.* ¶¶ 54, 56.

Texas A&M students established the Queer Empowerment Council in March 2023 after the University withdrew its own sponsorship for *Draggieland*. *Id.* ¶¶ 58, 63. The Queer Empowerment Council now privately funds *Draggieland*—and other student events the University administration no longer supports—using funds and ticket sales from past *Draggieland* performances. *Id.* ¶¶ 59–60, 63–68. *Draggieland* 2025 receives no government funding. *Id.* ¶ 66. Instead, the student organizers pay for the costs of the venue, staffing, rental of stage equipment, and the presence of campus police. *Id.* ¶ 67.

*Draggieland* 2025 is scheduled for March 27 at 7:30 p.m., with a final rehearsal the day before. *Id.* ¶¶ 76, 79. In May 2024, students took steps to book the theatre for rehearsals and the performance, and the university administration gave its final stamp of approval in October. By the time the Board of Regents convened to ban drag shows, Texas A&M University had listed *Draggieland* as "Approved," and the Rudder Theatre began selling tickets. *Id.* ¶¶ 76, 77.

### *The Texas A&M System's Board of Regents abruptly bans drag shows, despite* Draggieland *2025 having long been approved.*

On February 28, 2025, the Texas A&M University System Board of Regents held a special telephonic meeting, at which it adopted a "Resolution Regarding Certain Public Events on the

Campuses of Universities in The Texas A&M University System" (the "Drag Ban Resolution"). *Id.* ¶¶ 80, 82, Ex. 1. The Drag Ban Resolution asserts that the Board Defendants believe "Drag Show Events" are contrary to the institution's "values" because they are "meant to parody" women, that drag shows "demean[] women," and that drag shows are "likely to create or contribute to a hostile environment for women" because they "involve the mockery or objectification of women." *Id.* ¶ 82, Ex. 1.

The Drag Ban Resolution also invokes an Executive Order issued by President Trump, titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." *Id.* ¶ 84; Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025). The Resolution asserts that the Executive Order prohibits using federal funds to "promote gender ideology" and that, because Texas A&M receives unidentified federal funding, "the use of facilities at Universities for Drag Show Events may be considered promotion of gender ideology in violation of the Executive Order[.]" *Id.* ¶¶ 82, 85–86, Ex. 1. The Resolution does not identify any federal funding relevant to *Draggieland*. *Id.*

The Drag Ban Resolution directed Chancellor Sharp and President Welsh to immediately "cancel any upcoming Drag Show Events." *Id.* ¶ 87. The afternoon the resolution passed, Chancellor Sharp issued a memorandum directing the presidents of Texas A&M University System institutions, including President Welsh, "to take actions to cancel any 'Drag Show Events'" and "prompt action to implement the directives" in the Drag Ban Resolution. *Id.* ¶¶ 88–89, Ex. 2. Later that day, the administration informed the Queer Empowerment Council via email that "your event, Draggieland 2025, will not be permitted on campus." *Id.* ¶ 90.

## ARGUMENT

**I.**    **Plaintiff Is Likely to Succeed on the Merits Because the Drag Ban Is a Viewpoint-Based Ban and Prior Restraint.**

When Americans use theatre stages to express themselves, the First Amendment protects them, even if the performances are not a government official's cup of tea. *Se. Promotions*, 420 U.S. at 557. That is why the First Amendment protects drag performance, including in campus public forums like Rudder Theatre at Texas A&M. By preemptively banning drag performance across the Texas A&M System just because the Board of Regents believes drag "promotes gender ideology" and fears it "demeans women," Texas A&M discriminates against viewpoints and imposes a prior restraint on protected expression, triggering strict scrutiny, *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015), which Defendants cannot satisfy.

