# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| TEXAS A&M QUEER EMPOWERMENT COUNCIL,<br><br>      *Plaintiff*,<br><br>v.<br><br>WILLIAM "BILL" MAHOMES, ROBERT L. ALBRITTON, DAVID C. BAGGETT, JOHN W. BELLINGER, JAMES R. "RANDY" BROOKS, JAY GRAHAM, MICHAEL A. "MIKE" HERNANDEZ III, MICHAEL J. PLANK, SAM TORN, and CAGE SAWYERS in their official capacities as members of the Board of Regents of the Texas A&M University System; JOHN SHARP, in his official capacity as Chancellor of the Texas A&M University System, and MARK A. WELSH III, in his official capacity as President of Texas A&M University,<br><br>      *Defendants.* | CASE NO. 4:25-cv-992 |

---

## DEFENDANTS' RESPONSE TO MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

---

## TABLE OF CONTENTS

Index of Authorities ....................................................................................................... iii

Introduction ................................................................................................................... 1

Facts ............................................................................................................................... 2

Standard .......................................................................................................................... 4

Summary of Argument ................................................................................................. 5

Argument ....................................................................................................................... 6

    I.  Plaintiff is not substantially likely to succeed on the merits of the underlying case ............ 6

        A.  Drag shows are not inherently expressive .................................................... 6

        B.  Lewd speech and conduct on campus are not protected by the First Amendment ........................................................................................................ 9

        C.  Defendants are not engaged in unlawful viewpoint discrimination. ........................... 11

        D.  No controlling authority holds that drag shows are protected by the First Amendment ....................................................................................................... 12

        E.  Rudder Theatre is a limited public forum. ................................................. 14

        F.  To the extent that the Court finds that the First Amendment is implicated, Plaintiff has not shown that Defendants cannot pass intermediate or strict scrutiny ..................................................................................................................... 16

    II.  Plaintiff cannot show irreparable harm ......................................................... 17

    III. The threatened injury to the movant does not outweigh the threatened harm to the non-movant, and granting an injunction will disserve the public interest ........................ 18

Conclusion ..................................................................................................................... 20

Certificate of Service ..................................................................................................... 2

INDEX OF AUTHORITIES

<u>Cases</u>

*Anderson v. Jackson*,

556 F.3d 351 (5th Cir. 2009) ............................................... 4, 18

*Bd. of Dirs. of Rotary Intern. v. Rotary Club of Duarte*,

481 U.S. 537 (1987) ............................................................ 17

*Bethel Sch. Dist. No. 403 v. Fraser*,

478 U.S. 675 (1986) ......................................................... 9, 10

*Canady v. Bossier Par. Sch. Bd.*,

240 F.3d 437 (5th Cir. 2001) ................................................... 8

*Christian Legal Soc'y v. Walker*,

453 F.3d 853 (7th Cir. 2006) .................................................. 19

*Church of Am. Knights of the KKK v. Kerik*,

356 F.3d 197 (2d Cir. 2004) .................................................... 6

*City of Dallas v. Stanglin*,

490 U.S. 19 (1989) .............................................................. 6

*Clark v. Cmty. for Creative Non-Violence*,

468 U.S. 288 (1984) ............................................................. 6

*Clark v. Prichard*,

812 F.2d 991 (5th Cir. 1987) ................................................... 5

*Cohen v. California,*

403 U.S. 15 (1971) .............................................................. 7

*Fairchild v. Liberty Indep. Sch. Dist.*,

597 F.3d 747 (5th Cir. 2010) ............................................... 14, 15

*Farmer v. Kansas State Univ.*,

918 F.3d 1094 (10th Cir. 2019) ............................................... 19

*Gebser v. Lago Vista Indep. Sch. Dist.*,

    524 U.S. 274 (1998) ........................................................................................................ 19

*Good News Club v. Milford Cent. Sch.*,

    533 U.S. 98 (2001) .......................................................................................................... 15

*In re Alabama & Dunlavy, Ltd.*,

    No. 4:16-cv-0283, 2017 WL 8677361, at \*1 (S.D. Tex. Nov. 9, 2017) ......................... 4

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,

    993 F.2d 386 (4th Cir. 1993) .................................................................................... 13, 14

*Lackey v. Stinnie*,

    No. 23-621, 2025 WL 594737, at \*1 (U.S. Feb. 25, 2025) ........................................... 4

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*,

    508 U.S. 384 (1993) ........................................................................................................ 14

*Martin v. Parrish*,

    805 F.2d 583 (5th Cir. 1986) .......................................................................................... 10

*Mayo Found. for Med. Educ. & Research v. BP Am. Prod. Co.*,

    447 F. Supp. 3d 522 (N.D. Tex. 2020) ............................................................................ 5

*Nat'l Press Photographers Ass'n v. McCraw*,

    84 F.4th 632 (5th Cir. 2023) ............................................................................................ 8

*Nken v. Holder*,

    556 U.S. 418 (2009) .......................................................................................................... 5

*Norma Christie v. City of Okla. City*,

    572 F. Supp. 88 (W.D. Okla. 1983) .......................................................................... 12, 13

*Norman Bridge Drug Co. v. Banner*,

    529 F.2d 822 (5th Cir. 1976) ............................................................................................ 4

*Papish v. Bd. of Curators of Univ. of Missouri*,

    410 U.S. 667 (1973) .....................................................................................................7, 13

