**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| TEXAS A&M QUEER EMPOWERMENT COUNCIL, | |
| *Plaintiff*, | Civil Case No. 4:25-cv-992 |
| v. | |
| WILLIAM "BILL" MAHOMES, ROBERT L. ALBRITTON, DAVID C. BAGGETT, JOHN W. BELLINGER, JAMES R. "RANDY" BROOKS, JAY GRAHAM, MICHAEL A. "MIKE" HERNANDEZ III, MICHAEL J. PLANK, SAM TORN, CAGE SAWYERS, JOHN SHARP, and MARK A. WELSH III, in their official capacities, | |
| *Defendants*. | |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR A**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................2

    I.      Defendants' Prior Restraint Is Now Causing Irreparable Harm to the Queer Empowerment Council's First Amendment Rights. ................................................2

    II.    The Council Is Likely to Succeed on the Merits Because Defendants' Viewpoint-Discriminatory Prior Restraint Violates the First Amendment. ...........4

          A.     The First Amendment protects theatrical performance—including drag. ........................................................................................... 4

               1.     Theatrical performance, whatever its genre, is inherently expressive................................................................................ 5

               2.     Defendants effectively admit *Draggieland* 2025 is expressive................................................................................ 6

               3.     Defendants cannot justify censoring *Draggieland* by considering its harmonized components in isolation. .................... 6

          B.     The drag ban is a viewpoint-based prior restraint, imposing the two most pernicious forms of censorship in a public forum, or anywhere ........................................................................................... 7

                1.     Defendants do not deny the cancelation of *Draggieland* is an impermissible prior restraint. .......................................... 8

                2.     Defendants' ban is viewpoint-discriminatory because it is expressly premised on the "ideology" it fears is drag performances advance................................................... 8

                3.     Defendants cannot show the Rudder Theatre is not a designated public forum for student expression. ........................... 9

          C.     Defendants' drag ban fails strict scrutiny because it is not narrowly tailored to a compelling state interest. .................................................... 11

                1.     Blanket censorship of a theater performance is not narrowly tailored to providing an effective learning environment................11

                2.     The drag ban is not narrowly tailored to redress discriminatory harassment, which requires far more than assertedly offensive expression.................................................... 13

i

3.      A prior restraint is not narrowly tailored to advance any interest in penalizing lewd speech or conduct. ........................... 15

III.    The Public Interest in Protecting Free Expression Far Outweighs Defendants' Speculation About Title IX. .............................................16

1.      Speculation about Executive Order 14168 does not shift the balance. ...................................................................................... 17

2.      Granting university leaders unfettered discretion to censor speech they believe offensive undermines the public interest. ........................................................................................ 18

CONCLUSION ...........................................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Ark. Educ. Television Comm'n v. Forbes*,
    523 U.S. 666 (1998) ..................................................................................................... 11

*Atl. Beach Casino, Inc. v. Morenzoni*,
    749 F.Supp. 38 (D.R.I. 1990) ....................................................................................... 8

*Cohen v. California*,
    403 U.S. 15 (1971) ................................................................................................ 6, 7, 14

*Davis v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) .................................................................................................... 14

*DeAngelis v. El Paso Mun. Police Officers Ass'n*,
    51 F.3d 591 (5th Cir. 1995) ....................................................................................... 13

*Doe v. McKesson*,
    945 F.3d 818 (5th Cir. 2019) ..................................................................................... 10

*Elrod v. Burns*,
    427 U.S. 347 (1976) ...................................................................................................... 3

*Gay Student Servs. v. Tex. A&M Univ.*,
    737 F.2d 1317 (5th Cir. 1984) ........................................................................... 8, 10, 12

*Healy v. James*,
    408 U.S. 169 (1972) ............................................................................................ 3, 12, 16

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
    515 U.S. 557 (1995) ................................................................................................ 5, 6, 7

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
    993 F.2d 386 (4th Cir. 1993) ...................................................................................... 6, 14

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ..................................................................................................... 6, 7

*Just. for All v. Faulkner*,
    410 F.3d 760 (5th Cir. 2005) ...................................................................................... 10

*Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*,
    578 F.2d 1122 (5th Cir. 1978) ...................................................................................... 3

*Martin v. Parrish*,
    805 F.2d 583 (5th Cir. 1986) ...................................................................................... 15

*Matal v. Tam*,
    582 U.S. 218 (2017) ........................................................................... 9, 11

*McCauley v. Univ. of the V.I.*,
    618 F.3d 232 (3d Cir. 2010) ...................................................................... 16

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ............................................................................... 8

*Papish v. Bd. of Curators of the Univ. of Mo.*,
    410 U.S. 667 (1973) ........................................................................... 13, 15

*Pernell v. Fla. Bd. of Govs. of State Univ. Sys.*,
    641 F.Supp.3d 1218 (N.D. Fla. 2022) ............................................................ 14

*Pro-Life Cougars v. Univ. of Hous.*,
    259 F.Supp.2d 575 (S.D. Tex. 2003) ...................................................... 8, 10, 12

*Robinson v. Hunt Cnty.*,
    921 F.3d 440 (5th Cir. 2019) .................................................................... 9