### A.    The First Amendment protects drag performances.

In his recent decision in *Woodlands Pride*, Judge Hittner explained that the First Amendment protects drag performance because they "express either pure entertainment or, like most types of expressive art, an underlying deeper message. (Such as music, theater, and poetry)." 694 F.Supp.3d at 843; *see also Norma Kristie, Inc. v. City of Oklahoma City*, 572 F.Supp. 88, 91 (W.D. Okla. 1983) (holding drag shows are protected First Amendment expression); *S. Utah Drag Stars v. City of St. George*, 677 F.Supp.3d 1252, 1286 (D. Utah 2023) (same). This Court should follow Judge Hittner's lead and reaffirm First Amendment protection for drag performances.

The Supreme Court has "long recognized" the First Amendment's "protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). As Justice Thomas explained, the First Amendment protects "a wide array of conduct that can qualify as expressive, including nude dancing, burning the American flag … wearing a black armband, conducting a

silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 657 & n.1 (2018) (Thomas, J., concurring).

The First Amendment's protection for expressive conduct is perhaps nowhere more robust than on stage. "Since time immemorial," theatrical performance has "played an important part in the entertainment and the education of the people of the world," whether the performance is high-brow or "crude and amateurish." *Schacht v. United States*, 398 U.S. 58, 61–62 (1970) (holding a viewpoint-discriminatory prohibition on the use of a military uniform in theatre violated the First Amendment). And in *Southeastern Promotions*, the Supreme Court reaffirmed that the First Amendment protects stage performance, because theatre, like film, is not "subject to a drastically different standard" under the First Amendment. 420 U.S. at 557–58 (citing *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)).

That lack of a constitutional distinction makes sense. Whatever the genre, stage performances like drag shows are inherently expressive, and have been since the Ancient Greeks took the Athenian stage and Shakespeare's plays were performed in Elizabethan England. And of course, the First Amendment protects inherently expressive conduct. *Johnson*, 491 U.S. at 406. That includes drag shows, which "express a litany of emotions and purposes, from humor and pure entertainment to social commentary on gender roles." *Woodlands Pride*, 694 F.Supp.3d at 843.

The specific context of *Draggieland* cements why the First Amendment protects it. *Johnson*, 491 U.S. at 405–06. In organizing *Draggieland*, the Council intends to convey a message of support for the LGBTQ+ community on campus. Verified Compl. ¶¶ 13–14. An audience sitting in a theatre—with a stage, lighting, music, choreographed routines, and on-stage dialogue—will have all the cues necessary to know *Draggieland* performers are communicating *some* message, even if they might not always agree on the specific message conveyed. *See Hurley v. Irish-Am.*

8

*Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995) (A "narrow, succinctly articulable message is not a condition of constitutional protection…."). And here, the Board of Regents understands *Draggieland* to be expressive: It insists drag performance "promotes gender ideology," a message that it finds objectionable. Verified Compl. ¶¶ 7, 82, 85, Ex. 1.

First Amendment protection for drag performance does not waver on public university campuses. Long-settled decisions "leave no room for the view that … First Amendment protections should apply with less force on college campuses than in the community at large," and its protection is "nowhere more vital." *Healy*, 408 U.S. at 180 (quoting *Shelton*, 364 U.S. at 487). The First Amendment rightly deprives university officials of the authority to separate student expression in "good taste" from that which is "offensive." *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam). As the Fourth Circuit correctly concluded, the First Amendment protects stage entertainment at a public university even if administrators find it "low quality" and "crude." *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 389, 388–92 (4th Cir. 1993) (although administrators believed fraternity's "ugly woman contest," in which men "dressed as caricatures of different types of women," was contrary to the university's "values" of "equal treatment, respect for diversity, and individual dignity," the show was protected expressive conduct).

In short, drag shows, like other forms of theatrical performance, are expressive conduct, that enjoys full protection of the First Amendment, no matter if the Board of Regents thinks drag "promotes gender ideology" or "demeans women."