*Pederson v. La. State Univ.*,

213 F.3d 858 (5th Cir. 2000) ................................................................................. 17

*Reed v. Town of Gilbert,*

576 U.S. 155 (2015) ............................................................................................ 16

*Rumsfeld v. FAIR,*

547 U.S. 47 (2006) .............................................................................................. 8

*S. Utah Drag Stars v. City of St. George,*

677 F.Supp.3d 1252 (D. Utah 2023) .................................................................. 13

*Se. Promotions, Ltd. v. Conrad,*

420 U.S. 546 (1975) .................................................................................. 7, 11, 12

*Spectrum WT v. Wendler,*

693 F. Supp. 3d 689 (N.D. Tex. 2023) ................................................................ 6

*Spence v. State of Wash.,*

418 U.S. 405 (1974) ............................................................................................ 6

*Texans for Free Enter. v. Tex. Ethics Comm'n,*

732 F.3d 535 (5th Cir. 2013) ............................................................................. 19

*Texas v. Johnson,*

491 U.S. 397 (1989) ................................................................................. 6, 8, 11

*United States v. Alvarez,*

567 U.S. 709 (2012) ............................................................................................ 9

*Univ. of Texas v. Camenisch,*

451 U.S. 390 (1981) ............................................................................................ 4

*Voting for Am., Inc. v. Steen,*

732 F.3d 382 (5th Cir. 2013) .............................................................................. 8

*Widmar v. Vincent,*

454 U.S. 263 (1981) .......................................................................................... 14

*Williams-Yulee v. Fla. Bar,*

575 U.S. 433 (2015) .......................................................................................... 16

*Woodlands Pride, Inc. v. Paxton*,

694 F.Supp.3d 820 (S.D. Tex. 2023) ....................................................... 9

## Statutes

20 U.S.C. § 1681(a) .................................................................................. 3

Tex. Educ. Code § 51.9315 ...................................................................... 15

Tex. Educ. Code § 51.9315(g) .................................................................. 11

## Other Authorities

Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ..................... 2

Tex. S.B. 12, 88th Leg., R.S. (2023) ......................................................... 9

Tex. S.B. 18, 86th Leg., R.S. (2019) ......................................................... 15

## INTRODUCTION

Plaintiff seeks a temporary restraining order, or alternatively, a preliminary injunction, wrongly asserting an absolute First Amendment right to conduct a "drag show"—an event that is open to the public, lewd, and demeaning to women—in a campus facility of Texas A&M University. Texas A&M has barred such shows from its limited public forums on the grounds that such shows are vulgar and create a hostile environment for female students, in violation of the University's anti-discrimination policy and Title IX. Plaintiff can show no likelihood of success on the merits at trial because it is fundamentally incorrect about the nature of the right it claims. Drag shows in fact are not protected expression, lewd speech on campus is not protected by the First Amendment, there is no binding authority to the contrary, Plaintiff does not seek access to a designated public forum, and Defendants do not fail intermediate or strict scrutiny.

But this Court does not even need to reach the merits of this question to dispose of Plaintiff's request for injunctive relief. At this stage of litigation, the only question before this Court is whether Plaintiff is entitled to the extraordinary remedy that is injunctive relief before March 27, the date on which it was to host "Draggieland" in Texas A&M's Rudder Theatre. This Court should answer that question in the negative. Plaintiff has already, by its actions, disavowed its intent to host a drag show in Rudder Theatre on March 27. It has already refunded all tickets sold for that venue on that date. And it has stated that it is actively exploring options to reschedule or relocate the event. Plaintiff's pleadings tell one story—that it fully intends to go forward with Draggieland, in Rudder Theatre, on March 27—but its actions tell quite another: that Plaintiff will suffer no irreparable harm in the absence of injunctive relief, because it has already abandoned the once-planned event that is the object of its still-live request for injunction.

By contrast, Texas A&M will be irreparably harmed if this Court issues injunctive relief ordering it to host Draggieland in Rudder Theatre or in any of its limited public forums. Texas A&M is bound by a federal Executive Order and a state gubernatorial Directive which, collectively, put at risk a substantial portion of Texas A&M's budget if Defendants are forced to expend resources to hosting a drag show. This immense harm to Defendants from an injunction outweighs

the minimal harm to Plaintiff resulting from denial of an injunction. As such, Plaintiff cannot satisfy the merged balance of equities and public interest factors and thus cannot succeed on their motion for injunctive relief.

FACTS

President Trump on January 20, 2025, signed an Executive Order entitled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth in the Federal Government." *See* Ex. A, Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025). This Executive Order, among other things, directs that "federal funds shall not be used to promote gender ideology." Section 3(e) states that agencies "shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." Section 3(g) provides that "(e)ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." On January 30, 2025, Governor Abbott likewise sent a letter to Texas state agency heads directing them to follow federal and state law, including the foregoing Executive Order by President Trump, "rejecting . . . efforts by the Biden-Harris Administration to distort commonsense notions of biological sex." *See* Ex. A. On February 4, 2025, the Office for Civil Rights (OCR) at the United States Department of Education issued a "Dear Colleague" letter, stating that "ED and OCR must enforce Title IX consistent with President Trump's Order." *See* Ex. B, Letter from Governor Greg Abbott to State Agency Heads (January 30, 2025).

On February 28, 2025, the Texas A&M System Board of Regents met and adopted a resolution banning "drag show" performances that violated certain and specific parameters from taking place on any of its eleven university campuses. *See* Ex. C, Resolution Regarding Certain Public Events on the Campuses of Universities in The Texas A&M University System ("Resolution"). The Resolution noted that "both the System and the Universities receive significant federal funding" and that use of university facilities for drag shows could be considered violations of President Trump's Executive Order and Governor Abbott's directive. *Id.* at 2. The Resolution describes A&M on-campus venues as "limited forums for the purpose of promoting

2

the mission of the System to provide education, conduct research, commercialize technology, offer training, and deliver services for the people of Texas and beyond." *Id.* at 1.