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ......................................................................... 1, 9, 11

*S. Utah Drag Stars v. City of St. George*,
    677 F.Supp.3d 1252 (D. Utah 2023) .............................................................. 3

*Sable Commc'ns of Ca., Inc., v. FCC*,
    492 U.S. 115 (1989) ............................................................................. 11

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001) ..................................................................... 13

*Schacht v. United States*,
    398 U.S. 58 (1970) ............................................................................... 5

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ......................................................................... 3, 7, 16

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) ................................................................ 14, 19

*Spence v. Washington*,
    418 U.S. 405 (1974) ............................................................................. 5

*Texas v. Johnson*,
    491 U.S. 397 (1989) ............................................................................ 5, 7

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002) ................................................................................. 13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ................................................................................... 7

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ................................................................................. 11

*Whitney v. California*,
    274 U.S. 357 (1927) ................................................................................. 15

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ..................................................................... 2, 11, 16

*Winters v. New York*,
    333 U.S. 507 (1948) ................................................................................... 6

*Woodlands Pride, Inc. v. Paxton*,
    694 F.Supp.3d 820 (S.D. Tex. 2023) ....................................................... 5

**Statutes**

Tex. Educ. Code
    § 51.9315 ........................................................................................... 13, 19

**Other Authorities**

"Dear Colleague" Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't
    of Educ. (Feb. 4, 2025) ........................................................................... 18

"Dear Colleague" Letter from Gerald A. Reynolds, Asst. Sec'y, Off. for C.R., U.S. Dep't
    of Educ. (July 28, 2023) .......................................................................... 18

*Draggieland 2022: Performance by Lily Adonis Fables*, YouTube (Apr. 30, 2022) .................. 17

Exec. Order No. 14,168,
    90 Fed. Reg. 8615 (Jan. 20, 2025) ......................................................... 17

Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Federal
    Financial Assistance, 85 Fed. Reg. 30026-01 (May 19, 2020) ........................ 18

Press Release, Off. of Att'y Gen.,
    Attorney General Ken Paxton Defends Texas A&M's Ban on Drag Shows
    Against Lawsuit from Left-Wing Group (March 14, 2025) ............................. 9

Tex. A&M Univ. Pol'y No. 08.99.99.M1 ...................................................................... 10

U.S. Dept. of Educ.,
    Frequently Asked Questions About Racial Preferences and Stereotypes Under
    Title VI of the Civil Rights Act (Feb. 28, 2025)............................................................. 17

## INTRODUCTION

After five years of allowing student drag performances, Defendants now try to justify their sudden resort to the *most pernicious* form of censorship: a viewpoint-based prior restraint based on nothing more than speculation. Mem. in Opp'n to Mot. for TRO & Prelim. Inj. ("Opp."), ECF No. 20, at 3, 11. Their attempt fails. No matter what fears Defendants may conjure about "lewd conduct" or "harassment," the Constitution requires more than speculative fearmongering to excuse the exclusion of protected student expression from a campus stage open to all.

Defendants are opportunistically censoring student expression in an *express* effort to suppress speech because of its "ideology"—a motivation the Supreme Court squarely recognizes as viewpoint discrimination. *Compare* Verified Compl. ¶ 82, Ex. 1 ("Drag Show Events may be considered promotion of gender ideology"), *with Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828–29 (1995) (viewpoint discrimination occurs when the "rationale" officials offer for the regulation is "the specific motivating ideology" of the speaker). Everything the Court needs to know about Defendants' position is in the third line of their Opposition, decrying drag shows based on the view that they are "demeaning to women." Opp. 1. Defendants are entitled to hold and share that opinion. But they cannot silence contrary views. By prohibiting speech in advance and because of its viewpoint, Defendants are committing two cardinal sins under the First Amendment.

The freedom of expression extends to student drag shows. The First Amendment protects theatrical performances, whatever their genre, because they are inherently expressive. And while Defendants now say drag performances are not expressive, their own resolution proves otherwise, announcing that a ban is necessary because drag performances "*promote*" so-called "gender

ideology." Verified Compl. ¶ 82, Ex. 1 (emphasis added). How does one *promote* anything *except* through expression?

Defendants' opposition confirms they cannot meet the strict scrutiny needed to justify such drastic censorship. No matter what interest they claim in banning drag performances, they cannot explain why a blanket prior restraint on student expression is the least restrictive means of meeting that interest. Left unchecked, Defendants' claimed authority will allow administrators to suppress *any* student speech—even before it occurs—on sex, gender, race, and other matters of profound social and political concern, even if, as here, no student has ever complained about its content.

While censorship as pernicious as this always justifies injunctive relief, *immediate* relief is necessary to prevent irreparable harm to Plaintiff Queer Empowerment Council's constitutional rights. As a student organization whose very purpose is to convey a message of acceptance *at* Texas A&M University, the Council now faces the uncertainty that its annual flagship event will not occur anywhere, and that Defendants will deny it the same venue offered to other student organizations, all because the Council's expression offends state officials. The First Amendment forbids that result, and the Court should enjoin the drag ban swiftly.

## <u>ARGUMENT</u>

## I.     Defendants' Prior Restraint Is Now Causing Irreparable Harm to the Queer Empowerment Council's First Amendment Rights.