### B.    The Drag Ban is quintessential viewpoint discrimination.

When the "rationale" officials offer for a regulation is "the specific motivating ideology or the opinion or perspective of the speaker," that is classic viewpoint discrimination, "an egregious form of content discrimination" that is "presumed to be unconstitutional." *Rosenberger*, 515 U.S.

at 828–29. The Board of Regents' Drag Ban is no exception, censoring drag performance because they perceive it is "promoting gender ideology" and "demeaning women."

Defendants are violating the Constitution by banning *Draggieland* from any campus space, no matter how they characterize drag performance, because the ban is viewpoint discriminatory. Start with *Rosenberger*. In striking down a restriction on religious student speech at a public university, the Supreme Court affirmed that administrators engage in viewpoint discrimination when they limit speech based on its "motivating ideology or the opinion … of the speaker." *Id.* at 829. The Drag Ban maps so closely onto to the Court's description of viewpoint discrimination that it could be a verbatim quote: The Board of Regents is banning drag shows because it believes the shows "promote gender ideology." Verified Compl. ¶¶ 82, 85, Ex. 1. That is textbook viewpoint discrimination, and the Court had no patience for its imposition on at a public university: "For the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Rosenberger*, 515 U.S. at 836.

The Supreme Court's decision in *Papish* also dooms the Drag Ban. There, administrators sanctioned a student for distributing newspapers prominently featuring profane headlines and a political cartoon of "policemen raping the Statue of Liberty." *Papish*, 410 U.S. at 667. But the Court rejected the notion that administrators can separate the wheat from the offensive chaff, holding that "no matter how offensive to good taste," public university administrators cannot censor expression "on a state university campus … in the name alone of 'conventions of decency.'" *Id.* at 670. No matter how subjectively "demeaning" and "mocking" the Board of Regents views drag performances, *Papish* makes clear that the First Amendment requires the show to go on.

Echoing the same principles, the Fourth Circuit rejected a public university's attempt to punish a fraternity's "Ugly Woman Contest." *Iota Xi*, 993 F.2d at 392. When fraternity brothers dressed up as "caricatures" of women, administrators cited the university's anti-discrimination policies, its "mission" and "values," and its status as "a recipient of federal funds," to justify the sanctions they imposed on the students. *Id.* at 388–89. While campus administrators interpreted the event as conveying "that racial and sexual themes should be treated lightly," the Fourth Circuit held the university engaged in unconstitutional viewpoint discrimination because "the 'ugly woman contest'…ran counter to the views the University sought to communicate to its students and the community." *Id*. at 392–93. University leaders can enunciate their own values, but the First Amendment guarantees students the right to express their own tastes.

*Iota Xi* confirms an important rule: Viewpoint discrimination occurs when the government regulates speech because it finds the message conveyed by the speech—whether that message is the one the speaker intends, or the one the government perceives—to be subjectively offensive. As the Fifth Circuit recently held, government officials' regulation based on "subjective judgment that the content" is "offensive or inappropriate" unconstitutionally discriminates based on viewpoint. *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 582 U.S. 218, 243 (2017).). So even if officials find drag shows offensive, that does not justify banning them. After all, "[g]iving offense is a viewpoint." *Matal*, 582 U.S. at 243.

As the Supreme Court recently held, "the First Amendment extends to all persons engaged in expressive conduct," as part of an "enduring commitment to protecting the speech rights of all comers, no matter how controversial—or even repugnant—many may find the message at hand." *303 Creative LLC v. Elenis*, 600 U.S. 570, 600–01 (2023). The viewpoint-based Drag Ban is unconstitutional and the Court should enjoin its enforcement.