The Resolution also finds that drag shows "are likely to create or contribute to a hostile environment for women" contrary to the A&M system's anti-discrimination policy and Title IX as they "often involve unwelcome and objectively offensive conduct based on sex for many members of the respective communities of the Universities, particularly when they involve the mockery or objectification of women." *Id.* at 1. Title IX provides, with certain exceptions, that: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Given the availability of alternative, off-campus venues nearby, *See* Ex. D ¶ 7, Declaration of Thomas W. Reber, the Resolution directs the A&M System Chancellor and all Member Presidents to take the actions necessary to implement the new policy, "including action to cancel any upcoming Drag Show Events and to review and . . . to revise the university's procedures for the use of its Special Event Venues to ensure compliance with (a) the policy expressed in this resolution, (b) the above-referenced Executive Order from President Trump and directive from Governor Abbott, and (c) other state and federal law, including Title IX and its promise of a discrimination-free educational environment." *See* Ex. C at 2. The Resolution lays out the five factors that an event must have to be considered a prohibited drag show: (1) it must "involve biological males dressing in women's clothing, (2) wearing exaggerated female makeup and/or exaggerated prosthetics meant to parody the female body type; (3) be open to the public; (4) involve sexualized, vulgar, or lewd conduct; and (5) involve conduct that demeans women." *Id.* at 1.

One event that fell under the Resolution's definition of a prohibited "drag show" was the event "Draggieland," hosted by Plaintiff, which was scheduled from March 27, 2025 at Rudder Theatre on the College Station campus of the Texas A&M system. Following the Resolution, Texas A&M University President Mark A. Welsh III instructed Interim Vice President for Student

Affairs Thomas W. Reber to cancel Draggieland 2025. *See* Ex. D ¶ 4. Plaintiff immediately announced that it was exploring options to reschedule or relocate the event. *See* Ex. E Nicholas Gutteridge, *Draggieland to reschedule or relocate, organizers say*, The Battalion (Feb. 28, 2025). On March 6, 2025, supporters of Draggieland held a protest at the Academic Plaza—in what University Rules identify as the "Lawrence Sullivan Ross Statue Area" designated public forum—dressed in costume, speaking in support of drag shows and sharing their opposition to Defendants' actions. *See* Ex. F, J.M Wise, *'A direct attack against queer individuals': Student protestors gather to support Draggieland, free speech*, The Battalion (March 6, 2025).

**STANDARD**

While the standards for issuance of temporary restraining orders and preliminary injunctions are identical, the two forms of injunctive relief serve distinct purposes. TROs are intended to preserve "for a very brief time, the status quo, so as to avoid irreparable injury pending a hearing on the issuance of a preliminary injunction." *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 829 (5th Cir. 1976); *See also In re Alabama & Dunlavy, Ltd.*, No. 4:16-cv-0283, 2017 WL 8677361, at *1 (S.D. Tex. Nov. 9, 2017) (issuing a TRO "to preserve the status quo pending a hearing on [Plaintiff's] request for a preliminary injunction"). Preliminary injunctions, in turn, are issued "to preserve the status quo until a trial can occur." *Lackey v. Stinnie*, No. 23-621, 2025 WL 594737, at *1 (U.S. Feb. 25, 2025) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Since there is a hearing scheduled in this case for March 18, 2025, and since Plaintiff's agreement to the scheduled hearing date demonstrates that no irreparable injury would occur absent immediate pre-hearing relief, the only remedy properly before this Court is Plaintiff's request for a preliminary injunction.

Even though the District Court has discretionary power to issue a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, injunctive relief "is an extraordinary and drastic remedy, and should only be granted when the movant has clearly carried the burden of persuasion." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (internal quotation omitted).

4

Absent extenuating circumstances, no District Court should issue a preliminary injunction unless one is necessary to protect the plaintiff from irreparable injury or to preserve the court's power to render a meaningful decision after a trial on the merits. *Mayo Found. for Med. Educ. & Research v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 527–28 (N.D. Tex. 2020).

Even within this limited locus of action, the District Court should grant preliminary injunctions only when the plaintiff establishes the following: (1) it is substantially likely to succeed on the merits of the underlying case; (2) it is substantially likely to suffer irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any harm that the injunction may occasion for the defendant; and (4) the injunction will not undermine the public interest. *Id.* at 528. Though the balance of equities and public interest factors merge when a government is the opposing party, *Nken v. Holder*, 556 U.S. 418, 435 (2009), these four factors are nonetheless conjunctive—Plaintiff must carry its burden as to all four factors before a preliminary injunction may be considered, *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

### SUMMARY OF ARGUMENT

This Court should not grant Plaintiff's request for a preliminary injunction because Plaintiff can carry none of the four factors required for such relief.

*First,* Plaintiff is unlikely to succeed on the merits: drag shows are not inherently expressive, the lewd conduct that is an ineluctable facet of Draggieland does not receive First Amendment protection, there is no controlling authority holding that drag shows are entitled to such protection, Defendants have not illicitly discriminated based on viewpoint, and Plaintiff has not carried its burden to demonstrate that Defendants fail intermediate or strict scrutiny.

*Second*—and presenting the most straightforward means by which this Court can dispose of Plaintiff's motion—Plaintiff can show no irreparable harm that would be prevented by a preliminary injunction. That is because Plaintiff has already refunded all tickets for the March 27 drag show and demonstrates no intent to hold such a show on that date on any Texas A&M campus.