Defendants' drag ban is causing the Council irreparable harm right now, and the Court should reject Defendants' suggestion that their censorship of *Draggieland* 2025 is harmless because the performance could theoretically take place on some stage off-campus. For one thing, Defendants have no answer for a constitutional mainstay: Any loss of First Amendment freedoms "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). That injury alone justifies immediate injunctive relief to preserve the status

quo. And here, the status quo is the Council exercising its First Amendment right to organize and stage *Draggieland* on campus, as it has for five years running. *S. Utah Drag Stars v. City of St. George*, 677 F.Supp.3d 1252, 1277 (D. Utah 2023) (status quo is the "last uncontested status between the parties which preceded the controversy.").

Both constitutional and practical ramifications underscore the irreparable injury the Council faces absent a swift injunction. The Supreme Court long ago rejected Defendants' argument that there is no irreparable harm because the Council can simply perform its show elsewhere. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) (freedom of speech "in appropriate places" cannot be limited "on the plea it may be exercised in some other place" [citation omitted]). And it has specifically rejected Defendants' proffer "of alternative, off-campus venues nearby," Opp. 18, as undermining irreparable harm. *Healy v. James*, 408 U.S. 169, 183 (1972) (holding the ability to operate off-campus cannot justify denial of access to campus facilities). Denial of access to an "appropriate" venue is itself an irreparable injury even if alternative locations are available. *Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122, 1126 (5th Cir. 1978). Here, the Council's mission is to express itself *at* Texas A&M University and *to* the students enrolled there. Exile off-campus frustrates the Council's ability to reach its intended audience—and achieves Defendants' express goal of silencing a disfavored "ideology." Verified Compl. Ex. 1.

As a practical matter, Defendants' ban imperils the Council's ability to perform *Draggieland* at all. There is no guarantee the students can obtain another venue, as many of the venues Defendants cited are unavailable. Alexandra "Alex" Gonce Decl. ¶ 18. Even if they find another venue, it may not compare to the Rudder Theatre, whether that be due to fewer seats, unsuitability for staging a drag performance, distance from campus, or unavailability on the date

of the performance. And as the date draws nearer, the Council will have less ability to reassure performers, vendors, and prospective audience members the show will take place at all.

Because Defendants have banished drag shows from campus forums, the Council is of course seeking alternative venues to attempt to salvage the performance. Defendants insist those efforts mean the Council has "disavowed its intent" to host *Draggieland* at Rudder Theatre on March 27. Opp. 1. They are wrong. The Council remains ready, willing, dedicated, and *able* to use their desired and originally planned venue. If the Council had no sincere interest in using the venue, it would not have filed a federal lawsuit and sought urgent relief. The Council has a *current* reservation of the Rudder Theatre for March 26 and 27 and will use it for *Draggieland* 2025 if the Court enjoins the drag ban. Gonce Decl. ¶¶ 15–17. Ticket sales, meanwhile, are only "suspended." Reber Decl. ¶ 5. The Council did not, as Defendants claim, refund any tickets—the university did. Gonce Decl. ¶ 7.

The Council has a duty to mitigate its damages. Defendants' distortion of those efforts, and of the Council's resiliency to express itself, to justify campus censorship, only adds insult to the Council's imminent irreparable injury.

## II. The Council Is Likely to Succeed on the Merits Because Defendants' Viewpoint-Discriminatory Prior Restraint Violates the First Amendment.

### A. The First Amendment protects theatrical performance—including drag.

The First Amendment protects drag shows because theatrical performance is inherently expressive. Try as they may, Defendants cannot avoid the expressive nature of drag performance: The drag ban resolution claims drag performance "*promotes*" an ideology, which would not be possible were it not expressive. Stage musical performance has long qualified as expressive, and disaggregating its component parts finds no basis in precedent. *Draggieland* is squarely within the First Amendment's ambit.

1.   <u>Theatrical performance, whatever its genre, is inherently expressive.</u>

Courts have held time and again that drag performance is expressive, including Judge Hittner's well-reasoned decision in *Woodlands Pride, Inc. v. Paxton*, 694 F.Supp.3d 820, 842–44 (S.D. Tex. 2023), that drag is expressive. Defendants avoid meaningful confrontation with Judge Hittner's reasoning. Opp. 9. Instead, they misconstrue *Texas v. Johnson* to insist the First Amendment protects expressive conduct *only* when it conveys a particularized message. Opp. 6–8 (relying on *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). That is not the law. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995) (rejecting, six years after *Johnson*, any requirement of a "particularized message" or a "narrow, succinctly articulable message" as a precondition for First Amendment protection). If that were the law, ballet, orchestral music, interpretive dance, Lewis Carroll's poetry, and Jackson Pollock's paintings would fall outside the First Amendment's embrace. *See id*. That outcome defies basic constitutional principles and common sense.