And the Drag Ban is all the more unconstitutional because it excludes the Queer Engagement Council's expression from a *designated* public forum, where limits on content are subject to the highest constitutional skepticism. Queer Engagement Council intends to host *Draggieland* at Rudder Theatre, a venue the University opened by policy and practice to student organizations for expressive activity. Verified Compl. ¶¶ 25–38. That makes it a designated public forum on campus. *Pro-Life Cougars v. Univ. of Houston*, 259 F.Supp.2d 575, 582 (S.D. Tex. 2003) ("When as here, a University by policy and practice opens up an area for indiscriminate use … by some segment of the public, such as student organizations, such area may be deemed to be a designated public forum"); *see also Just. for All v. Faulkner*, 410 F.3d 760, 768–69 (5th Cir. 2005) (where a university opens a venue to expressive activity with only "minimal" limits on speech, that "broad … guarantee of expressive freedom" establishes a designated public forum).

In designated public forums, any content-based restriction is subject to strict scrutiny. *See Widmar v. Vincent*, 454 U.S. 263, 269–70 (1981) (applying strict scrutiny to denial of religious student group's use of a "generally open forum" at a public university campus). That's especially true here, because the Drag Ban excludes students "who fall[] within the class to which" Rudder Theatre "is reserved." *Just. for All*, 410 F.3d at 766–67 (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)). And viewpoint discrimination "is forbidden" in all public forums, even limited public forums. *Matal*, 582 U.S. at 243.

Whether the Rudder Theatre is a designated or limited public forum, the university's efforts to limit access to its stage are subject to strict scrutiny, and the university's interest in preventing offense is not a compelling one.

C.    **The Drag Ban is an unconstitutional prior restraint, highlighting why this Court's swift intervention is vital.**

By silencing *Draggieland* before anyone took the stage, the Drag Ban is a classic prior restraint, the "most serious and … least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). A prior restraint on student expression carries "a heavy presumption against its constitutionality," a burden Defendants cannot overcome. *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984) (citation and internal quotation marks omitted).

*Southeastern Promotions* controls. There, the Supreme Court concluded that city officials imposed a prior restraint by excluding the musical *Hair* from a municipal theater because the show did not fit the city's requirement for entertainment to be "clean and healthful and culturally uplifting." 420 U.S. at 549. The Drag Ban imposes a similar prior restraint: The Board of Regents thinks drag performance "promote[s] gender ideology" and "demeans women," so it is banned from campus. Verified Compl. ¶ 82, Ex. 1.

Under *Southeastern Promotions*, Defendants cannot bar stage performances "in advance of actual expression," unless they meet two stringent requirements. First, the performance "must fit within one of the narrowly defined exceptions" to the First Amendment, like obscenity; and second, any scheme for preemptively banning the performance must be "bounded" by "narrow, objective, and definite standards." 420 U.S. at 553, 559 (quoting, in part, *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)). Defendants can meet neither requirement.

The Drag Ban does not hint at obscenity. Nor could it. According to the Board of Regents, "Drag Show Events" involve "biological males" choosing what "women's clothing" to *put on* and perform in. Verified Compl. ¶ 82, Ex. 1. They do not involve nudity, let alone the type of depiction satisfying the constitutional test for obscenity. *See Miller v. California*, 413 U.S. 15, 24 (1973)

(unprotected obscenity must "appeal to the prurient interest in sex," "portray sexual conduct in a patently offensive way," and "not have serious literary, artistic, political, or scientific value").

The Drag Ban is also not bounded by narrow, objective, and definite standards, because the Board of Regents vests unfettered authority in Texas A&M officials to determine what qualifies as "drag" expression, whether that's *Draggieland*, Shakespeare's *The Taming of the Shrew* or *The Merry Wives of Windsor*, or an adaptation of Disney's *Mulan*. Verified Compl. ¶ 82, Ex. 1. For instance, the Drag Ban prohibits events that "demean women" or are "lewd." *Id.* Those subjective terms unconstitutionally vest campus officials with power to arbitrarily prohibit speech *before* it occurs. *Se. Promotions*, 420 U.S. at 560–61 (striking down prior restraint that turned on official's view of what was "culturally uplifting or healthful"); *see also Pro-Life Cougars*, 259 F.Supp.2d at 583–84 (granting preliminary injunction against campus prior restraint).