*Third*, Plaintiff cannot satisfy the merged balance of equities and public interest factors. The harm to Texas A&M that would result from an issued injunction drastically outweighs the harm to Plaintiff from denial of injunctive relief. Texas A&M stands to lose upwards of fifteen percent of its operating budget if it allows Draggieland to go forward in Rudder Theatre. Plaintiff would suffer only the harm of progressing with its current plan of action—refunding tickets and either moving venues or cancelling the show.

ARGUMENT

**I.    Plaintiff is not substantially likely to succeed on the merits of the underlying case.**

**A.    Drag shows are not inherently expressive.**

Plaintiff bears the burden of establishing that their conduct contains an expressive element. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive.").

"In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," this Court must ask whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (alterations in original) (quoting *Spence v. State of Wash.*, 418 U.S. 405, 410–11 (1974)). This inquiry includes both "the context in which [the conduct] occurred" and whether "[t]he expressive, overtly political nature of th[e] conduct was both intentional and overwhelmingly apparent." *Johnson*, 491 U.S. at 405–06. While there is "some kernel of expression in almost every activity a person undertakes . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). Instead, Plaintiff must advance something "more than a mere 'plausible contention' that its conduct is expressive." *Spectrum WT*

*v. Wendler*, 693 F. Supp. 3d 689, 702 (N.D. Tex. 2023) (quoting *Church of Am. Knights of the KKK v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004)).

According to Plaintiff, Draggieland is comprised of two essential elements, both of which involve "performers who don clothing and makeup that often, but not always, runs counter to their expected gender identity." ECF 3 at 4. The first component is the performance of "choreographed routines set to music and lighting, advancing a chosen theme." *Id.* The second is an interview in which the still-costumed performers speak "about what drag and LGBTQ+ culture means to them." *Id.* The second of those components is clearly expressive, and Texas A&M has not barred such expression on campus. In fact, A&M has supported Plaintiff's expressive rights. After the drag show ban, supporters of the Draggieland were free to hold a protest at the Academic Plaza in front of the Academic Building, dressed in costume and speaking about the positive experiences they have had with drag and sharing their opposition to Defendants' actions. *See* Ex. F. Texas A&M had no opposition to this protest by the students, because A&M supports both the First Amendment and their students' right to expressive conduct on campus. This aligns with the framework for campus regulation of student speech and conduct set out by the U.S. Supreme Court: state universities have an "undoubted prerogative to enforce reasonable rules governing student conduct," but are not "enclaves immune from the sweep of the First Amendment." *Papish v. Bd. of Curators of Univ. of Missouri*, 410 U.S. 667, 669–70 (1973) (reaffirming and quoting *Healy v. James*, 408 U.S. 169, 180 (1972)).

On the other hand, Draggieland's first component is nonexpressive conduct—not speech—that A&M has a prerogative to regulate and is not protected by the First Amendment. "Each medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975). But this first component of Draggieland is simply an archetypal "drag show," which unlike an interview conducted in the clothes of the opposite sex does not promote any message apparent to the viewer. It is true that some clothing can qualify as expressive by conveying a message readily apparent to the viewer. *See Cohen v. California,* 403 U.S. 15 (1971) (finding that

a jacket with a phrase written on it was protected expression). But there is nothing inherently expressive about wearing clothing. *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 441 n.3 (5th Cir. 2001) ("We do not conclude that every choice of clothing expresses a particularized message."). Simply wearing and performing in the clothes of the opposite sex does not itself "convey a particularized message" that is readily "understood by those who view[] it." *Johnson*, 491 U.S. at 404. Here, the only clue an audience member would have as to the message of Draggieland would be the explanatory speeches between performances. The performative component that makes up the bulk of Draggieland is entirely bereft of expression.

That Draggieland combines nonexpressive conduct with post-performance interviews does not transform the whole into constitutionally protected expressive conduct. The very "fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006). "If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it." *Id.* "For instance, if an individual announces that he intends to express his disapproval of the Internal Revenue Service by refusing to pay his income taxes, we would have to apply [*United States v.*] *O'Brien* to determine whether the Tax Code violates the First Amendment. Neither *O'Brien* nor its progeny supports such a result." *Id. See also Nat'l Press Photographers Ass'n v. McCraw*, 84 F.4th 632, 648 & n.70 (5th Cir. 2023) (quoting *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013)) "[O]nly conduct that is 'inherently expressive' is entitled to First Amendment protection."

According to Plaintiff, drag shows—by some unknown mechanism—inherently express various things about "LGBTQ+ culture," "gender identity," and the like that audiences are likely to understand. ECF 3 at 4. But Plaintiff's argument that all drags shows inherently express messages about "LGBTQ+ culture," "gender identity," etc. leads to the absurd conclusion that "male football players posing in cheerleader skirts" or "JD Vance in drag at Yale Law" is now inherently a political statement "in favor of LGBTQ+ culture" or "advocating a message of support for the LGBTQ+ community," ECF 3 at 18, and that "the likelihood [is] great that the

message would be understood by those who viewed it," *Johnson*, 491 U.S. at 404. The fact remains that some instances of drag are merely performative conduct that some find entertaining, which disproves Plaintiff's argument that all drag shows are inherently expressive in the ways that they say they are.