More fundamentally, theatrical performance is inherently expressive because the audience has all the cues necessary to understand that the on-stage activity is intended to express *something*. *See Spence v. Washington*, 418 U.S. 405, 410 (1974) (holding that evaluation of expressive conduct considers its "context and environment"). After all, if the long history of *outdoor* theatre is enough context to alert passersby that a street skit is performative, an audience going to see a drag performance *inside* a theatre knows it's about to see something expressive. *See Schacht v. United States*, 398 U.S. 58, 61 (1970). And because the First Amendment does not distinguish between entertainment and political speech in this regard, Defendants cannot draw the even subtler distinctions they attempt between which theatrical genres are expressive. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (the "line between the informing and the entertaining is too elusive" to draw as a constitutional matter (quoting *Winters v. New York*, 333 U.S. 507, 510

(1948)); *see also Cohen v. California*, 403 U.S. 15, 25 (1971) (First Amendment "leaves matters of taste and style" to individuals, not the government.).

2.    <u>Defendants effectively admit *Draggieland* 2025 is expressive.</u>

Defendants' ban claims drag performances like *Draggieland* "promote" an "ideology." Verified Compl. ¶ 82, Ex. 1. But how can the Council's performance "promote" an "ideology" *except* through expression? Viewers may come away from a performance with conflicting views about what it meant, as artistic expression often takes the form of a "subtle shaping of thought." *Joseph Burstyn, Inc.*, 343 U.S. at 501. But when officials themselves perceive a message, that is strong evidence the performance is understood to be expressive in nature. *See Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 392 (4th Cir. 1993) (administrators interpreted "ugly woman contest" to mean students were sending a message that "racial and sexual themes should be treated lightly"). Having insisted drag performances "promote" a specific "ideology," Defendants' argument they send no message at all is "self-defeating." *Id.*

Even if the Board of Regents' resolution did not contain that statement, the First Amendment would still protect the Council's *Draggieland* performance. Just as an LGBTQ group's participation in an Irish heritage parade was "expressive," the Council's embrace of a genre of performance widely associated with LGBTQ groups is a means of "celebrating its members' identity as openly" LGBTQ people, communicating to the campus community that "there are such individuals in" the conservative campus community. *Hurley*, 515 U.S. at 570.

3.    <u>Defendants cannot justify censoring *Draggieland* by considering its harmonized components in isolation.</u>

The court should also reject Defendants' argument that, at its core, seems to be that each scene in a drag performance must convey a distinct, narrow idea to merit First Amendment protection. Opp. 7. *Hurley* disproves that argument. 515 U.S. at 569.

Defendants' argument proves too much, conceding that *Draggieland* is composed of "clearly expressive" components. Opp. 7. Seeking to avoid First Amendment scrutiny, they try to slice-and-dice theatrical performance into distinct parts. But government officials cannot control the *mode* of expression any more than they can control the *style*. *Cohen*, 403 U.S. at 25. Theatrical performance harmonizes speech and conduct. "By its nature, theater usually is the acting out—or singing out—of the written word, and frequently mixes speech with live action or conduct." *Se. Promotions*, 420 U.S. at 557–58. "But that is no reason to hold theater subject to" a standard different from that applied to other modes of communication. *Id.* at 558. The government may prefer, as Justice Stevens did, that a speaker use "an available, alternative mode of expression" like "uttering words critical of a flag" instead of burning it, but the First Amendment protects the speaker's right to choose the "particular mode" of expression. *Johnson*, 491 U.S. at 416; *id.* at 437 (Stevens, J., dissenting); *see, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–508 (1969) (holding that students' "silent" wearing of black armbands to protest the Vietnam War was "closely akin to 'pure speech'").

So too here. Defendants may prefer students limit their expression to the spoken word and leave dance or choice of dress out of it. But Defendants' theater criticism does not justify their censorship; the First Amendment empowers students—not the government—to choose how to mix speech with conduct to convey their "subtle" message. *Joseph Burstyn, Inc.*, 343 U.S. at 501.

**B.     The drag ban is a viewpoint-based prior restraint, imposing the two most pernicious forms of censorship in a public forum, or anywhere.**

Defendants have no answer for the legion of precedent establishing that the drag ban violates the First Amendment threefold: It is a prior restraint, it censors speech based on viewpoint, and it excludes the Council from a forum designated for its use. In all cases, Defendants face strict scrutiny—which they cannot overcome.

1.    Defendants do not deny the cancelation of *Draggieland* is an impermissible prior restraint.

When public university officials "deny use of a forum in advance of its actual expression" as Defendants have here, it is a prior restraint that bears a "heavy presumption" against its constitutionality. *Pro-Life Cougars v. Univ. of Hous.*, 259 F.Supp.2d 575, 582–83 (S.D. Tex. 2003). And in response to this heavy presumption? Defendants offer nothing. The Council cited binding cases, including one involving Texas A&M itself, that hold when campus officials deny of use of campus facilities, it is a prior restraint subject to strict scrutiny. Pl.'s Mot. for a TRO & Prelim. Inj. ("Mot."), ECF No. 3, at 13–14 (citing among others *Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1325 (5th Cir. 1984)).

Not only do Defendants fail to rebut these cases rejecting prior restraints at public universities, but they also fail to engage with the prior restraint at all. Opp. 11 (solitary reference to "prior restraint"). By all but waving the white flag, Defendants have shown why the Council is likely to succeed on the merits. And because prior restraints are the "most serious" and "least tolerable" restriction on First Amendment rights, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), immediate injunctive relief is warranted. *See also Atl. Beach Casino, Inc. v. Morenzoni*, 749 F.Supp. 38, 39–42 (D.R.I. 1990) (enjoining efforts to cancel concert by 2 Live Crew following the artists' arrests for obscenity).