As the Supreme Court has explained, a "free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand," when "the risks of freewheeling censorship are formidable." *Se. Promotions*, 420 U.S. at 559. Defendants have taken exactly the opposite—and unconstitutional—approach, banning *Draggieland* before a single performer could take the campus stage. That prior restraint highlights an ongoing threat to free expression: public university officials blocking student speech for ideological reasons. Our "current national condition" has seen administrators "in a spirit of panicked damage control" trade expressive principles for "hasty and disproportionate punishment." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 339 (5th Cir. 2020) (citation and internal quotation marks omitted). The prior restraint at Texas A&M exemplifies that threat, and this Court should swiftly enjoin it.

**D.        The Drag Ban cannot survive strict scrutiny.**

In public forums like Rudder Theatre, viewpoint discrimination "is forbidden." *Matal*, 582 U.S. at 243. With that, and the heavy presumption against prior restraints, the Court need go no further to enjoin the Drag Ban. In any case, strict scrutiny dooms the Drag Ban. Defendants cannot show the ban is "necessary to serve a compelling state interest" and narrowly tailored to achieve that purpose using the least speech-restrictive means. *Widmar*, 454 U.S. at 270.

Public university officials never have a compelling interest in banishing a category of protected expression from campus as the Board of Regents has done here. Disagreement with a perceived message is never a legitimate governmental interest, let alone a compelling one. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 579–80 (2011). The Supreme Court rejected a similar viewpoint-driven speech restriction in *Widmar*, explaining that singling out a Christian student group from facilities "available for … registered student groups" was subject to "the most exacting scrutiny." *Widmar*, 454 U.S. at 264–65, 276. Because the university "discriminated against student groups and speakers based on their desire to use a generally open forum to engage in" protected expression, the Supreme Court concluded that the university's stated goal, "achieving greater separation of church and State," was not a compelling interest. *Id*. at 269, 276.

In the same way, the Board of Regents' hand-wringing over "mockery or objectification of women" is not a compelling interest. Drag shows present no tangible harm to women—and Defendants cannot show otherwise.

Likewise, the Board of Regents' concerns about a "hostile environment" and harassment under Title IX are unavailing. As then-Judge Alito observed in striking down a harassment policy challenged by religious students, there "is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001). To prevent federal anti-discrimination law from morphing into an all-purpose campus

speech code, courts have carefully defined hostile-environment harassment, requiring that the conduct be *so* "severe, pervasive, and objectively offensive" that it effectively denies a student access to educational opportunities. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999).[2] *Draggieland* comes nowhere close to satisfying this standard.

To start, *Draggieland* is an annual event—that's not "pervasive." Nor is it "objectively offensive" to attendees voluntarily entering a ticketed event in an enclosed theatre. Those attendees are not denied access to an event; they are *trying to* access it. And a theatrical event is not "severe" conduct that would prevent any student from attending classes or participating in campus activities. A public university campus is not a "safe space" from ideas, and *Draggieland* in no way creates a hostile environment for any student as that phrase is defined in law.  Defendants cannot justify the Drag Ban on a paternalistic desire to shield students from speech the Regents find offensive.

The Board of Regents' asserted interest in following the Executive Order banning the "promotion of gender ideology" fares no better as a compelling interest. For one thing, the Executive Order is directed at federal agencies, not state public universities. Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025). And even if it applies, the Executive Order merely states that "Federal funds shall not be used to promote gender ideology." *Id.* at § 3(g). *Draggieland*, conversely, is entirely funded through the *Council's* own funds that it raises. Verified Compl. ¶¶ 16, 65–66. It receives no funding from Texas A&M. *Id.* ¶ 66. And the University has an unyielding obligation to uphold its students' First Amendment rights, not trot out an irrelevant Executive Order as pretext for censoring protected expression its officials dislike.