Plaintiff largely relies upon *Woodlands Pride, Inc. v. Paxton*, 694 F.Supp.3d 820, 842–44 (S.D. Tex. 2023) for the contention that drag shows are protected, expressive conduct. ECF 3 at 2. As Plaintiff notes, this case contrasts with *Spectrum WT*. The present matter is an analogue to *Spectrum WT*, while sharing many important differences with *Woodlands Pride. Woodlands Pride* dealt with Texas Senate Bill 12, which restricted sexually oriented performances on public property, on the premises of a commercial enterprise, or in the presence of a child. It authorized a civil penalty up to $10,000 and created a Class A misdemeanor criminal offense, which carries a maximum penalty of a year in jail. Tex. S.B. 12, 88th Leg., R.S. (2023). The threat of criminal prosecution carries with it a "chilling" effect on speech in a First Amendment context. *United States v. Alvarez*, 567 U.S. 709 (2012). None of these issues are present here. The Resolution does not prohibit drag shows based on age, at private venues, or even on public property—the prohibition only extends to the limited public forums of the A&M System. The present matter is almost factually identical to *Spectrum WT*—both are actions brought by A&M System student groups to host public drag shows on an A&M System campus. This Court should find as in *Spectrum WT* and deny Plaintiff's request for injunctive relief.

**B.  Lewd speech and conduct on campus are not protected by the First Amendment.**

Even if a proposed drag show actually contained inherent expressive conduct, under Fifth Circuit precedent, colleges may prohibit lewd speech and conduct without violating the First Amendment. "The first amendment does not prevent schools from determining 'that the essential terms of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent or offensive speech and conduct.'" [Citing *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986).] *Bethel* admittedly involved a high school audience and it may be suggested that its

justification for speech restraints rests largely on this fact. Nevertheless, we view the role of higher education as no less pivotal to our national interest." *Martin v. Parrish*, 805 F.2d 583, 585 (5th Cir. 1986). The *Bethel* court also held that it is "perfectly appropriate" for a public school to "disassociate itself" from "vulgar speech and lewd conduct that is wholly inconsistent with the 'fundamental values' of public school education." *Bethel*, 478 U.S. at 685-86.

Restricting lewd conduct is a permissible restriction on the "time, place, and manner" in which Plaintiff may express itself. *See Healey v. James*, 408 U.S. 169, 192–93 (1972) (holding that campus groups do not have a first-amendment right to flout campus rules or to fail to adhere to generally accepted standards of conduct, and that requiring campus groups to follow rules and maintain standards of conduct is a reasonable time-manner-place restriction).

Texas A&M does indeed prohibit "[p]ublic behavior that is disruptive, lewd, or indecent." Texas A&M University, Student Conduct Code § 24.4.17. *See* Ex. G. Defendants could reasonably assess that a purported drag show might be offensively lewd or indecent, and therefore disapprove the show without violating the First Amendment (even assuming that all drag shows have inherent expressive conduct, which they do not).

Draggieland performers have performed in a manner that is lewd and indecent in past years. "Lily Adonis Fables" performs widely in drag, including a highly-sexualized "Catwoman" performance involving whipping, lap dances, and sexual fondling. *See* Ex. H.[1] "Lily Adonis Fables" performed at 2022 Draggieland. Also, during Draggieland 2022, performer "Shelby Fine" simulates grinding his crotch and performs the splits with limited fabric coverage of his groin region. *See* Ex. I.[2]

Plaintiff argues that in the past Rudder Theatre has hosted the Broadway musicals *Chicago* and *Hadestown* which had "mature themes," as well as *The Cher Show* "featuring women in risqué costumes." ECF 3 at 4. But they have not shown how these are equivalent behaviors under the First Amendment.

---

[1] Also seen at: https://www.youtube.com/watch?v=6uHn-4_E8e8
[2] Also seen at: https://www.youtube.com/watch?v=VMuyp05IA8g&t=5s

### C.  Defendants are not engaged in unlawful viewpoint discrimination.

Even if it were true that Draggieland is protected, expressive, and not lewd conduct, Defendants would still not be engaged in the prohibited viewpoint discrimination that Plaintiff claims. ECF 3 at 19. In addition to the strictures of federal law, Texas law prohibits viewpoint discrimination against student groups by institutions of higher learning. Tex. Educ. Code § 51.9315(g); *see Johnson*, 491 U.S. at 411 (where the Supreme Court found a Texas law banning flag burning discriminated based on viewpoint, because the law punished the action differently based on whether the burning intended to desecrate the flag or to dispose of dirty or torn flag.) Defendants reject the assertion that their conduct contravenes either federal or state law, because the Resolution bans a specific behavior, regardless of the viewpoint (if any) that the behavior is intended to express.

The Resolution finds that the *act* of a drag performance that falls within specific parameters—namely, one that features biological males dressing in women's clothing with makeup or prosthetics exaggerating stereotypical female physiognomies, is open to the public, involves "sexualized, vulgar, or lewd conduct," and involves conduct that demeans women—is "inconsistent with the System's mission and core values." *See* Ex. C at 1. It does not matter what viewpoint such a performance is meant to, or actually does, convey. The viewpoint of such a performance could be wholly salutary, it could even be that women ought to be honored and uplifted, and it would not impact the rationale laid out in the Resolution. The Resolution targets conduct that is demeaning, regardless of whether that conduct is meant to express a viewpoint that is itself demeaning.

Plaintiff alleges that "(w)hen Americans use theatre stages to express themselves, the First Amendment protects them," citing *Se. Promotions*, 420 U.S. at 557. ECF 3 at 7. Plaintiff uses this case for the proposition that the drag ban is both viewpoint discrimination and a prior restraint. The Court in *Se. Promotions* however was not saying that by being hosted in a theater, an event gained First Amendment protection—it in fact said almost the opposite. The Court stated that

there "is no reason to hold theater subject to a drastically different standard" for First Amendment analysis than other forums. *Se. Promotions*, 420 U.S. at 558.