2.    Defendants' ban is viewpoint-discriminatory because it is expressly premised on the "ideology" it fears is drag performances advance.

No matter how Defendants try to shade their campus drag ban, it violates the First Amendment's bar on viewpoint discrimination. Above all, the drag ban expressly does what the Supreme Court has identified as viewpoint discrimination: It regulates speech *because of* its "ideology." *Compare* Verified Compl. ¶ 82, Ex. 1 ("Drag Show Events may be considered promotion of gender ideology"), *with Rosenberger*, 515 U.S. at 828–29 (viewpoint discrimination

8

occurs when the "rationale" officials offer is "the specific motivating ideology" of the speaker.).

Defendants have no answer for *Rosenberger*. Nor do Defendants address the Fifth Circuit's

holding that when officials regulate speech based on their "subjective judgment that the

content … is offensive or inappropriate," they engage in viewpoint discrimination. *Robinson v.

Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019). Even now, Defendants confess they acted because

drag shows are "demeaning," Opp. 11, and the Attorney General issued a press release assailing

the Council as "left-wing radicals" seeking to attack "our values" through "offensive … shows."[1]

Defendants insist their action is permissible because they would shutter *any* demeaning

speech. Opp. 11. But once again, the Supreme Court already rejected Defendants' argument,

holding that if the government tries to prevent the "disparagement of all groups," it is still

viewpoint discriminatory. *Matal v. Tam*, 582 U.S. 218, 243 (2017). As Judge Willett explained as

part of the Fifth Circuit's consideration of *Doe v. McKesson*, *Matal* makes clear that unfavorable

government regulation of "hateful speech that demeans" represents unconstitutional viewpoint

discrimination. 945 F.3d 818, 840 n.28 (5th Cir. 2019) (Willett, J., concurring), *vacated on other

grounds*, 591 U.S. 1 (2020). Moreover, even if the drag ban were facially neutral, policies that

*function* to "discourage one viewpoint and advance another" are viewpoint discriminatory. *Gay

Student Servs.*, 737 F.2d at 1332. The drag ban cannot stand.

>    3.    <u>Defendants cannot show the Rudder Theatre is not a designated public
>          forum for student expression.</u>

Defendants' efforts to reimagine Rudder Theatre as a limited public forum are not only

flawed in law and fact, but ultimately futile. Opp. 14–16. Defendants have exiled the Council's

---

[1] Press Release, Off. of Att'y Gen., Attorney General Ken Paxton Defends Texas A&M's Ban on Drag Shows
Against Lawsuit from Left-Wing Group (March 14, 2025), https://www.texasattorneygeneral.gov/news/releases/
attorney-general-ken-paxton-defends-texas-ams-ban-drag-shows-against-lawsuit-left-wing-group
[https://perma.cc/6HDX-869V].

*Draggieland* performance from a space the university holds open without limit on subject matter to student events, including performances. Mot. 12. That makes it a designated public forum, where viewpoint- *or* content-based regulations face strict scrutiny. And even were that not the case, Defendants' viewpoint discrimination against drag is unconstitutional in all forums.

Start with the binding law Defendants ignore. As here, when a university broadly opens access and imposes "minimal restrictions" on the "substance" of speech in that area, that "broad … guarantee of expressive freedom" creates a designated public forum. *Just. for All v. Faulkner*, 410 F.3d 760, 768–69 (5th Cir. 2005); *see also, e.g.*, *Pro-Life Cougars*, 259 F.Supp.2d at 582 (holding that where a university opens space for use by "some segment of the public, such as student organizations," it creates a designated public forum for those organizations). Texas A&M University's intent to create a designated public forum for student organizations is clear: It adopted the same language the Fifth Circuit held to establish a designated public forum and applied it to campus "buildings" like Rudder Theatre.[2] The Rudder Theatre Complex "Standard Operation" manual only reinforces that intent, as it contains no reference to substantive, subject-matter, or content-based limits on students' expressive uses. Defs' Ex. J at 5, *linking to* https://tx.ag/reserverudder (reservation request form allowing students to select a "Program Type," including "Performance," "Variety Show," "Concert," and the catch-all "Other"). Nor does the reservation process Defendants identify, Opp. 15, revert a designated public forum to a limited forum, as "ministerial judgments" about access logistics do not alter a forum's classification. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998).

---

[2] *Compare Just. For All*, 410 F.3d at 768 (quoting the policy placing "minimal restrictions on the substance of speech," which barred the university from discriminating "on the basis of the political, religious, philosophical, ideological, or academic viewpoint expressed by any person"), *with* Tex. A&M Univ. Pol'y No. 08.99.99.M1 ("Expressive Activity on Campus" policy) (barring the university from denying use of campus facilities for expressive purposes "on the basis of a political, religious, philosophical, ideological, or academic viewpoint expressed by the organization" and defining "campus" to mean "all land and buildings"), *available at* https://rules-saps.tamu.edu/PDFs/08.99.99.M1.pdf.