---

[2] Noting that speech restrictions "governing 'rude,' 'uncivil,' 'harassing,' or 'offensive' speech can in fact cover speech otherwise protected by the First Amendment," the Fifth Circuit has even questioned whether campus anti-discrimination codes may lawfully permit "purely verbal harassment claims." *Speech First*, 979 F.3d at 337 & n.16.

While the Drag Ban targets "sexualized, lewd, and vulgar conduct," that also does not make out a compelling interest in banning drag shows. The Supreme Court all but settled in *Papish* that censoring speech on a state university campus in the name of "lewdness" does not serve a compelling interest. 410 U.S. at 669–70. And in all cases, concerns about potential "lewdness" do not justify blocking a stage performance before it occurs. *Se. Promotions*, 420 U.S. at 555.

A compelling interest demands more than what the Board of Regents offers, for good reason. Permitting public university officials to quash speech on flimsy concerns about harassment or federal funds would imperil protected campus expression from political speech to pure entertainment. *DeJohn v. Temple Univ.*, 537 F.3d 301, 316–20 (3d Cir. 2008) (harassment policy would reach "'core' political and religious speech, such as gender politics").

Not only do Defendants fail the compelling interest requirement, but they also fail the narrow tailoring and the least-restrictive means requirements. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (content-based regulation must "choose the least restrictive means to further the articulated interest" (cleaned up)). A content-based law is not narrowly tailored if it leaves untouched a significant amount of expression causing the same problem. *Reed*, 576 U.S. at 172. That's exactly what the Drag Ban does, leaving untouched music, visual art, books, cheerleading, or other campus expression that some might think "demeans women," is "sexualized," or "promotes gender ideology." *See Iota Xi*, 993 F.2d at 393 ("[A] public university has many constitutionally permissible means to protect female and minority students" short of censorship.) Just consider the recent "Miss Black and Gold" pageant at Rudder Theatre, which some may argue objectifies women but remains unscathed by the Drag Ban. Verified Compl. ¶ 38(b).

17

Exiling protected expression from a university campus just to shield some from certain viewpoints is neither narrowly tailored nor a least restrictive means. Instead, those who find a drag show "demeaning" or "lewd" can choose not to attend and "effectively avoid further bombardment of their sensibilities simply by averting their eyes." *Cohen v. California*, 403 U.S. 15, 21 (1971). As the Supreme Court observed, the First Amendment "leaves matters of taste and style so largely to the individual," because government officials "cannot make principled distinctions" between what is "palatable" or "distasteful." *Id*. at 25. The Board of Regents is no different.

## II. Without an Immediate Temporary Restraining Order, Plaintiff Will Suffer Irreparable Harm to Its First Amendment Freedoms.

Without immediate injunctive relief, *Draggieland* will not see the campus stage on March 27 as planned—and as the First Amendment guarantees. That "loss of First Amendment freedoms … unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. And that is not the limit of irreparable injury the Council faces. It fills a unique expressive role on campus, advocating a message of support for the LGBTQ+ community. Verified Compl. ¶¶ 71–72.

The Drag Ban is chilling the Council's advocacy every day it remains in place. And if the Drag Ban ends up forcing the Council to move *Draggieland* off-campus, the students' expressive rights will suffer even more. Much of the Council's intended campus audience may be less willing to attend off-campus. So not only will moving off-campus harm the Council by forcing them to spend considerable funds securing an outside venue, but it will also harm its ability to raise funds through ticket sales. *Id.* ¶ 65. The only alternative is a stark one—self-censorship.

The Council is ready, prepared, and willing to go forward with *Draggieland* on March 27. Only Defendants' blanket ban on protected expressive stands in the way. This Court's immediate action is the sole remedy to prevent irreparable harm here.

### III.    Ensuring Public Universities Do Not Stifle Campus Expression on a Viewpoint-Discriminatory Basis Is Vital to the Public Interest.