**D. No controlling authority holds that drag shows are protected by the First Amendment.**

Plaintiff cites many cases, but does not cite *FAIR* or *Martin v. Parrish*, does not address *FAIR*'s discussion of inherently expressive conduct, and does not address the "lewd and indecent speech."

Plaintiff puts many of its eggs in the *Woodlands Pride* basket for the contention that drag shows are protected, expressive conduct. ECF 3 at 2, 7-8. As Plaintiff notes however, this case contrasts with *Spectrum WT*, where plaintiffs similarly situated to the present matter lost at the preliminary injunction stage. ECF 3 at n.1.[3] *Woodlands Pride* also contains many factual differences with this matter. *Supra* at Part I.A.

Plaintiff cites one case, *Norma Christie v. City of Okla. City*, 572 F. Supp. 88 (W.D. Okla. 1983) for the proposition "holding drag shows are protected First Amendment expression." ECF 3 at 7. That case is inapposite because it involved city property, not a campus. *Norma Christie*, 572 F. Supp. at 90. Moreover, the case did not concern a drag show, but rather a proposed "event that was to be a national contest for female impersonators entitled the 'Miss Gay America Pageant.'" *Id.* An official declined to approve the event on city property because "he thought the event to be an open expression of homosexuality which he believed violated prevailing community standards." *Id*. The court disagreed:

> Defendants conceded at the hearing of this cause that they had no evidence that contestants would engage in lewd exposure of the body in violation of [Oklahoma law]. Defendants have no evidence that contestants will engage in depiction of sexual conduct in violation of [Oklahoma law]. Defendants merely argue that the exposure of a male in female attire is immoral. There are no state laws prohibiting a man dressing as a woman. Defendants have not satisfied their burden of showing

---

[3] Both cases are on appeal at the Fifth Circuit and have been argued before similar panels (Ho, Southwick, and Dennis for Spectrum WT (No. 23-10994) and Engelhardt, Southwick, and Dennis for Woodlands Pride, Inc. (No. 23-20480)).

the production to be obscene. Inasmuch as Defendants have not produced evidence of obscenity, this Court declines to find Plaintiff's production legally obscene.

*Id.* at 92.

Finally, the court barely discussed whether the show contained inherently expressive conduct. "Defendants contend the 'Miss Gay America Pageant' is not accorded Constitutional protection because it is a commercial enterprise and not a noteworthy artistic endeavor such as a play or musical. Defendants contend that a blatant showing of men parading in women's apparel is not artistic. Such a judgment is subjective. While this Court may agree that such a 'pageant' may not rise to the level of artistic endeavor that 'Hair' or 'La Cage aux Folles' represent, it is still expression." *Id.* at 91 (paragraph break omitted). This analysis is not valid after *FAIR*. Those plaintiffs did not even try to articulate what message the show supposedly expressed. *Norma Kristie* does not support Plaintiff's case here.

Plaintiff further cites *S. Utah Drag Stars v. City of St. George*, 677 F.Supp.3d 1252, 1286 (D. Utah 2023) for the contention that holding drag shows are protected First Amendment expression. ECF 3 at 7. The court in *St. George* stated that "drag shows . . . are indisputably protected speech," but performed no analysis why that would necessarily be so. Indeed the Judge stated that the defendant's "arguments to the contrary do not merit discussion." *S. Utah Drag Stars*, 677 F.Supp.3d at 1286. This Court should not put any weight on an opinion that rejects out-of-hand the idea of performing legal analysis. Additionally, *St. George* is not a school campus case and was decided on vagueness and overbreadth grounds.

Plaintiff also cites *Papish*, 410 U.S. at 670, for the proposition, "(t)he First Amendment rightly deprives university officials of the authority to separate student expression in 'good taste' from that which is 'offensive.'" ECF 3 at 9. But *Papish* concerned the distribution of a campus newspaper containing speech and press, not alleged expressive conduct. *Papish*, 410 U.S. at 667. It is inapplicable.

Plaintiff next cites *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 390 (4th Cir. 1993) for the proposition "fraternity 'ugly woman contest' is protected

expression." ECF 3 at 9. The Court held that any "low-grade entertainment [] was inherently expressive and thus entitled to First Amendment protection." *Iota Xi Chapter of Sigma Chi Fraternity*, 993 F.2d at 391. That is contrary to *FAIR*, which requires that all conduct, entertainment or not, inherently express some thought without additional explanatory speech in order to qualify for First Amendment protection. The court ruled in the alternative that the university admitted that the "the message conveyed by the Fraternity's conduct [was that] that racial and sexual themes should be treated lightly." *Id.* at 392. But Defendants here do not concede that drag shows inherently covey any message.

Plaintiff also cites *Widmar v. Vincent*, 454 U.S. 263 (1981), for the proposition that the First Amendment bars Defendants from denying Plaintiff and other student groups access to campus public forums like Rudder Theatre because of their message's content or viewpoint. ECF 3 at 12, 15. *Widmar* concerned a regulation "that prohibit[ed] the use of University buildings or grounds 'for purposes of religious worship or religious teaching.'" *Widmar*, 454 U.S. at 265. Thus, that case concerned discrimination against certain speech and all exercise of religion. But drag shows are neither speech nor religion, and alternatively fall under the lewd and indecent speech exception. *Widmar* does not apply to this case.

**E.  Rudder Theatre is a limited public forum.**

Even if this Court determines that Draggieland constitutes First Amendment-protected speech, that determination does not resolve this dispute—Plaintiff still must demonstrate that Rudder Theatre is a forum in which Texas A&M is required to host Draggieland. The core of this inquiry "exists at the line between designated and limited public forums." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010). Plaintiff asserts, in error, that Rudder Theatre is a designated public forum, ECF 3 at 12—a place that is and must be "open for indiscriminate public use for communicative purposes," *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 392 (1993). But Rudder Theatre is, instead, a limited public forum, where Texas A&M "is not required to and does not allow persons to engage in every type of speech."