Having opened a designated public forum, the university "must respect the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829. And of course, no matter the forum type, the drag ban violates the First Amendment because viewpoint discrimination is prohibited in *all* public forums. *Matal*, 582 U.S. at 243.

### C.    Defendants' drag ban fails strict scrutiny because it is not narrowly tailored to a compelling state interest.

All the roads chosen by Defendants—prior restraint, viewpoint discrimination, and content discrimination in a designated public forum—lead to strict scrutiny, requiring Defendants to establish that the drag ban "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar v. Vincent*, 454 U.S. 263,  270 (1981). Narrow tailoring, in turn, requires Defendants to use the "least restrictive means to further the articulated interest." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (quoting *Sable Commc'ns of Ca., Inc., v. FCC*, 492 U.S. 115, 126 (1989)).

Defendants fail to carry their heavy burden. The ban is not narrowly tailored to address the two interests Defendants identify: the university's academic activities and addressing discriminatory harassment. Nor is a prior restraint on a performance the least restrictive means to address professed concerns for lewd speech or conduct.

### 1.    Blanket censorship of a theater performance is not narrowly tailored to providing an effective learning environment.

Defendants' first offered interest—"providing an effective learning environment," Opp. 16, fails strict scrutiny for the same reasons it did not carry the day in *Pro-Life Cougars* and *Gay Student Services*. In *Pro-Life Cougars*, the University of Houston defended its policy of allowing administrators to deny use of outdoor spaces if the speech was "potentially disruptive" to classes, claiming it necessary to preserve the university's academic mission. 259 F.Supp.2d at 584. But the policy failed narrow tailoring (even under a more permissive reasonableness analysis)

because it reached speech even when it did not disrupt the *classroom* environment. *Id.* Defendants' drag ban fails narrow tailoring for the same reason: It reaches speech far removed from the classroom environment—including, as here, a performance set to take place *indoors* during the evening, when there is no reasonable chance it could disturb some academic activity.

Likewise, in *Gay Student Services*, Texas A&M presented "no evidence" that allowing a student group use of its facilities would "interrupt classes" or "substantially interfere with the opportunity of other students to obtain an education." 737 F.2d at 1330 (quoting *Healy*, 408 U.S. at 189). As it failed to do in *Gay Student Services*, Texas A&M again fails to show how allowing an LGBTQ student group the use of its facilities will disrupt some unidentified academic function.

Universities are not "enclaves immune from the sweep of the First Amendment" and cannot invoke their academic functions as a permission slip to censor extracurricular student expression. *Healy*, 408 U.S. at 180 (officials could not limit on-campus, extracurricular speech on the basis that it conflicted with the institution's values and philosophy); *see also Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 671 (1973) (the "First Amendment leaves no room for the operation of a dual standard in the academic community."). Texas state law likewise recognizes that broad protection of students' freedom of expression is "central to the mission" of Texas A&M University—not subordinate to it. Tex. Educ. Code § 51.9315(b)(1).

Texas A&M opens its stages to extracurricular student entertainment of all stripes, including pageants with female students performing in gender-conforming attire. Verified Compl. ¶ 38(b) ("Miss Black & Gold" pageant). Defendants cannot selectively invoke an academic mission to censor speech, particularly when Texas has declared unfettered student expression as central to that academic mission.

Because the drag ban is not narrowly tailored to limit disruption to Texas A&M's academic functions, it fails strict scrutiny.

<ol start="2">
<li>**The drag ban is not narrowly tailored to redress discriminatory harassment, which requires far more than assertedly offensive expression.**</li>
</ol>

The drag ban is also not narrowly tailored to meet Defendants' second identified interest, "complying with federal antidiscrimination law." Opp. 16–17. By imposing a prior restraint on speech to avoid presumed offense, Defendants aren't avoiding constitutional problems and censoring speech as a last resort: They are *embracing* censorship as a *first* resort. *Contra Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) (the regulation of "speech must be a last—not first—resort.").

When anti-discrimination law reaches expression, it "steers into the territory of the First Amendment" and imposes "viewpoint-discriminatory restrictions on speech." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001) (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596–97 (5th Cir. 1995)). Recognizing the danger harassment regulations pose to student and faculty First Amendment rights, the Supreme Court has made clear Title IX, the federal law prohibiting discrimination based on sex, does not require an institution to take "action that would expose it to constitutional … claims." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649 (1999); *see also id.* at 667 (Kennedy, J., dissenting) (raising concerns about the First Amendment implications of university speech codes and disciplinary sanctions, and citing *Iota Xi*, 993 F.2d 386, among others). As a result, universities cannot suppress protected expression that does not amount to conduct "so severe, pervasive, and objectively offensive" that it effectively denies a student educational opportunities. *Id.* at 633 (majority opinion); *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 & n.16 (5th Cir. 2020).