The balance of equities and the public interest favor the Council, especially with the glaring unconstitutionality of the Drag Ban. These factors "merge when," as here, "the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (quoting *Walker,* 453 F.3d at 859).

An injunction here especially favors the public interest, because "the vigilant protection of constitutional freedoms is nowhere more vital" than public university campuses, as they are "peculiarly the 'marketplace of ideas.'" *Healy*, 408 U.S. at 180–81 (quoting *Shelton*, 364 U.S. at 487). The State of Texas agrees. In 2019, it enacted a campus free speech law forbidding universities from "tak[ing] action against a student organization or deny[ing] the organization any benefit generally available to other student organizations at the institution on the basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization or of any expressive activities of the organization." Tex. Educ. Code § 51.9315(g).

The state's campus free speech laws only underscore why Defendants' prior restraint on certain viewpoints hinders the public interest. While the government might have an interest in keeping hostile environments off campus, they must protect free expression by meeting that interest under the *Davis* standard—not under ideological litmus tests, as the Drag Ban does.

### IV.    The Court Should Waive a Bond Requirement.

Plaintiffs are litigating in the public interest to vindicate First Amendment rights, "an area in which the courts have recognized an exception to the Rule 65 security requirement." *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981). The Court should thus waive Rule 65's bond requirement here.

## V.    A TRO Is Necessary and Justified.

The Court should grant a TRO if it cannot grant a preliminary injunction before March 27, because it will both preserve the status quo and prevent irreparable harm to Plaintiff until the court makes a final decision on injunctive relief. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda County*, 415 U.S. 423, 439 (1974). Here, the status quo is clear-cut. The Council, as it has in years past, has properly reserved a campus forum for rehearsing and hosting *Draggieland*. Verified Compl. ¶¶ 74–77. And as they have in years past, campus staff readily approved the reservation request. *Id.* ¶ 77.

The Court should halt the Board Defendants' subjective, eleventh-hour censorship from upsetting the status quo, especially given the Council's undoubted First Amendment freedoms at stake. And with immediate irreparable harm to those freedoms on the horizon absent this Court's intervention, the need for injunctive relief before March 27 is even more necessary.

## <u>CONCLUSION</u>

For all these reasons, Plaintiff asks that the Court grant its motion for a temporary restraining order and a preliminary injunction.

Dated: March 5, 2023

Respectfully submitted,

/s/ JT Morris
JT Morris (Tex. Bar No. 24094444; S.D. Tex.
    Bar No. 3163670)
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION (FIRE)
(215) 717-3473
700 Pennsylvania Ave., Suite 340
Washington, DC 20003
jt.morris@thefire.org

Adam Steinbaugh (Cal. Bar No. 304829)*
Jeffrey D. Zeman (Mich. Bar No. P76610)*
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION (FIRE)

510 Walnut St., Suite 900
Philadelphia, PA 19106
adam@thefire.org
jeff.zeman@thefire.org

*\* Pro hac vice motion forthcoming*

**Attorneys for Plaintiff**
**Texas A&M Queer Empowerment Council**

**CERTIFICATE OF COMPLIANCE WITH LR7.1(D)**

The undersigned certifies the movant has conferred with the respondent and that counsel

for respondents cannot agree about the disposition of this motion.

/s/ JT Morris

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 5th day of March, 2025, a true and correct copy of Plaintiff's motion was served via the CM/ECF system to all counsel of record. The undersigned also certifies that efforts are being made to promptly serve this motion via service of process to all Defendants who have not yet appeared or agreed to accept service via e-mail, and that a copy of this motion was sent by email to:

Zachary Berg
Special Counsel
Special Litigation Division
Office of the Texas Attorney General
P.O. Box 12548 (MC 009)
Austin, TX 78711-2548
Phone: (512) 936-1808
Fax: (512) 457-4410
zachary.berg@oag.texas.gov

/s/ *JT Morris*

23