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). While the ability to restrain speech in a limited public forum is not without bound—such restriction cannot be viewpoint based and must be "reasonable in light of the purpose served by the forum"—the restraint is not subject to the strict scrutiny that Plaintiff asserts is applicable here. *Id.* at 107 (quoting *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,* 473 U.S. 788, 806 (1985)). To distinguish between designated public forums and limited public forums like Rudder Theatre, courts "focus on two factors: (1) the government's intent with respect to the forum, and (2) the nature of the forum and its compatibility with the speech at issue." *Fairchild*, 597 F.3d at 758–59.

First, Texas A&M has long manifested and recently reemphasized its intent that Rudder Theatre serve as a limited public forum. Texas A&M's University Rules define "[l]imited public forums" as spaces which "have limited open access for public expression," or "may be limited to particular groups or particular topics." Tex. A&M Pol'y 08.99.99.M1, Definition of "Limited Public Forums" (May 14, 2020).[4] Rudder Theatre's status as a "Special Event Venue" for which there is an involved reservation process subject to University staff approval strongly implies that it is a limited public forum. *See* Ex. J, Rudder Theatre Complex Standard Operation Procedures. This is in contrast to portions of campus, such as the 6, which the Rules classify as "reservable designated public forums." Tex. A&M Pol'y 08.99.99.M1 § 2.1. In this category of forum, no reservation is required unless the event is promoted in advance, is sponsored by a student organization, or is expected to draw a crowd of more than 25 people. *Id.* § 3. And to make the intent of the University abundantly clear, A&M's Resolution of February 28, 2025 reiterated that "the Board recognizes a special interest in maintaining the Universities' Special Event Venues as limited forums." Ex. J at 1.

---

[4] This rule was revised November 12, 2021 and June 25, 2024. These revisions did not alter Texas A&M's policies with regard to forums, they were in response to a legislative enactment protecting campus expression and a gubernatorial order designed to combat antisemitism. *See* Tex. A&M Pol'y 08.99.99.M1 at 1 (referencing Tex. S.B. 18, 86th Leg., R.S. (2019) (adding Tex. Educ. Code § 51.9315) and Executive Order GA-44 of March 27, 2024).

Second, the nature of Rudder Theatre and its incompatibility with Draggieland distinguishes it from the designated public forums located on the A&M campus. The Resolution does not bar drag shows from *all parts* of the Texas A&M University system, it only provides that "Drag Show Events shall not be held at *Special Event Venues* on any of the campuses of the Universities." Ex. C at 2 (emphasis added). Drag in designated public forums is not impacted by the Resolution, as evidenced by the fact that many individuals in drag attended a protest of the Draggieland cancellation at the Ross Statue Area mere days after the Resolution was promulgated. *See* Ex. K, March 6 Drag Protest. Certainly, this protest had a primarily expressive component that Draggieland plainly lacks. But that Texas A&M allowed drag at the Ross Statue Area while barring it in Rudder Theatre reflects a sophisticated distinction between the campus' designated public forums and limited public forums. Rudder Theatre is one such limited public forum, and in consequence, A&M's decision to bar Draggieland from Rudder Theatre is subject not to strict scrutiny, but only to the prohibition on viewpoint discrimination and the reasonability requirement.

**F. To the extent that the Court finds that the First Amendment is implicated, Plaintiff has not shown that Defendants cannot pass intermediate or strict scrutiny.**

Plaintiff argues that based on *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015), A&M is discriminating against viewpoints, which should trigger strict scrutiny, and alleges that A&M cannot meet that standard. ECF 3 at 7. First, A&M is not restricting "expression because of its message, its ideas, its subject matter, or its content." *Reed*, 576 U.S. at 163, so strict scrutiny should not apply.

Provided the Court agrees that Defendants have not engaged in content-based or viewpoint-based discrimination, A&M's actions should be evaluated under intermediate scrutiny or rational basis. Even under strict scrutiny, narrow tailoring does not mean "perfect tailoring." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (Where Chief Justice Roberts found that the State's interest in the integrity of the judiciary was a compelling government interest.) Here, A&M's compelling interest is in providing an effective learning environment to its students and in

complying with federal antidiscrimination law. The narrowly-tailored action to achieve this compelling interest was to prohibit drag show from performing in the A&M System's limited public forums. This is narrowly tailored because it preserves its students expressive interest. Students may still wearing drag and express any associated views on campus, *see* student's March 6, 2025 protest of the A&M System's decision. "Even if the Unruh Act does work some slight infringement on Rotary members' right of expressive association, that infringement is justified because it serves the State's compelling interest in eliminating discrimination against women." *Bd. of Dirs. of Rotary Intern. v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987).

Plaintiff argues that "(t)he Board Defendants' stated desire to comply with an executive order is not a compelling interest because the order concerns only federal funding and does not apply to student funded shows." Complaint at ¶121. Plaintiff notes that "Draggieland 2025 receives no government funding," ECF 3 at 5, and "(t)he Resolution does not identify any federal funding relevant to *Draggieland*." ECF 3 at 6. The Plaintiff seems to be arguing that because the federal funding that A&M stands to lose would not be allocated to fund their show, although it would still go to the campus facilities they enjoy the use of, that it is not probative. Universities however waive sovereign immunity "by accepting any federal funding under Title IX." *Pederson v. La. State Univ.*, 213 F.3d 858, 875 (5th Cir. 2000).