Defendants do not explain how the drag ban is narrowly tailored to address discriminatory harassment. As the Council showed, Defendants' ban burdens more speech than is necessary because *Draggieland* does not come close to satisfying the "severe, pervasive, and objectively offensive" *Davis* standard. *See* Mot. 15–16. A one-night-only performance before a ticketed (not *captive*) audience is neither "severe" nor "pervasive." Nor do Defendants show the performance is objectively offensive—let alone *subjectively* offensive to its voluntary audience. Indeed, none of Defendants' eleven exhibits reveals even a solitary complaint about *Draggieland*. That is perhaps because a drag show is easily avoided: Don't buy a ticket. *Cf. Cohen*, 403 U.S. at 21 (observing that a person who wants to avoid "bombardment of their sensibilities" from protected profanity can do so "simply by averting their eyes").

In imposing a blanket ban on expression as a first strike against allegedly offensive speech, Defendants burden far more speech than is necessary to address the asserted interest. *See, e.g.*, *Pernell v. Fla. Bd. of Govs. of State Univ. Sys.*, 641 F.Supp.3d 1218, 1274 (N.D. Fla. 2022) (enjoining ban on university classroom discussion of "divisive concepts" that did not meet the *Davis* standard under a rule that instead made any speech promoting an ideology "*per se* severe and pervasive"). Defendants do not attempt to explain how this is constitutional.

Further, Defendants have less-restrictive alternatives to respond to any claim of a hostile environment (if one ever materialized), the availability of any one of which dooms the drag ban. For one, rather than impose a preemptive prior restraint (the most extreme form of censorship), they can respond *post hac* to discriminatorily harassing conduct in a manner consistent with the First Amendment if such conduct actually occurs. And the university can engage in or facilitate "more speech," the remedy to offensive expression the First Amendment prefers to censorship.

14

*Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). The drag ban is not narrowly tailored to redressing discriminatory harassment.

> 3.    A prior restraint is not narrowly tailored to advance any interest in penalizing lewd speech or conduct.

Nor can Defendants justify the prior restraint of the drag ban based on mere speculation that someone might engage in lewd conduct or "indecent speech." Opp. 14. To start, the Supreme Court has directly rejected the notion that university administrators may police the "decency" or "offensive" nature of student *expression*. *Papish*, 410 U.S. at 670. Defendants are thus simply wrong in positing that "colleges may prohibit lewd speech … without violating the First Amendment." Opp. 9. The Fifth Circuit did not (and could not) purport to overrule *Papish* in the inapposite *Martin*, *see id*. at 10, which involved discipline of a professor—an employee subject to more restrictive limits on their on-the-job speech to students—who cursed at and harassed his students. *Martin v. Parrish*, 805 F.2d 583, 585 (5th Cir. 1986). The interests of universities and their adult students differ from those of pupils in elementary schools. That's why the "teachings of *Tinker*, *Fraser*, *Hazelwood*, *Morse*, and other decisions involving [student] speech in public elementary and high schools, cannot be taken as gospel in cases involving public universities." *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 247 (3d Cir. 2010).

Even if Defendants were targeting lewd *conduct*, the ban would fail narrow tailoring because there are less restrictive alternatives than a prior restraint on stage performances. First, even if Defendants' speculative concern for "lewd" conduct were credible, Defendants can penalize prohibited conduct after the fact *if* it occurs. They cannot constitutionally restrict *all* speech in advance. *Se. Promotions*, 420 U.S. at 559 (rejecting a prior restraint imposed on a stage performance out of fear of lewd conduct). A "free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand," given the

"formidable" risks of permitting "freewheeling censorship." *Id.* Defendants insist cases involving municipal rather than campus theatres are irrelevant. Opp. 12. But that difference is of no constitutional consequence. The Supreme Court applies the same "level of scrutiny appropriate to any form of prior restraint" at public universities as it does off campus. *Widmar*, 454 U.S. at 268 n.5; *see also id.* at 268 (citing *Se. Promotions*, 420 U.S. at 549) & *Healy*, 408 U.S. at 180 (First Amendment applies with no "less force on college campuses than in the community at large.").

The facts only further refute Defendants' claim of being motivated by concerns over "lewd conduct." Defendants have approved *Draggieland* for five years in a row without raising any concerns about "lewdness." And the videos they cite fail to justify censorship in the name of preventing "lewdness." Opp. 10. The first video they cite does not, as they claim, depict a performer "simulat[ing] grinding his crotch." Opp. 10 (citing Defs' Ex. I). And while it does depict a performer doing "the splits," few would suggest cheerleaders doing splits on a Saturday afternoon at Kyle Field are engaged in prohibited "lewd" conduct. The second video they offer, of a "Catwoman" performance by Lily Adonis Fables, *did not* occur at *Draggieland*. Instead, that performer's actual appearance at *Draggieland* 2022 featured a full-length gown.[3]

Because measures short of a prior restraint on speech can address any interest in prohibited *conduct* if it materializes, the cancelation of *Draggieland* fails strict scrutiny.

## III.    The Public Interest in Protecting Free Expression Far Outweighs Defendants' Speculation About Title IX.

The Court should refuse Defendants' claim that the public interest prong favors them for one simple reason: Defendants offer no more than speculation, hypothesizing that speech *might* trigger Title IX, which *might* lead to repercussions if the university fails to act. In no event can

---

[3] *Draggieland 2022: Performance by Lily Adonis Fables*, YouTube (Apr. 30, 2022), https://youtu.be/h-BX83a2xss.

mere speculation outweigh the public interest in upholding free expression and stopping censorship on public university campuses.