## II.    Plaintiff cannot show irreparable harm.

While the Plaintiff can make no showing of likely success on the merits, this Court need not even reach a preliminary merits analysis in this case. The most straightforward way for this Court to rule on Plaintiff's requested relief is to find that Plaintiff cannot demonstrate that it will be irreparably harmed in the absence of an injunction. Plaintiff asserts that it "is ready, prepared, and willing to go forward with Draggieland on March 27," that "[o]nly Defendants' blanket ban on protected expressive stands in the way," and that immediate injunctive "action is the sole remedy to prevent irreparable harm." ECF 3 at 18. But there is no evidence that Plaintiff intends to go through with a March 27th show, even if it succeeds on its motion. After the Resolution, Plaintiff

17

immediately announced that all ticket buyers for the March 27th show would be refunded. The refund process has been completed and there are no tickets sold for a March 27th event. Ex. D ¶ 5; Ex. L, Draggieland Sales Report 2025 (showing $0 net sales and all tickets refunded.) Plaintiff may intend to hold a show in the future, but because injunctive relief "is an extraordinary and drastic remedy" it is not properly issued to protect an as-yet unscheduled show. *Anderson*, 556 F.3d at 360.

Further, Plaintiff has held and can continue to hold non-drag show events in A&M facilities, including Town Halls, Winter Wonderland, "The Coming Out Monologues, Pride Mentors socials, and Lavender Graduation. Ex. D ¶ 6. Should Plaintiff decide to host a drag show off-campus, there are several suitable venues nearby. *Id.* at ¶ 7.

## III.    The threatened injury to the movant does not outweigh the threatened harm to the non-movant, and granting an injunction will disserve the public interest.

There are two primary threatened harms to A&M if an injunction is granted. First, A&M's female students may have their rights abridged under Title IX antidiscrimination law. Second, if A&M is found responsible for that abridgment or to be in violation of President Trump's and Governor Abbott's directives, A&M risks losing federal and state funding.

This is not an idle threat. On March 7, 2025, the Trump administration cancelled $400 million in federal grants to Columbia University due to the school's failure to comply with federal antidiscrimination laws. *See* Ex. M, Alexandra Marquez, *Trump administration cancels $400 million in grants for Columbia University*, NBC News (Mar. 7, 2025). Universities are reliant on government funding, especially public schools like those of the Texas A&M system. In the current fiscal year, federal appropriations make up 12% of the A&M System's budget.[5] Additionally, contracts and grants, many of which come from the federal government (as were those cancelled at Columbia University), make up 16% of the System's budget. *Id.* Also, tuition and fees, some of which comes from federally-backed student loans, makes up 25% of the System's budget. *Id.* Title

---

[5] The Texas A&M University System FY2025 Executive Budget Summary, p. 6, https://assets.system.tamus.edu/files/budgets-acct/pdf/Executive-Budget-Summary/FY2025/FY2025EBS.pdf.

IX prohibits, with certain exceptions, "any entity that receives 'federal financial assistance' from discriminating against individuals on the basis of sex in education programs or activities. The clearest example of federal financial assistance is the award or grant of money." U.S. Department of Justice, Civil Rights Division, *Title IX Legal Manual*.[6] Schools are considered indirect recipients "when they accept payments from students who directly receive federal financial aid." *Id.* Should the Texas A&M System not comply with federal and State law, it risks losing a significant portion of the funding that is a backbone of its budget.

"Congress enacted Title IX under its spending power, 'conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds.'" *Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1098 (10th Cir. 2019) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998)). The most reasonable reading of the February 4, 2025, Dear Colleague Letter's statement that "ED and OCR must enforce Title IX consistent with President Trump's Order," is that the Trump Administration considers failure to comply with the Order to be a violation of Title IX. The Order's funding language in Section 3(e-g)—ordering agencies to take all steps to eliminating all funding and grants related to gender ideology—implies that failure to comply with the Order will result in cuts in federal funding. Governor Abbott's January 30, 2025, letter states that President Trump's Order "confirms what my office has repeatedly stressed before."

Plaintiff cites *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)) for the proposition that "injunctions protecting First Amendment rights are always in the public interest." ECF 3 at 3. *Christian Legal Society*, however, also reiterated that a "district court must exercise its discretion to determine whether the balance of harms weighs in favor of the moving party *or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied.*" 453 F.3d at 859 (emphasis added). At minimum, there is no presumption that the public interest is

---

[6] Available at https://www.justice.gov/crt/title-ix.

counted with the plaintiff in a First Amendment case, as implied by Plaintiff. And an injunction would still only be appropriate if there was a First Amendment violation, which A&M maintains there is not.

Defendants respectfully ask the Court to determine that the injunction is not in the public interest and that the harm to the Plaintiff of holding the event at a venue off-campus does not exceed the potential harm to their fellow students and of A&M potentially being forced to make dramatic cuts to its student services and educational offerings.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction.

Dated March 13, 2025

Respectfully submitted,

KEN PAXTON
Attorney General

RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998
SDTX No. 882329

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

/s/ Zachary Berg

ZACHARY BERG
Special Counsel
Tex. State Bar No. 24107706
SDTX No. 3481711

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

MARK A. CSOROS
Assistant Attorney General
Texas State Bar No. 24142814
SDTX No. 3896171

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone.: (512) 463-2100
zachary.berg@oag.texas.gov
mark.csoros@oag.texas.gov
ryan.kercher@oag.texas.gov

COUNSEL FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on March 13, 2025 and that all counsel of record were served by CM/ECF.

/s/ Zachary Berg

ZACHARY BERG
Special Counsel