        1.     <u>Speculation about Executive Order 14168 does not shift the balance.</u>

Defendants' speculative hand-wringing over Executive Order 14168 should not dissuade the Court from enjoining their viewpoint-based prior restraint. The Executive Order does not compel Defendants to act at all because, on its face, it concerns only *federal agencies* and *federal spending.* Exec. Order No. 14,168, 90 Fed. Reg. 8615, § 1 (Jan. 20, 2025). It does not reference universities, let alone purport to impose a nationwide speech code on student expression. And, to the contrary, the U.S. Department of Education not only reminded university officials—on the *same day* the Board of Regents adopted the drag ban resolution—that the Department "enforces federal civil rights law consistent with the First Amendment," it commended them to existing guidance that harassment requires "something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive."[4]

Most importantly, the Executive Order does not—and cannot—overrule *Davis*, which recognized that university officials need only take "reasonable" steps to address harassment. 526 U.S. at 648–49. Such reasonable steps surely do not include violating First Amendment rights, let alone addressing "harassment" for which there is no evidence, as Defendants have done. What's more, there is no remote possibility the Trump administration will hold Texas A&M to a different standard, as it has now reaffirmed that the *Davis* "severe, pervasive, and objectively offensive" standard governs universities' obligations under Title IX.[5]

---

[4] U.S. Dept. of Educ., Freq. Asked Questions About Racial Preferences & Stereotypes Under Title VI of the Civ. Rts. Act (Feb. 28, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf (citing "Dear Colleague" Letter from Gerald A. Reynolds, Asst. Sec'y, Off. for C.R., U.S. Dep't of Educ. (July 28, 2023), *available at* https://bit.ly/4krQvqV).
[5] "Dear Colleague" Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ. (Feb. 4, 2025), *available at* https://bit.ly/43QqrzG (citing Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026-01 (May 19, 2020)).

The situation at Columbia University that Defendants cite, arising under Title VI dealing with race and national origin, not Title IX's concern with sex, is plainly distinguishable. There, students and others have engaged in repeated, continuous *conduct*, such as takeovers of campus buildings, in ways that Jewish students often could not avoid. Officials have alleged Columbia's response to campus *violence* has been deliberately indifferent. A one-night drag performance in an enclosed venue—by students following the rules—is not likely to trigger the university's Title IX obligations, particularly because the audience is willing, not captive.

### 2.    Granting university leaders unfettered discretion to censor speech they believe offensive undermines the public interest.

The public interest is served by ensuring that public universities like Texas A&M remain a bulwark against government censorship, as the First Amendment, Fifth Circuit precedent, and Texas state law all recognize and require. The Fifth Circuit has recognized that administrators' "panicked damage control" has traded expressive principles for "hasty and disproportionate punishment" in seeking to prevent offense to campus constituents. *Speech First, Inc.*, 979 F.3d at 339. But the First Amendment requires that courts "be especially vigilant against" efforts to restrict protected campus speech. *Id.* It is also Texas state policy to broadly protect students' freedom of expression and require that administrators do not deny access to campus facilities on the basis of the "ideological" perspectives student organizations advance. Tex. Educ. Code § 51.9315(b)(1), (g). The drag ban offends these interests, while preliminarily restraining its operation serves them.

Defendants' claimed authority also will have ramifications far beyond *Draggieland*. If administrators can preemptively cancel any student expressive event because it may be offensive to a protected class, campus officials will have unfettered discretion to cancel *any* expressive event relating to race, national origin, gender, or sex. They will use that breathtaking authority to censor student speech whenever it may be upsetting to state officials, lawmakers, students, faculty, or

activists. The danger to free expression is all the greater if campus officials can cherry pick executive orders as cover for censorship, like Defendants do here. That is why this Court should remain vigilant against this effort to censor speech state officials believe to be wrong.

## <u>CONCLUSION</u>

The Court should grant a Temporary Restraining Order prohibiting Defendants from canceling *Draggieland* 2025 until it can issue a Preliminary Injunction enjoining enforcement of the Drag Ban Resolution, Verified Compl. ¶ 82, Ex. 1.


Dated: March 17, 2025                                    Respectfully submitted,

/s/ JT Morris_____
JT Morris (Tex. Bar No. 24094444; S.D. Tex.
    Bar No. 3163670)
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION (FIRE)
(215) 717-3473
700 Pennsylvania Ave., Suite 340
Washington, DC 20003
jt.morris@thefire.org


Adam Steinbaugh (Cal. Bar No. 304829)*
Jeffrey D. Zeman (Mich. Bar No. P76610)*
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION (FIRE)
510 Walnut St., Suite 900
Philadelphia, PA 19106
adam@thefire.org
jeff.zeman@thefire.org


* Admitted *pro hac vice*.

**Attorneys for Plaintiff**
**Texas A&M Queer Empowerment Council**

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 17th day of March, 2025, a true and correct copy of

Plaintiff's reply memorandum was served via the CM/ECF system to all counsel of record.

/s/ *JT Morris*