UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

*********************************************************************

TEXAS A&M QUEER EMPOWERMENT        4:25-CV-00992
COUNCIL

          Plaintiff,

VS.

                    HOUSTON, TEXAS
WILLIAM "BILL" MAHOMES,
ROBERT L. ALBRITTON, DAVID C.
BAGGETT, JOHN W. BELLINGER,
JAMES R. "RANDY" BROOKS, JAY
GRAHAM, MICHAEL A. "MIKE"
HERNANDEZ III, MICHAEL J.
PLANK, SAM TORN, CAGE
SAWYERS, JOHN SHARP, and MARK
A. WELSH III, in their
official capacities,

          *Defendants*     MARCH 18, 2025


*********************************************************************


TRANSCRIPT OF MOTION HEARING PROCEEDINGS
HEARD BEFORE THE HONORABLE LEE H. ROSENTHAL
UNITED STATES DISTRICT JUDGE

*********************************************************************


APPEARANCES:

FOR THE PLAINTIFF:          MR. ADAM B. STEINBAUGH
                        510 Walnut Street
                        Suite 900
                        Philadelphia, PA 19106



Proceedings recorded by mechanical stenography,
transcript produced via computer.

MR. JT MORRIS
Foundation for Individual
Rights and Expression
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003

FOR THE DEFENDANT:          MR. ZACHARY WILLIAM BERG
                            MR. MARK A. CSOROS
                            Texas Attorney General's Office
                            Capitol Station
                            P.O. Box 12548
                            Austin, Texas 78711-2548


Official Court Reporter:    Lanie M. Smith, CSR, RMR, CRR
                            Official Court Reporter
                            United States District Court
                            Southern District of Texas
                            515 Rusk
                            Room 8004
                            Houston, Texas 77002

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT:  State your appearances, please; and then the lawyers may be seated.  Everyone else may be seated now.

MR. STEINBAUGH:  My name is Adam Steinbaugh for the plaintiff.

MR. MORRIS:  J.T. Morris, also for the plaintiff.

THE COURT:  I don't think you need the mic.

Go ahead.

MR. BERG:  Zachary Berg and Mark Csoros for the defendants.

THE COURT:  Very good.  All right.  It's your request for a TRO.

And let me just preface your presentation, both presentations, both sides have done a very good job briefing. The briefs are thorough.  These are not new issues for the plaintiff, so I'd like you to really focus on addressing each other's points.

MR. STEINBAUGH:  I will try to do that.

THE COURT:  Thank you.

MR. STEINBAUGH:  Good morning, Your Honor.  May it please the Court.  My name is Adam Steinbaugh, and I'm here on behalf of plaintiff Queer Empowerment Council.

I want to point out that Alex Gonce is in the gallery.  They are a student at Texas A&M University and a

member of the Queer Empowerment Council.

THE COURT:  Very good.  Thank you.

MR. STEINBAUGH:  And I will start with if Your Honor wants to first discuss the expressed nature of theater in drag, I think we'll start there.  I think that's a good starting point.

THE COURT:  I think that's the threshold issue.  Is this expressive and, therefore, protected conducted?

MR. STEINBAUGH:  I think it is.  I think the theater is itself expressive.  I think that any person walking down to the theaters just a stone's throw away from here, when you walk in, you are expecting what is happening on stage to express something.

THE COURT:  Let me ask you a question about the case law.  There is a case from the Northern District of Texas that doesn't find that there's no expressive conduct, but raises a question about whether the conduct at issue, which is a drag show, as I recall, had shown that the conduct was expressive.

Are you aware -- and then there's a raft of cases that find that this type of performance squarely meets the definition of protected expressive conduct.

Are you aware of other cases besides the Northern District case, which is a district court case, that have found that this type of performance is not expressive?

MR. STEINBAUGH:  To my knowledge, no.  I believe that

is an outlier, a stand-alone case.

THE COURT:  I have not found any either, but I wanted to check and I'll ask the defendants the same question.

MR. STEINBAUGH:  So I think that you start with context and you start with the -- what people, when they walk into a theater, what they recognize and what they understand and I think that that is -- when you walk into a theater, you are purchasing a ticket for a particular performance.  You are going there with the intent to see people perform.

THE COURT:  Well, in essence you are consenting.  You are volunteering.  There's nothing compulsory about attending this performance.

MR. STEINBAUGH:  It's the exact opposite of an audience that is required to be there.

THE COURT:  Let me ask you another question about the audience.  Some of the cases that have dealt with this kind of performance have raised a concern about whether children will be exposed and obviously A&M students presumptively are 18 and older.  They're allowed to vote.  They can be drafted.  They are adults.  Is there anything in the record before me that suggests that children are likely to be present or that there's some kind of intent to have some of the ticket holders be families including children?

MR. STEINBAUGH:  No, nothing in the record.  No. Again, this is a college campus.  This is directed -- of all of

the places where you least expect a child to wander into some sort of performative atmosphere, the college campus is the last place. It's a place primarily intended for adults to learn from each other and we don't childproof expression even on the off chance that someone might bring someone who is under the age of 18.

And certainly students, to my knowledge, have warned that, you know, this is intended for adult audiences and they leave it to the audience to figure out whether or not they want to bring someone.

THE COURT: The name of the performance itself --

MR. STEINBAUGH: Yeah, it conveys --

THE COURT: -- conveys what --

MR. STEINBAUGH: The people going to *Draggieland*, they know what they're getting into; and if they're not sure, the students post videos of these performances online. Someone can look at it and say, "That's not the right atmosphere for my child. I don't want to bring them."

So certainly the target audience here is not children. It is adults at a public university, and I think that the adults walking into this performance are going to know that it is expressive. It's called "*Draggieland*." These are students who are conveying to a very conservative campus community that there are LGBTQ members of this conservative community and there's a space for them within this community.

That is what we want to have happen at public universities where people can build communities with each other.

THE COURT:  Let me push back a little bit on your characterization of the community as susceptible to such a simple label.

MR. STEINBAUGH:  Certainly it's a college campus --

THE COURT:  One thing that I wanted to ask both sides about is A&M's own rules on freedom of expression.  I don't know if this has been revised since 2015.  The one that I found is dated revised 2015, but it is a robust defense of the presence of the First Amendment on campus.

MR. STEINBAUGH:  I think just for clarity the most recent version came out this summer because, per the governor's directive, there was a change in language about anti-Semitism.

THE COURT:  Okay.  Is there any other change?

MR. STEINBAUGH:  As far as I know, no.  I think the other side can speak to that if I'm incorrect about that, but my understanding of it is that Your Honor is correct.  This is a very robust protection of free expression.  It is saying, "We don't discriminate based on viewpoint."

And if you look at the policy, it's talking about when you make reservations of particular spaces on campus, it is supposed to be done in a first-come, first-serve manner; and it is not supposed to discriminate from either viewpoint or content.

And I think at the end of the day the forum here doesn't really matter because this is viewpoint-discriminatory; but even if this was just a content-based limitation, it would still be subject to scrutiny.

THE COURT:  So is there any question about whether the plaintiffs here complied with the requirements for an advanced registration for the performance?

MR. STEINBAUGH:  Not -- as far as I know, there's not a solitary question.  I don't see that there are any logistical hurdles here.  I've not been informed of any undotted i's or uncrossed t's.  The students still have a reservation on the books.  They can go on this date or on these two days, hold the rehearsal and a performance.  It just can't be the performance they want to hold, and I think the only impediment here is the Board of Regents' abhorrence of the expression.

So I think that --

THE COURT:  Because of its content and viewpoint?

MR. STEINBAUGH:  Because of its content and viewpoint.

And I think that as I'm getting older, I've recognized and, you know, as my college years disappear into the rearview mirror, I think that one thing that becomes apparent is that every generation has some form of art that those of us who are in the preceding generations don't really understand.  We don't quite get it.  There are forms of music and theater and video games --

THE COURT: At my stage of life, I can only wholeheartedly agree. There is much in today's world in terms of performance that --

MR. STEINBAUGH: Yes. And --

THE COURT: -- I don't even know about.

MR. STEINBAUGH: You and me both. But the --

THE COURT: But I grew up in the Sixties and went to college in the Seventies; so I know about protests, I know about expressive activity on campus and in public spaces. There's a robust history.

MR. STEINBAUGH: There is and there's also a history of --

THE COURT: And a robust set of cases.

MR. STEINBAUGH: Yeah, especially with *Healey* and *Papish*. I think those are sort of north stars, if I could name two, for campus free speech.

But, you know, speaking of the Sixties and Seventies, I think you can look back at that era and see some of the panics that arose over younger generations' artistic expression.

Thinking of starting in the Fifties with the suppression of comic books or a Florida judge telling Elvis "If you swivel those hips down here, you're going to wind up in the county pen" or FBI agents stalking The Kingsmen trying to record them to see if *Louie Louie* has obscene lyrics, which it

does not.

And then you have in the Nineties efforts to suppress violent video games and the Supreme Court in *Brown versus Entertainment Merchants Association* saying even video games are protected by the First Amendment.

So I think that there's a lot of speech out there that people just don't like; and I think our natural human instinct is to try to suppress the speech that we find abhorrent, because it's very easy to say, "I love free speech." It's very easy to say, "I love free speech" in the abstract; but when the rubber hits the road, a lot of people put the word "but" behind that. They say, "I love free speech, but not that."

And I think what we can draw from that is a lot of people have their own individual lines that they think speech should not cross, but it's not the government that gets to draw those lines. It is the individual.

What the Supreme Court told us in *Cohen*, for example, is that if you believe that there is speech out there that you don't like, avert your eyes. And that -- one thing that I would like to draw the Court's attention to here is that the -- one of the exhibits -- and I believe it's Exhibit H. I may be wrong about that. But there's an article here from the campus newspaper in which a conservative student attends a protest in support of *Draggieland* and he --

THE COURT: Well, conservative students have been on the receiving end --

MR. STEINBAUGH: Oh, yeah.

THE COURT: -- of efforts to restrict speech that they favor and has resisted efforts by other students to heckle or prevent or disrupt those kinds of speeches.

MR. STEINBAUGH: That pendulum swings right back and forth. In the morning I get to defend pro-life groups, and in the afternoon it's pro-choice groups. And the rule of law means with those rights, if one of them sinks, it sinks for everyone.

THE COURT: Can I ask one question?

MR. STEINBAUGH: Sure.

THE COURT: I know I'm looking at the updated set of the university's rules regarding expressive activity on Texas that were revised about a year ago in June of 2024, a little less than a year ago; and one of the provisions is that any person who believes that their campus expressive activity rights has the right to file a grievance and recognizes that those who choose to attend are charged with the duty of recognizing and honoring the right of free speech.

Is there any record of grievances being filed --

MR. STEINBAUGH: No, and I --

THE COURT: -- on either side of --

MR. STEINBAUGH: No. And I'm not even aware of any

party ever filing a grievance under that law.  I think it's possible, but I've never heard of it.  I would like to think I would have heard of it at some point, but I think it would be an act of futility if they had to.

THE COURT:  Can you address A&M's argument that the drag show would offend or violate the recent executive order recognizing that there are only two genders?

MR. STEINBAUGH:  Well, I think that -- if you'll give me one moment.

THE COURT:  And the governor's executive order.

MR. STEINBAUGH:  I view those as sort of one and the same.  I think they're both trying to accomplish the same thing and --

THE COURT:  I agree.

MR. STEINBAUGH:  -- I think as a starting point universities just aren't identified within the order itself. It addresses primarily the government's own speech and if the government wants to form its own ideas and its own viewpoints, the First Amendment has no implications there; but when it starts to attempt to use funding to impose a speech code on college campuses, what we know from the Fifth Circuit is that that starts implicating the First Amendment rights of students.

But, you know, setting aside the executive order itself, I don't think that's an announcement by the Trump administration of some policy targeting universities and

colleges.

THE COURT:  Well, isn't there a distinction and is there -- let me ask the question this way.  Is there case law support for distinguishing between two sexes -- and I was always taught that plants have gender and people have sex and that there is a distinction between sex and gender; but putting that semantic issue aside, even if there is only a male and a female sex, recognized biologically, that there are -- that does not describe adequately the human imagination and the creativity that can result in a variety of sexual expressions --

MR. STEINBAUGH:  Right.

THE COURT:  -- or sexual forms of art or all sorts of fields.  Poetry, drama, visual arts.  Sexual expression is intuitively different, and the various forms of sexual expression are different from describing the biological nature of human genders.  Is there case law that discusses this?

MR. STEINBAUGH:  Well, I think that we start with the first principle that there's no such thing as a false idea under the First Amendment -- I think that's *Gertz v. Welch* -- and the government does not get to dictate what truth is, especially on a college campus.

On a college campus, you have *Keyishian versus Board of Regents* explaining that students learn there not from the authoritative selection of views, but from the exchange of

views.  Students learn truth that way.

On the subject of a distinction between sex and gender, I might look at then-Judge-Alito's opinion -- I believe that was in *Saxe*, S-A-X-E.  If you give me a minute, I can look for it.

But he points out that the -- that there is a distinction between sex and gender and that people have approached gender and come to different views about what that means and I think that if Judge Alito can recognize that, I don't think the President of the United States can de facto declare otherwise.  I think that that imposes a speech code at a public university, and that is just not how we approach the exchange of ideas.  We don't approach it through dictate.

THE COURT:  Let me ask you, then, to address specifically the argument by the defendant that the drag show events are demeaning to women, that they are likely to create or contribute to a hostile environment for women because of the mockery or objectification of women -- I think I'm using the words that they used -- that the shows parody and demean and, therefore, they are contrary to the institution's values, which are undefined other than in the speech code, the Expressive Activity on Campus Rule 8.99.99.M1.  And we've already talked about the executive order prohibiting institutions from using federal funds from promoting gender ideology.

Can you address those arguments?

MR. STEINBAUGH:  I think --

THE COURT:  You've already addressed some of them, but the specific argument about demeaning and objectifying women.

MR. STEINBAUGH:  Let me attempt to do so and if I miss part of that, let me know, because I'd like to get all of that.

Let's start with the assertion that drag shows are demeaning to women.  I think our clients would very much disagree, but it's a subjective question.  And I'm not going to begrudge the state or the officials to hold a different opinion.  That's what happens in a free society.  We can look at artistic expression and say, "That's beautiful.  I love it."

Or we can look at that and say, "That's reprehensible.  I'm going to avert my eyes.  I'm not going to spend my hard-earned money on that."

But then we move on to the notion that there is a philosophy that student expression can be held up against and permitted or not permitted.  That is what the Supreme Court in *Healy* said was not permissible where the university president said to a Students for Democratic Society chapter "Your society is abhorrent" or "Your group is abhorrent to the philosophy of our institution."

Those are subjective judgments that the government does not get to make.  It is not about making moral judgments about people's expression.  I think that that's where this resolution runs on the rocky shores of the First Amendment

is that it is imposing viewpoint-based judgments about the speech and regulating on that basis.  As a subjective matter it is saying, "We are regulating this because it is an ideology.  It is promoting an ideology."

That is almost word-for-word what the Supreme Court said in *Rosenberg* is viewpoint discrimination.  But then even on its face this policy starts talking about "It's a drag show if it parodies women."

Well, that just means if you have a drag show under their definition of it, it is a drag show and prohibited if you are mocking women, if you are saying something that they view as negative about women.

But if you have, as this university does, a pageant where women are presented in a stereotypical feminine clothing and attire and behavior, that's absolutely permitted on the exact same stage.  That is viewpoint discrimination, and that is what that does.

And I'm sorry if I'm missing part of your other question.

THE COURT:  Let me ask you to address two questions.  One is the argument that this is a limited forum and, therefore, is subject to restrictions that have to be judged on a lower standard than strict scrutiny.

The second is the availability of alternative forums and whether there is, in fact, an ability to move off

campus that is within the kind of time, place or manner regulation permitted by the First Amendment.

MR. STEINBAUGH:  Well, let me start with the forum categories.

THE COURT:  Yes, there are two questions.

MR. STEINBAUGH:  And I think that this is -- I don't think the answer depends.  I don't think the answer to this case depends on the classification of the forum.  They concede that there is a public forum here.  We just disagree about whether or not it's a designated or limited public forum, but viewpoint discrimination is prohibited in both.

And even if this were only a limitation based on content, we know from cases like *Pro-Life Cougars* and from I believe it is -- I am blanking on the name here.  But we know from the Fifth Circuit -- and I can look this case up in a moment -- *Justice for All versus Faulkner.*

We know from those cases that when you open a forum for the use of student organizations and you don't impose anything other than very minor limitations on it, you're essentially creating a designated public forum for use by those students and that gets strict scrutiny.

Now, it would be different if the university opened this forum specifically for students and then someone else outside the university sought to use it.  That wouldn't get strict scrutiny, but the students' use does.

So, you know, again, I don't think it matters whether or not it's a designated or limited public forum because of the viewpoint discriminatory aspects here; but if you look at the policies about this forum or about this stage, they don't impose any form of content-based restrictions on this stage.

When you fill out the form in order to be able to apply to use this space, there's a catchall category of "Other" for the type of performance that you can hold there.  And I think the other area where the parties disagreed was whether or not it was a suitable space for a drag show; but if you look at the last five years, it was a suitable space then.  What is the difference now?  And --

THE COURT:  Well, A&M used to publicize on its website that it was the Number 3 college in the United States for free speech.  I don't think that celebration of adherence to the First Amendment is on the current website.

MR. STEINBAUGH:  And I think, to be fair, that recognition may have come from my organization.

THE COURT:  I think that's right.

MR. STEINBAUGH:  And other than, you know -- other than this, Texas A&M has very good policies for free speech.  The problem here is --

THE COURT:  Even the current policies.

MR. STEINBAUGH:  Correct.  And the problem here is the

board is not modeling that dedication to free speech. Instead of, you know -- I keep coming back to this conservative student who is at this protest who was like, "Hey, this is not my cup of tea, but I'm here to defend their rights."

That is exactly what we want to have students model.

THE COURT: Exposure to both sides. Or all sides.

MR. STEINBAUGH: Yeah. And I think, you know, it's very easy to talk about free speech in the abstract; but here we have a student who is saying, "I don't like this speech, but it is protected."

Why can't the board do that? I think the board is teaching an awful lesson to students, and we are going to lose students like this if the answer to this type of speech is to suppress it. They are saying, "If you don't like speech, you can trust us to suppress it for you."

I think that is a terrible result for freedom of speech in this country.

And with respect to your second question about the availability of alternative venues, we don't play Whac-A-Mole with free speech. We know from *Southeastern Promotions*, we know from *Healy,* that the availability or your ability to express yourself off campus is not a justification to be able to say, "You can't express yourself here," because if they can say, "You can't express yourself here," what's

going to stop the local city from also saying, "You can't express yourself here either"?

That is something that we do not start down that road because we don't know where it's going to wind up.  And I think the First Amendment is very clear on that point, and it's especially salient for this group.  This group, their entire mission is to speak to students at this campus on this campus. It is called "*Draggieland*" because it is about the Aggies and the more that you push speech off campus, the harder it is to be able to reach the people on that campus and it also sends the message that they are not welcome here.  It sends the message that this viewpoint is not welcome here.

I hope that answers your question.

THE COURT:  Yes, I think it does.  Thank you.

Do you know and is there anything in the record that reflects whether student groups have in the past, or members of the public, applied to host performances and have been refused?

MR. STEINBAUGH:  For drag performances?

THE COURT:  Any kind of expressive performance, speakers, performances.

MR. STEINBAUGH:  I don't know.  You know, if they were, I hope they'd call us because I think it is very rare for a -- I think that when a university does reject a proposed speaker or allows students to shout down a speaker or shuts

down a pro-Israel club because their views might be seen as harassment to Palestinian students, that tends to get attention.  When you suppress speech, there's this phenomenon called the Streisand effect, where it draws more public attention to the very thing you were trying to hide.  And I would hope that if the university had rejected speakers, I would have learned about it.  It's always possible, but there's nothing in the record.

THE COURT:  There is information in the record about the funding source for this performance.  As I understand it, it is student-funded and it doesn't use A&M funds.  It is on the A&M campus.  It uses a campus venue.  What is the significance, in your view, of the funding source?

MR. STEINBAUGH:  Well, I think that even if state funds were put into the pot here or used here, when you run a public university, you have to expect there's going to be speech that you don't like.  You can't just selectively provide that funding and withdraw it based on the viewpoint.  We know that from *Widmar* and *Rosenberg.*

But, you know, the point of a university and the university and the state both say that their mission is to -- is founded upon unfettered student expression.  They say this is central to their mission, to their academic mission, I might add.

And who is paying for the air-conditioning that's

going to be on in the theater at the time I don't think really has any relevance. You can't turn off the air conditioner or turn off the lights because you don't like the viewpoint. The state -- or the funding that is at issue here, these are students paying to use this space. This is not about some public or some use of public funding. This is not the state funding this any more than it's funding just the general availability of these spaces and the state certainly understands that the availability of those spaces is important to being able to facilitate student speech.

THE COURT: Can you sum up with whatever last remarks you want to make and put it in the framework that I have to apply whether you have met the requirements for a TRO?

MR. STEINBAUGH: Certainly. I think that, you know, this is a student organization that exists to speak on this campus; and anytime you impose a prior restraint on speech, that itself is irreparable harm. Every day that proceeds forward from here, the students have to ask themselves whether or not they need to surrender their First Amendment rights in order to put on this performance somewhere and that's because this takes a lot of logistics to be able to put this performance on and I think at the top of my mind, as I think back to my college days, the students have a lot going on.

First and foremost, they are students. They have academic responsibilities. They have classes. They have

tests.  That's tough.  That's tough even if you have nothing else going on.  On top of that, a lot of these are graduate students or they might have jobs that they also have to attend and here we have students who on top of both of those things with what little time they have left are going in and trying to improve their community, they are trying to contribute to their community.

And now what the state has done is said, "Not only do you have to continue doing that if you want to be able to exercise your rights in this space we made available for you, you need to go do it twice because if you want to hold this at all, you need to go to a second venue.  You need to start making arrangements and making sure that your performance can be at that venue.  You need to vet the security at those venues.  You need to come up with the money to rent those venues.

And your audience, your audience that may not always be paying attention all the time, you need to go and tell them where this new event is going to.  And by the way, all of your tickets, we returned them; so you need to resell those, too."

And I think that --

THE COURT:  Who paid the refunds for the tickets?

MR. STEINBAUGH:  Well, the members of the public, the audience, bought them --

THE COURT: Right.

MR. STEINBAUGH: -- so that's not the state.

THE COURT: And I understand that there was a refund.

MR. STEINBAUGH: Right.

THE COURT: Who paid that?

MR. STEINBAUGH: The students were told "Your event is off. We're going to refund the tickets."

THE COURT: "We" being the defendants?

MR. STEINBAUGH: The box office, yes.

So I think that every day that goes by, these students have to ask themselves "At what point do we just have to jump ship so that we can make sure that this event happens at all?"

That clock is ticking now; and in order to ensure that the students are able to perform this at all, I think that that justifies a TRO in order to preserve the status quo, because the status quo is the relationship between the parties before the controversy; and for five years that's been the ability to put on this performance in this space that is appropriate and set aside for these students.

Does that answer your question?

THE COURT: It does. It does.

MR. STEINBAUGH: Unless there's anything else, I'm --

THE COURT: All right. Let me hear from the defendants.

And then you will have a brief opportunity to respond since you have the burden.

MR. STEINBAUGH:  Thank you.

THE COURT:  So as a threshold issue, I'm holding up the A&M rule on expressive activity on campus.  Doesn't this document allow this performance?

MR. BERG:  We don't believe so, no, Your Honor.

THE COURT:  Why?

MR. BERG:  The restriction on the drag shows is purely on conduct.  The board laid out a five-factor test in the resolution that has only to do with conduct.  You don't need to know anything about viewpoint.  You don't need to know anything about how they feel about gender expression even.  You can judge it purely based on content.

THE COURT:  Well, that is the content.

MR. BERG:  Sorry.  Conduct.

THE COURT:  That is the conduct.  It's expressive conduct.  So I'm still not clear on how that's consistent with what I see in the rule statement as stated in the preamble to the bill:  Freedom of expression is of critical importance and requires each public institution of higher education to ensure free, robust, and uninhibited debate and deliberations by students enrolled on the campus, whether they're on or off campus.  It is a matter of statewide concern that all public institutions of higher education officially recognize freedom

of speech as a fundamental right.  A person should be permitted to assemble peaceably on the campuses of higher education for expressive activities, including to listen to or observe the expressive activities of others.

That seems to me to tie into the plaintiff's arguments.  Tell me why it doesn't.

MR. BERG:  I think defendants still stand by it.  All that -- the plaintiffs themselves make the distinction in these performances that there are two phases.  The first stage, which we say is pure conduct and then sort of interview phase where they talk about what drag means to them, what the performance means to them, maybe how they pick their outfit.

THE COURT:  Why isn't that expressive?

MR. BERG:  So the second part, I think, is definitely expressive and that is not banned.

THE COURT:  Why isn't the first part expressive?  It's a performance.

MR. BERG:  So the first part, I would point to *Texas v. Johnson*, the two-step test.

First, whether an intent to convey a particularized message was present and whether the unlikelihood was great that the message would be understood by those who viewed it.

And in the plaintiff's briefing, they talk about how the -- what they're expressing is support for the LGBTQ+

culture or gender identity.  But I think we can all think about examples where someone might be in drag and that's not inherently expressive of those ideas.

THE COURT:  I think the test is it doesn't have to be a narrow or succinctly articulable message for it to be constitutionally protected.  The question is whether the reasonable person would interpret it as some sort of message, not whether an observer would necessarily infer a specific message.  That's out of the Supreme Court.

And in *The Woodlands Pride* case, one of my esteemed and very experienced colleagues found that drag performances were expressive and met this test.

MR. BERG:  Yeah.  Can I answer that in two parts?

THE COURT:  Judge Kacsmaryk found differently in the *Spectrum* case.

Were either of those cases appealed?

MR. BERG:  They are both on appeal.  They were both heard last year.  They even have similar panels.  I believe they are waiting on the health of Judge Dennis to issue, but yeah, both those went up.  *Spectrum* first, then *Woodlands Pride*.

THE COURT:  And the panels were?

MR. BERG:  The panel in *Spectrum* was Ho, Southwick and Dennis; and the panel in *Woodlands Pride* I believe was Engelhardt, Southwick and Dennis; so very similar.

THE COURT:  Yes.

MR. BERG:  Two points to respond to your previous statements.

I would point to *Rumsfeld v. FAIR* where they talk about how you can't combine non-expressive conduct with expressive conduct to make them both expressive conduct.  And *FAIR* requires that all conduct, entertainment or not, inherently express some thought without additional explanatory speech in order to qualify for First Amendment protection.

And the Court in *FAIR* said that the very fact that such explanatory speech is necessary is strong evidence that the conduct at issue is not so inherently expressive that it warrants protection, which certainly seems to fit the facts here where you have the two parts of the performance.  You have the performance and then you have the literal explanation of the performance.

THE COURT:  Why aren't both of those -- I still don't understand how given the Supreme Court's description of what expressive conduct is why both parts of this event don't meet the test.

MR. BERG:  Sure.  The conduct, the first part of the performance, you could look at that and get different messages.

THE COURT:  That's the point.  That's exactly the point.

MR. BERG:  You can have different messages, but we

would say that not only is there different messages, there's not a coherent message, I think.

THE COURT:  It doesn't have to be a specific articulable message.  That's what the Supreme Court said.

MR. BERG:  I think we're talking about the same case.  But one, they could be, I think, expressing unrelated things.  Also I think you could have a performance, say, here in drag where the intent is not to express, where the performer gets something personally from the performance that makes them feel strong or beautiful or sexual and that there isn't an expressive element inherent in the performance.

THE COURT:  I think I understand your position.

Let me ask --

MR. BERG:  Oh, and if I may add --

THE COURT:  Yes, of course.

MR. BERG:  You also talk about *Woodlands Pride*.  That is the only case within the Fifth Circuit that plaintiffs advanced for the proposition that drag shows are inherently expressive.  As you've noted, this contrasts with *Spectrum West Texas*.

THE COURT:  Judge Kacsmaryk's case?

MR. BERG:  Yes.

THE COURT:  On the other hand, I found a lot of cases in other courts, including circuit cases, that address similar kinds of performances and they all seem to allow these

performances in a variety of fora.

MR. BERG:  Well, we can certainly go through those cases if you would like.  I would just like to point out the differences factually in *Spectrum West Texas* versus *Woodlands Pride* and how this case is almost a pure analog to *Spectrum West Texas*.  It's a Texas A&M campus student group suing for the right to hold a drag event on campus in a specific venue.

*Woodlands Pride* was a much broader bill.  It was Texas Senate Bill 12.  It restricted sexually oriented performances on public property, on the premises of commercial enterprises or the presence of a child.  It had civil penalties up to $10,000.  It created a Class A misdemeanor.  None of that is here.

THE COURT:  So you think Judge Hittner was right in his approach in that case --

MR. BERG:  No.

THE COURT:  -- given all the facts that you've laid out?

MR. BERG:  I don't, no.  I, perhaps not surprisingly, agree with Judge Kacsmaryk.

THE COURT:  Of course, he didn't have the additional facts that were present in Judge Hittner's case that you have just argued distinguished it from both this case and the *Spectrum* case.

MR. BERG: Sure. I would say neither case is controlling here, but the facts in *Spectrum West Texas* map much clearer to this case than do *Woodlands Pride*.

THE COURT: Can you address the issue of going beyond the dispute as to whether this is an expressive conduct?

MR. BERG: Sure.

THE COURT: Let me ask you whether student groups or members of the public in the past have applied to host performances and not been permitted to do so?

MR. BERG: So we looked into this. The records aren't great. There are instances where people tried to register and for some reason it didn't happen; but the people who used to work at A&M don't work there anymore, so we're not quite sure.

THE COURT: So you have nothing in the record that says that in the past students have been -- have applied to host performances and have been denied permission because of the nature or content of the performance?

MR. BERG: No. But even assuming that that is the case, if we could see all the facts, I think the Board of Regents -- the defendants here, many are the same people who have been in their positions during the length of the *Draggieland*.

THE COURT: Including permitting it in the last five years?

MR. BERG: Yes. And they are best situated. They have

seen the show over the years.

THE COURT:  I don't mean to interrupt you, but they didn't prohibit it for five years.  Nothing in the record indicates that the show has changed.

MR. BERG:  I think the record indicates that the view of the --

THE COURT:  -- Board of Regents has changed.

MR. BERG:  -- and the university has evolved as they've become more exposed to this event.

THE COURT:  They have still issued just not even a year ago this statement on expressive activity on campus, which begins with the robust defense of the First Amendment and with a commitment in the face of the turmoil on various campuses involving anti-Israel/pro-Palestinian views -- a robust defense of expressive activity rights.

So explain how the --

MR. BERG:  So there's three parts to that.

First, if I could finish my answer on the last question about --

THE COURT:  Sure.

MR. BERG:  -- the evolving view of the Board of Regents as they became more exposed to performances.  This is in the record following the 2021 show.  Something happened where it was previously university-funded and that ended after 2021.

THE COURT:  And it's now all student-funded?

MR. BERG:  Yes.  Although the university still provides the venue, which is an issue.

THE COURT:  Of course.

MR. BERG:  Second, as to --

THE COURT:  But no university funds are going to the performance.

MR. BERG:  Well, the venue itself, which is meaningful here, it's one of the prime venues on campus.

THE COURT:  Right.  And it's hosted a whole variety of different events, right?

MR. BERG:  It has and --

THE COURT:  Including conservative speakers --

MR. BERG:  Yes, conservative speakers and --

THE COURT:  -- not-conservative speakers, beauty pageants.

MR. BERG:  And beauty pageants and it continues to do so, and I think it could potentially even hold a drag show in the future.

THE COURT:  Why not now?

MR. BERG:  So if we look at the -- the board laid out a five-factor test of what would be considered prohibited drag show events.  This is not just drag shows are banned.  There's a five-factor test.

The first involves biological males dressing in women's clothing.  That's not going to change, right?

But then you have wearing exaggerated female makeup and/or exaggerated prosthetics meant to parody the female body type; open to the public, meaning the public associates it with A&M even more in this venue; involves sexualized, vulgar or lewd conduct; and involves conduct that demeans women, the conduct itself demeaning women, not the performance.  So --

THE COURT:  Wait, wait, wait.

The conduct demeaning women, but not the performance?  Is that what you -- did I mishear you?

MR. BERG:  Not any expressive elements that might come from the speech or explanation that the performers provide.

THE COURT:  So let me ask you this.  Let's assume that the university wanted to have or host -- a student group, to be more precise, applied to host a speaker who was committed to a conservative view that women should occupy certain positions in life and not others and this was protested as demeaning to women because it portrayed women as limited to certain roles and not roles that were equal in a variety of ways to roles of men.  Would the university restrict that because it was demeaning to women?

MR. BERG:  Possibly.  It would certainly --

THE COURT:  Really?

MR. BERG:  Judge, it certainly would be a different case, and I think even plaintiff's briefing will show that the

university has hosted speakers of all persuasions --

THE COURT:  Right.  I agree.

MR. BERG:  Yes.  We're in agreement.

So I think the more interesting hypothetical is if a drag show applied to perform at Rudder Theater and did not have one of these elements whether they would be approved, and I believe the answer to that question is yes.

THE COURT:  What exhibit in the records lists these five factors?

MR. BERG:  I believe it is Defendants' Exhibit C.

THE COURT:  Okay.  Thank you.

MR. BERG:  I believe it's the bottom of Page 1 perhaps.

THE COURT:  I've got it right here.

MR. BERG:  So the resolution prohibits drag show events that satisfy all five of these factors.  Also they have no cure at a particular venue, a limited public forum; so you could say there's like a fifth and a half factor.

But that also opens up the fact that you could potentially have a drag show, even one that hit on all five of these elements, that would be hosted on campus, just not in Rudder Theater because it's a limited public forum.

THE COURT:  Explain to me the nature of this forum.

MR. BERG:  Yes.

THE COURT:  Not just the labels that you're using, but the type of events that this forum has been used for in the

past.

MR. BERG:  Certainly speakers of variety of sorts.  The theater itself is named after Earl Rudder, who was president and -- president of the A&M system, somewhat of a celebrity. He was a hero in World War II.  He led the troops that stormed the cliffs of Normandy.  Ronald Reagan, when he commemorated the landings, stood where his unit --

THE COURT:  When was his last year as president?

MR. BERG:  I don't have -- I don't have that right before me.

THE COURT:  Was he president in 2015?

MR. BERG:  He was not, Your Honor.

THE COURT:  Who was?

MR. BERG:  I don't have a roster in front of me.

THE COURT:  When was the first time A&M issued rules on expressive activity?

MR. BERG:  There have been a number of editions, as we've talked about the most recent, due to the anti-Semitism --

THE COURT:  That's recent.

MR. BERG:  Recently.

THE COURT:  What about during Vietnam?  Did it have free expressive activity rules at that time when there were many protests?

MR. BERG:  I'm sorry.  I didn't catch the first part of that, Your Honor.

THE COURT:  You may not remember the protests that surrounded the Vietnam War.

MR. BERG:  Yes.

THE COURT:  I don't know if they reached A&M, but do you know if there have been in the past rules on expressive activity that predated 2015?

MR. BERG:  Without having certain specifics, I believe that is correct because the preexisting rules were amended, I believe, in 2019, which suggests that there was rules at the date that you are asking about.

THE COURT:  So there is a 2015 edition and then a 2019 edition and then a 2024 edition.

MR. BERG:  That sounds correct, Your Honor.

THE COURT:  Do they all repeat the preamble that emphasizes that this is a university, a very distinguished research university that is dedicated to the personal and professional development of each individual, that it's a mission of higher -- an institution of higher learning that encourages the free exchange of ideas that requires the university to protect the rights of freedom of speech?

MR. BERG:  I don't have the specific documents in front of me, but I would imagine that most of the documents go along those lines.  A&M certainly has a history of protecting free speech.  I think you can even see that here, although you may question that, but this is --

THE COURT:  How does this protect -- how does the board's refusal of this performance -- in fact, the banning of this performance -- how does that promote free speech or protect free speech?

MR. BERG:  Yeah.  In two ways.  First of all, they're not banning the expressive conduct.  After this decision came down, the plaintiff organization and several related organizations were able to come together on campus in a public forum, dressed in drag, expressed what they supported about drag, supported about -- or talked about how the defendants' actions were something that they they opposed.  We talked a little about the conservative students.  I don't think anybody on the Board of Regents would find any issue with that.

THE COURT:  Well, I applaud the board's lack of action to forbid a protest.

MR. BERG:  If I --

THE COURT:  That is certainly required and consistent with the board's own policies on protecting free speech.  Tell me how that's consistent with the ban --

MR. BERG:  What was the last --

THE COURT:  -- other than the five-factor test.

MR. BERG:  Oh.  So I think -- if you're talking about the five-factor test, I think that shows how narrowly tailored this is.  I mean you could have drag shows on campus that are still allowed.  This is --

THE COURT:  What drag shows would be allowed?

MR. BERG:  Any drag show that either did not have one of these five factors or was not at a limited public forum.

THE COURT:  So if I find that this is a traditional public forum, not limited, that would require the performance to be allowed?  Is that consistent with what you've just said?

MR. BERG:  Yes.

THE COURT:  Okay.  As I understand it, the Draggieland performers are fully-clothed, correct?

MR. BERG:  Sort of.

THE COURT:  Well, there's no nudity that I've seen evidenced in the record.

MR. BERG:  Not --

THE COURT:  I mean they are clothed in a way that some people might find offensive, including the board, but they are fully clothed; is that correct?

MR. BERG:  I don't think the clothing necessarily is offensive.  It could be offensive.  Well, not "it could be." If it was contributed to a sexualized, vulgar or a lewd conduct.

THE COURT:  Well, let me --

MR. BERG:  But I think that's sort -- I think that's sort of separate.  I don't think the clothes are the issue because --

THE COURT:  Okay.

MR. BERG:  -- we talked about the protest.  People came in their outfits, and I don't think that was an issue.

THE COURT:  That's good to know.  So is it the -- if it's not the clothing -- and I assume that the clothing includes makeup, hairdos, things like that, correct?

MR. BERG:  That's my understanding, Your Honor.

THE COURT:  All right.  So if the clothing is not offensive and not a basis for banning the show, what aspects of the performance are?

MR. BERG:  Well, I think it is one of the aspects.  It's one --

THE COURT:  Well, you just told me --

MR. BERG:  -- of the five.

But you have to have all of the five.

I think the conclusion -- and this is why this is narrowly tailored.

THE COURT:  So define "lewd" for me.

MR. BERG:  Sorry?

THE COURT:  Defined "lewd."  Anything sexual?

MR. BERG:  I wouldn't think so, but --

THE COURT:  So the board would decline to permit Elvis Presley to perform because he certainly had elaborate costumes and was often criticized for the sexual body language that he conveyed in his performances, a lot of grinding.

MR. BERG:  Yeah.  You may have more familiarity with

Elvis than I do, although I certainly --

THE COURT:  It was a long time ago.

MR. BERG:  -- saw the recent movie.

THE COURT:  Or the Cher Show, which involves women scantily clad, which the board, I think, permitted.  Or a beauty pageant.

MR. BERG:  Yeah.  That beauty pageant, I thought that was odd to include in the list.  It's basically the African-American version of a Miss America, which --

THE COURT:  Right.  Which is a beauty pageant.

MR. BERG:  Yeah.  I don't --

THE COURT:  And some view it as offensive, as demeaning to women.

MR. BERG:  That's not in the record.

I would say -- to the Elvis I would say that he would fail at least three of the factors.  Dressing as a woman, I don't believe -- I'm not super-familiar, but I don't think he was -- he was a provocative dresser, but I don't think he did that.

THE COURT:  But you would not say it's vulgar or lewd?

MR. BERG:  I don't know if it was or not and the --

THE COURT:  Can you -- I guess -- go ahead.  Finish your answer, but then I have a question.

MR. BERG:  I think the universities are in the best position to judge that, especially -- so you have -- I think

you have two categories of defendants here. You have sort of the campus people and then the board people. The campus -- like the president is responsible for what happens on campus; but the board has to look at the whole environment, what's happening on campuses, what's happening nationally. I think that's where we get into the Trump executive order, which I can talk about more if that -- I think that goes -- the position, to be clear, is not that A&M thinks drag shows necessarily violate the executive order. Our position is that it seems pretty clear that the Trump administration thinks it does and that goes to --

THE COURT: Has the Trump administration issued an order on drag shows? I didn't see it in the record. Have I missed it?

MR. BERG: You did not miss it. So we think -- so you have -- if you take a few forms of evidence, you can come to the same conclusion.

So we have the original executive order that we're talking about defending women from gender ideology, extremism and restoring biological truth in the federal government --

THE COURT: Well, assuming biological truth, isn't there a difference between recognizing only two genders and also recognizing that there's a whole range of sexual expression?

MR. BERG: Sure. I don't -- I don't know that really goes to drag, though. I mean certainly some performers might identify as a different gender, but I think plenty of straight people perform or either attend shows.

THE COURT: I don't think that the drag shows performers are seeking to alter their genders.

MR. BERG: Yeah. I don't -- I don't -- so, yeah, like I said, I don't think -- I don't think the first executive order necessarily ties itself perfectly to drag.

THE COURT: I think that's right.

MR. BERG: Then you follow that up. You have the Office of Civil Rights, the OCR, always a terror at the Department of Education, although they are somewhat diminished as of recently. They issued a Dear Colleague Letter, which we know had strong persuasive effects on universities following the executive order and in that they said that ED and OCR must enforce Title IX consistent with President Trump's order. So we've gone from gender ideology to Title IX.

And then we have a second executive order the next day after the Dear Colleague Letter, the Keeping Men Out of Women's Sports Executive Order, which found that men who impersonated women in the context of college athletics is a violation of Title IX. And now we're starting to get pretty close to drag.

Over the weekend you may have seen -- this isn't

the Trump administration.  But The University of Texas regent indicated that UT would be taking some steps shortly to implement some form of drag ban to comply with the order.

But to be clear, our position is not necessarily that drag is in conflict with the order.  That goes to the potential risk to the university if injunctive relief is granted.

Now, on March 7th -- I believe we've talked a little bit about the Israel-Palestinian dynamic.  On March 7th the Trump administration pulled $400 million of grants from Columbia University for violating federal antidiscrimination law like Title IX of the federal antidiscrimination law.

THE COURT:  I think that issue is now before the courts.

MR. BERG:  I'm sure it is, Your Honor.  That's still a lot of heartburn, though, for a university.

THE COURT:  It is heartburn for the university, but the First Amendment is not meant to be an antacid.  The First Amendment is not always easy to live with.  It requires us to be exposed to and allow others to be exposed to contrary, conflicting, often offensive or uncomfortable views; and traditionally universities have embraced that kind of exposure as essential to educating young men and women to live in the world and to participate in our democracy with critical thinking.  A&M prides itself on preparing young men and women

to be good, productive citizens, doesn't it?

MR. BERG:  I would certainly hope so.  Otherwise what are we doing?

THE COURT:  And A&M teaches critical thinking, right? That's what it wants its students to develop, the ability to analyze, hear, learn and make decisions for themselves.  Is that accurate?

MR. BERG:  Yes, Your Honor.  If I may continue the arc of this Title IX Trump horror story --

THE COURT:  All right.

MR. BERG:  -- so the board in the resolution also found that some drag shows could potentially conflict with Title IX; and that's where you get the five factors, which I think a lot of drag shows wouldn't even satisfy.

I'm sorry I got a little close to the microphone there.

But the state has a compelling interest in complying with Title IX and providing an educational environment that has as little discrimination as possible.

Also I think the stringent level that you have to rise to to reach this drag -- with what was defined as drag show events shows how narrowly tailored this is.  I mean you could have the exact same show in a public forum.  You could have -- at a limited public forum you could have a drag show that lacked any one of these elements.  The board, I think,

took steps to balance these interests between --

THE COURT:  So if the drag show limited the audience to A&M students rather than having it open to the public, the board would have no problem?

MR. BERG:  Correct.  If --

THE COURT:  Even if --

MR. BERG:  -- the plaintiffs --

THE COURT:  -- everything else was --

MR. BERG:  -- wish to host a private show, they could -- yeah, they can go about it.

THE COURT:  So as long as it was just A&M students, the board would have no problem even if it featured biological males dressing in women's clothing with makeup or prosthetics, exaggerating stereotypical physical physiognomies, involved sexual, vulgar or lewd conduct and involved conduct that demeaned women, it would still be okay with the board because it would lack that one factor?

MR. BERG:  So -- yeah, as long as a show that satisfied the other four elements, but was not open to the public, it would not be affected by the resolution.

THE COURT:  Even if it was open to all A&M students? Tell me how that squares with the board's notion of the mission and core values that were offended by the performance.

MR. BERG:  So I think -- I think the distinction is the private performance v. public performance.  There is an

association with the university, especially when you're talking about a theater or a location like Rudder Theater.  A&M describes Rudder Theater complex as "a cornerstone of arts and culture on the campus."  It's one of their finest venues.

I think when you're in a limited public forum like that, there is -- even if you're not directly funding it, there is an association.  People come and think "This is a Texas A&M event," which I think then does get you in trouble with are you creating an environment that's hostile to women?  Is the university participating in this?  So I think --

THE COURT:  So if you had a speaker who came on campus and was committed to narrow views of the ability of women to participate in life and that was associated with -- that was on an A&M stage, would you be concerned with that?  Or a speaker that advanced views favoring eugenics or advanced views that embraced Nazis and Nazism?  Would you take the position that they would not be allowed on campus because there might be an association with A&M?

MR. BERG:  No.  I think -- this is where we also see how narrowly tailored the resolution is.  You can't just ban expressive conduct.  And I don't think that's what A&M has done here.  We still have all the expressive conduct allowed.  We see -- in the protests we see -- if you take away any of the five factors --

THE COURT:  But you would ban this expressive conduct,

although you don't think it's expressive conduct.  If I find it is, would you then agree with me that the ban would violate the First Amendment?

MR. BERG:  No.  I think in certain --

THE COURT:  Even if it's expressive conduct?

MR. BERG:  We don't think that it's expressive conduct, but even --

THE COURT:  I know you don't.

MR. BERG:  Even if you find it's expressive conduct, we do think this is narrowly tailored.  This is a minimum step that the university took to separate itself from the content -- the conduct that it believes is discriminatory.

Students may still wear drag, they can express any associated views on campus in prominent locations on campus, perhaps just the expressive element, even in the limited public forum itself.  It does not ban drag shows on campus.

THE COURT:  It doesn't?

MR. BERG:  No.

THE COURT:  It bans this drag show.  It bans this drag show.

MR. BERG:  Yes.  It does ban this -- before this started, there was no resolution.  The --

THE COURT:  Well, there's still a resolution.  There's still a resolution that -- there's a rule that supports free

speech on campus; is that right?

MR. BERG:  There's -- there's -- yeah.  That's free speech.

THE COURT:  Can I ask you one question?  And then I'll certainly let you finish your thought.

Can you define "vulgar" or "lewd"; that is, where in the record will I find a definition of those terms?

MR. BERG:  Sure.  The -- well, the A&M student code --

THE COURT:  I'm looking at it.  8.99.99.M1?

MR. BERG:  Is that where I'm going?

THE COURT:  Yeah.  So I'm looking at these definitions. There's a definition of "illegal harassment" that has to be "so severe and pervasively and objectively offensive that it denies or limits a person's ability to participate in or benefit from an educational program or activity."

That's not here, is it?  I mean, people don't have to go if they don't want to.

MR. BERG:  They don't have to go, but I think the association -- and we've talked about the limited public forum a bit.  The venue itself is so associated with A&M that people associate the performance with the university; and to the extent that the defendants feel that this particular event involves conduct that demeans women, A&M is connected to that behavior through the use of the limited public forum.

But like I said, we have --

THE COURT:  Is this a --

MR. BERG:  Sorry.  Go ahead.

THE COURT:  This is a public forum, right?

MR. BERG:  It's a limited public forum.

THE COURT:  I understand that you and the plaintiffs disagree about --

MR. BERG:  Well, yeah.

THE COURT:  -- that issue.

MR. BERG:  We can talk a little bit more about that. We talked -- plaintiffs talked a little about the *Justice for All* case.  It was a Fifth Circuit case about The University of Texas that found that outdoor or open areas of its campus generally accessible to students such as plazas and sidewalks were public forums.  You will find that discussion in cases of public forums usually involve outside areas.

The Fifth Circuit also in *Hays County Guardian v. Supple* found that Texas State University's outdoor premises were a designated public forum.

But under the First Amendment, a government entity can still create a limited public forum --

THE COURT:  How is the --

MR. BERG:  -- as long as --

THE COURT:  What is it about the past use of this theater that supports the definition -- that supports characterizing it as a limited public forum?

MR. BERG:  Yes.  So I think the -- we have the approval process that you have to go through.

THE COURT:  Has there ever been a refusal to approve a student request for an event that students fund?

MR. BERG:  Like we talked about --

THE COURT:  It's not in the record, is it?

MR. BERG:  Like we talked about before, the record is incomplete.  There are events where the registration process was started, but it was stopped --

THE COURT:  For reasons that are not explained to --

MR. BERG:  The reasons are unclear.

THE COURT:  Can I ask you -- still press you on this one point?  Can you tell me where in the record I will find a definition of "vulgar or lewd conduct"?

MR. BERG:  So the -- as we talked about, the student code talks about behavior that's disruptive, lewd, or indecent; and obviously there's a line of cases that talk about lewd content and what a university may or may not prohibit.

THE COURT:  True.  And most of the cases involving drag performances have not supported the position you're asking me to take.

MR. BERG:  One, almost all of those cases are outside of the Fifth Circuit; and, two, one of the distinctions that I --

THE COURT:  Which is interesting because there have

been drag parades throughout this state that have been allowed to proceed.

MR. BERG:  Yes.  And parades have special First Amendment protections as well.

THE COURT:  Don't theater performances also have a First --

MR. BERG:  No.

THE COURT:  -- Amendment protection?

MR. BERG:  There is no case --

THE COURT:  There's no --

MR. BERG:  -- supporting that.

THE COURT:  All right.  And no case challenged -- I think we've covered that.

So definitions of "lewd or vulgar," can you point me in the record?  "Expressive activity on campus," I've looked through the definition section of this document; and I don't see definitions of "lewd or vulgar."

MR. BERG:  There is a line of cases that talk about lewd conduct.  I think there's sort of a community standards approach to that, whereas we've argued in the briefing and here today that the university is the best-situated party to make that determination.

To finish off the point that we were just talking about, you talked about cases outside the Fifth Circuit where they found that drag shows were expressive.  Most of those

cases involve cities.  There is a distinction between --

THE COURT:  Aren't universities even more committed to First Amendment values and the free exchange of ideas as essential to the educational mission as set out in the A&M rules on freedom of expression than cities?

MR. BERG:  Universities certainly do value the First Amendment.  I would point you to the --

THE COURT:  The free exchange of ideas even more than cities do.  I mean cities are not educational institutions. A&M prides itself on being a wonderful educational institution, as it should.

MR. BERG:  And as I believe as it is.

The *Papish* case -- *Papish v. Board of Curators* at the University of Missouri, which quotes *Healy v. James* that we talked about a little bit -- *Papish* said that "State universities have an unbounded prerogative to enforce reasonable rules governing student conduct, although they are not immune to the First Amendment."

But I think what you see -- and this distinction comes up when you look at all the city cases -- is the relationship between cities and citizens is purely transactional.

Our culture, however, has always understood that schools have a formative aspect; so to the extent that consistent with the First Amendment schools enforce conduct to

help in growth of the whole human, I think that tradition goes back in western civilization for -- back into the BCs.

THE COURT:  All right.  Anything further from the defense?

MR. BERG:  Yeah.  We've talked quite a bit about expressive conduct, whether the first part of the drag events is expressive or not.  We certainly hold that it isn't; but however, even if you find -- it seems you're a little skeptical; but even if you do find it is expressive, we can still pass strict scrutiny.  This is narrowly tailored to comply with the state's compelling interest to comply with Title IX and providing an educational environment with as little discrimination as possible.

Article 7 of the Texas Constitution mandates the education through the universities.  This resolution is very narrowly tailored.  You have to satisfy a laundry list of misdeeds before you're even considered.  There are the numerous places where plaintiffs and other groups could perform on and off campus.  The restricted areas are very small, I know.  Maybe not in this case.  We've litigated with plaintiffs enough times.  They'll -- they'll have these cases where they say the -- they create free speech zones that are so small that essentially you're suppressing speech.

This is the opposite.  There's a very small area that's limited, and the rest of it is a free public forum.

THE COURT: So if the drag show was held outside, that would be okay?

MR. BERG: Yes.

THE COURT: It's just not in this theater, even though this theater has been used for a whole range of performances --

MR. BERG: Yes.

THE COURT: -- and there's no record of any attempt to restrict student-hosted events.

MR. BERG: No, but there certainly is record in the performances of the plaintiffs in the past and the conduct involved in those performances that may have --

THE COURT: Which were permitted for five years.

MR. BERG: (No response.)

THE COURT: Which were permitted for five years.

MR. BERG: In a shrinking -- in a shrinking way over time, yes.

THE COURT: What shrunk before this year?

MR. BERG: First the university's financial commitment, which the first two years were funded by the university. Something happened in 2021 where the university said, "Huh-uh. We can't do this anymore."

THE COURT: Do you know what?

MR. BERG: That's not in the record, Your Honor. If we go to discovery, perhaps that's something that will come up.

Also I would briefly say on the TRO/PI

distinction, TROs are generally intended to preserve for a very brief time the status quo to avoid irreparable injury pending hearing on the issuance of a preliminary injunction. The time for a TRO has passed.

Since the plaintiff filed, the parties have fully briefed this issue. We've argued it here today. The Court has obviously been very involved in this. The Court should, therefore, deny the TRO and rule on the preliminary injunction.

Thank you, Your Honor.

THE COURT: Thank you, sir.

Response?

MR. STEINBAUGH: I have a laundry list of notes here, so --

THE COURT: All right.

MR. STEINBAUGH: -- please feel free to interrupt me.

THE COURT: I will. I think you know that I will.

MR. STEINBAUGH: You know, this is the first time I've ever heard of a no-free-speech zone on campus. That's --

THE COURT: I'm sorry. Say that --

MR. STEINBAUGH: This is the first time I've ever heard of a no-free-speech zone on campus. I've heard of free speech zones where they say, "You can protest over there. You can speak over there, but that's where you have to do your main expression."

But I've never heard of a forum where they say

you can't speak.

But I think, Your Honor, what is happening there is they are asking this Court to allow them to censor based on no more than speculation, speculation that there might be lewd conduct they can't define.

You know, Bob Dylan once said --

THE COURT:  But they know what these shows consist of. They've seen them in the past.  They've allowed five years of them to occur.

MR. STEINBAUGH:  But they just --

THE COURT:  I'm not sure it's speculation, but I understood your argument to be that -- maybe it is speculation as to whether people would find it offensive.

MR. STEINBAUGH:  I think that's speculative; but I think there's also a lot of other speculation going on here, meaning in line with whether or not people would find it offensive and the people that are going to these are not going to be offended.

But how can you create a hostile environment if there's not even subjective offense?  They haven't even shown that there's even objective offense here, that these are objectively offensive, and that's their burden.

THE COURT:  What about the argument that the association with A&M is enough to trigger a ban?

MR. STEINBAUGH:  I think it was Justice O'Connor who

once said that "The notion that universities do not endorse the things that they fail to censor is not a complicated subject."

And the Supreme Court in *Healy* said that the notion that the college might have a quote, unquote, stamp of approval is just not relevant.

People look at universities and they expect them to be hosting speech.  They don't expect it to mean "You got to speak to this campus.  That must mean the president of the university agrees with you."

That is not how free speech works, especially at a public university.

Does that answer your question?  I think that --

THE COURT:  I'm looking at one part of the, just recently issued in 2024 code, rule on expressive activity on campus.

One of the provisions is that "The university may not deny a student organization any benefit generally available to other student organizations on the basis of a political, religious, philosophical, ideological or academic viewpoint expressed by the organization or of any expressive activities of the organization."

Is the ability to reserve and use this theater a benefit generally available to other student organizations?

MR. STEINBAUGH:  Yes.

THE COURT:  And where in the record will I find that?

MR. STEINBAUGH:  I think that is clear if you look at the handbook that they provided that is the standard operating procedure for this theater.  It's all ministerial.  It's all saying, "Here is the step-by-step way to do this."

If you follow the link that is in that document to look at the reservation form, it's saying, "If you're a student organization, here is the different categories of things that you can request use of this space for."

And it's performances, it's concerts, there's even just an "other" button; so if you don't fall in one of these broad categories, if it's "other," you can engage in it.

Another thing that I would like to address is the argument about *Rumsfeld versus FAIR*.  You know, Chief Justice Roberts who, if I recall correctly, authored that opinion during *303 Creative* said, "FAIR involved law schools providing rooms for the military recruiter."

And what the Court said is that empty rooms don't speak.

It's in the trial -- or the transcript of oral arguments at Page 65, Lines 1 through 9, in *303 Creative*, 600 U.S. 570.

But, you know, the -- I think that *Rumsfeld v. FAIR* is just not relevant here because in *Rumsfield* it was about universities removing or preventing military recruiters from appearing on campus.  And the only possible way you could

know that that action was expressive was if the university told you "Hey, this is what we were doing here, intending to express something here."

It was the only way that you could identify that there was an absence of any sort.

But here you consider context, and you have enough context here in performances that if the performers in *Draggieland* came out and said nothing, you would still know that you're at a drag show.  You don't need someone to explain that to you.  I'd also point out that Judge Hittner also rejected *Rumsfeld v. FAIR* saying:  "Drag shows and performances that express conduct with no need for extra explanation, whether as expressing either pure entertainment or, like most types of expressive art, an underlying deeper message such as music, theater and poetry."

So I just don't view *Rumsfeld v. FAIR* as relevant.

The other thing I'd point out is that the articulation of these factors just doesn't square with the expressed interest.  So they said that the board has to look at the whole environment and that the reason the board took this action was that its views evolved.

I thought it was about this executive order that came down.  It's hard to square those two different points.  I don't see any indication in the record that the Trump

administration thinks drag shows violate Title IX.  To the contrary, after this executive order was issued, they issued guidance saying you had to meet those standards set forth by the Supreme Court in *Davis*, which is that "In order for it to amount to a hostile environment, harassment has to be severe, pervasive and objectively offensive."

And, you know, looking at these factors, they just don't square with any of this.  For one, they say that you can have a drag show as long as it's only women who are objectifying and mocking women and sending this apparently abhorrent message.  I'm not even sure that passes rational basis.

They've also said that you can -- it's perfectly fine to hold a drag show as long as you don't open it to the public.  Well, it's not to the public that they owe a Title IX obligation to.  It's to the students.  I don't -- you know, how does that square with their Title IX obligations?  Perhaps worse they're saying that you can have a drag show as long as it's on the quad on campus, as long as it's open to the general public.  How are you going to -- you know, for the people who are just wandering on campus going from class to class, we still expect them to avert their eyes.  That's still protected speech even if they did it outside.

THE COURT:  So the fact that it's outside and, therefore, exposes people who may not want to see it --

MR. STEINBAUGH:  Yeah.  It's contrary to the expressed interest.

THE COURT:  Can I ask you to --

MR. STEINBAUGH:  Sure.

THE COURT:  -- for your views on one point that is part of the board's position?

The resolution targets conduct that is demeaning regardless of whether that conduct is meant to express a viewpoint that is itself demeaning.  Can you explain what that means?

MR. STEINBAUGH:  I don't know.  I struggle to understand what that means.  I think that if you look to *Matal versus Tam*, the notion that "We will always act to suppress any speech that is offensive or any expression or conduct that is offensive," that's still viewpoint discrimination.  Just protecting people from offense is viewpoint discrimination.

The other thing I get back to here, given how much of this is speculative, the notion that this speech might be offensive, this speech might create a hostile environment, this speech -- you know, we might become aware of a hostile environment and then the university might not respond in an adequate manner and then the Trump administration might take action against us, you know that's a whole lot of speculation to build a prior restraint on.

Prior restraint is the most pernicious form of

censorship. We do not punish speech or stop it before it occurs. If a prior restraint is permissible ever, it's in the context of describing troop movements overseas during wartime. This is not that. And I think that imposing a prior restraint at a public university on the basis that people might be offended by a show they volunteered to go to, that's just wholly offensive to the basic notions of the First Amendment.

Another thing I would like to point out is we don't protect free speech through censorship. You don't censor your way to free speech. I think that once you start drinking from that poison cup, it's going to affect everyone.

That pendulum, as I've said before, goes back and forth and the limits on -- if you impose limits on free speech to get at one group whose speech you find abhorrent, it's not going to be there to protect you when the pendulum swings back.

And I think when you look at universities like Harvard, like Columbia, they went before Congress and said: This speech is protected by the First Amendment and that's why we have to protect it.

Nobody believed them because they didn't have the credibility to be able to say we've protected conservative speech in the past. The university needs that credibility to defend speech when its favor of speech becomes threatened in the future. If you don't have that credibility, you're just not going to be able to protect it.

And on the TRO point, again, these are students who are trying to contribute to their university.  They're trying to contribute to their community.  They're trying to be able to say:  We are here.  We are members of this community, and we have all the same rights that every other organization does.

And the longer that this uncertainty is hanging over them, the more likely it is that they're going to have to surrender their free speech in order to be able to engage in any speech at all.

And I think the Court can end that now by issuing a TRO so that the Court can issue a preliminary injunction against the broader ban.

And I understand that -- writing an opinion like that, you can't just turn around and write it overnight.  But I think a TRO can issue now to remove that uncertainty so that the show can go on.

With that, I think I've belabored the Court's attention long enough.  If you have any other questions, I'm happy to answer them.

THE COURT:  I think that both sides have answered my questions.

MR. BERG:  One minute, Your Honor?

THE COURT:  Yes, sir.

MR. BERG:  Thank you, Your Honor.  Two brief points.

One, this is not a prior restraint.  A prior restraint is when we say you can't have the event at all.  That's not what this is.  They can have it elsewhere, even on campus.

Two, the limited public forum was not to --

THE COURT:  So they could have it outside?

MR. BERG:  Yes.

THE COURT:  So that anybody would be exposed, including children --

MR. BERG:  Yes.

THE COURT:  -- as opposed to in the theater where you have to buy a ticket so that children or parents who don't want their children to be exposed or people who don't want to be exposed can exercise that choice.

Tell me how that makes sense.

MR. BERG:  I think the age restriction would take more than a minute for us to discuss.

THE COURT:  That would address one of the concerns that motivated Judge Kacsmaryk's opinion, that the audience would include children.

MR. BERG:  Yes.  The concern that there's children would raise the standard, although you could still meet the standard if it's only adults.

The second point I wanted to address was the limited public forum.  That doesn't go to the merits of the

resolution.  That has to do with the standard.  As long as there is no viewpoint discrimination --

THE COURT:  It has to be viewpoint neutral --

MR. BERG:  Yes.

THE COURT:  -- even if it is a limited public forum.

MR. BERG:  Yes.  Then it's intermediate scrutiny.

And a good illustration of why this is not viewpoint discrimination, if you look at *Texas v. Johnson*, the flag burning case, the Supreme Court found that the law was discriminatory based on viewpoint because you could burn a flag if you did it respectfully to dispose of an old flag; but if you did it to protest, it was a violation of the law and the same event treated two different ways was viewpoint.

Here, as long as you satisfy the five factors, you're in violation, period.  Viewpoint is irrelevant.

THE COURT:  Can you explain this sentence:  "The resolution targets conduct that is demeaning, regardless of whether that conduct is meant to express a viewpoint that is itself demeaning"?

MR. BERG:  Yeah.

THE COURT:  Explain what that means.

MR. BERG:  So the conduct, by seeing it, you can judge whether it fits the five factors.  You don't need to know any viewpoint or intended message of the performer.  That's irrelevant to the analysis.  It's purely a conduct-based

standard.

THE COURT:  Conduct that is expressive conduct is also protected by the First Amendment, correct?

MR. BERG:  Yes, although we maintain it's not expressive conduct and that we can satisfy strict scrutiny.

Thank you, Your Honor.

THE COURT:  Thank you.  That was helpful.

Anything further from either side?

MR. STEINBAUGH:  I'm happy to respond if it would be helpful, but...

THE COURT:  I think -- yes, if you want to respond, I'd like to hear it.

MR. STEINBAUGH:  Well, I think the main point I would respond to there is that a prior restraint is not just banning all speech.  It's canceling an event.  If you cancel an event before it happens -- we know that from *Southeastern Promotions* -- that is a classic prior restraint.

I think that's the only point I have.  I'm happy to answer any other questions.

THE COURT:  This event is scheduled to occur on the 28th?

MR. STEINBAUGH:  27th.

THE COURT:  27th.

MR. STEINBAUGH:  They may have a rehearsal on the 26th.

THE COURT:  All right.  I will have an opinion out well

before then.

MR. STEINBAUGH:  Thank you.

THE COURT:  Thank you all very much.

MR. BERG:  Thank you, Your Honor.

THE COURT:  This is very helpful.  You are all excused.

(The proceedings were adjourned.)

*  *  *  *

REPORTER'S CERTIFICATE

I, Lanie M. Smith, CSR, RMR, CRR, Official Court Reporter, United States District Court, Southern District of Texas, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

___/s/ Lanie M. Smith_____
Official Court Reporter

## $

**$10,000** [1] - 30:13
**$400** [1] - 44:10

## /

**/s** [1] - 68:13

## 1

**1** [2] - 35:12, 59:20
**12** [1] - 30:10
**12548** [1] - 2:7
**18** [3] - 1:14, 5:18, 6:6
**19106** [1] - 1:22

## 2

**20003** [1] - 2:3
**2015** [5] - 7:9, 7:10, 36:11, 37:6, 37:11
**2019** [2] - 37:9, 37:11
**2021** [3] - 32:23, 32:24, 55:20
**2024** [3] - 11:16, 37:12, 58:14
**2025** [1] - 1:14
**26th** [1] - 67:24
**27th** [2] - 67:22, 67:23
**28th** [1] - 67:21

## 3

**3** [1] - 18:15
**303** [2] - 59:15, 59:20
**340** [1] - 2:3

## 4

**4:25-CV-00992** [1] - 1:4

## 5

**510** [1] - 1:21
**515** [1] - 2:12
**570** [1] - 59:21

## 6

**600** [1] - 59:21
**65** [1] - 59:20

## 7

**7** [1] - 54:14
**700** [1] - 2:2
**77002** [1] - 2:13
**78711-2548** [1] - 2:8
**7th** [2] - 44:8, 44:9

## 8

**8.99.99.M1** [2] - 14:22, 49:9

**8004** [1] - 2:12

## 9

**9** [1] - 59:20
**900** [1] - 1:22

## A

**A&M** [32] - 1:4, 3:25, 5:18, 18:14, 18:22, 21:11, 21:12, 25:5, 30:6, 31:13, 34:4, 36:4, 36:15, 37:4, 37:23, 42:8, 44:25, 45:4, 46:3, 46:11, 46:21, 47:2, 47:8, 47:14, 47:18, 47:21, 49:8, 49:20, 49:23, 53:4, 53:10, 57:24
**A&M's** [2] - 7:8, 12:5
**abhorrence** [1] - 8:15
**abhorrent** [5] - 10:9, 15:20, 61:11, 63:14
**ability** [8] - 16:25, 19:23, 24:19, 45:5, 47:12, 49:14, 58:22, 68:10
**able** [12] - 18:7, 19:24, 20:10, 22:10, 22:21, 23:9, 24:15, 38:8, 63:21, 63:25, 64:4, 64:9
**above-entitled** [1] - 68:11
**absence** [1] - 60:5
**absolutely** [1] - 16:15
**abstract** [2] - 10:10, 19:9
**academic** [3] - 21:23, 22:25, 58:19
**accessible** [1] - 50:13
**accomplish** [1] - 12:12
**accurate** [1] - 45:7
**act** [2] - 12:4, 62:13
**action** [4] - 38:14, 60:1, 60:22, 62:23
**actions** [1] - 38:11
**activities** [3] - 26:3, 26:4, 58:20
**activity** [12] - 9:9, 11:15, 11:18, 25:5, 32:11, 32:15, 36:16, 36:22, 37:6, 49:15, 52:15, 58:14
**Activity** [1] - 14:22
**ADAM** [1] - 1:21
**Adam** [2] - 3:5, 3:22
**add** [2] - 21:24, 29:14
**additional** [2] - 28:8, 30:22
**address** [9] - 12:5, 14:14, 14:25, 16:20, 29:24, 31:4, 59:12, 65:18, 65:24
**addressed** [1] - 15:2
**addresses** [1] - 12:17
**addressing** [1] - 3:17
**adequate** [1] - 62:22
**adequately** [1] - 13:9
**adherence** [1] - 18:16
**adjourned** [1] - 68:6
**administration** [7] - 12:25, 42:10, 42:12, 44:1, 44:10, 61:1, 62:22
**adult** [1] - 6:8
**adults** [5] - 5:20, 6:3, 6:20, 6:21, 65:23
**advanced** [4] - 8:6, 29:18, 47:15
**affect** [1] - 63:11
**affected** [1] - 46:20

**African** [1] - 41:9
**African-American** [1] - 41:9
**afternoon** [1] - 11:9
**age** [2] - 6:6, 65:16
**agents** [1] - 9:24
**Aggies** [1] - 20:8
**ago** [4] - 11:16, 11:17, 32:11, 41:2
**agree** [5] - 9:2, 12:14, 30:21, 35:2, 48:2
**agreement** [1] - 35:3
**agrees** [1] - 58:9
**ahead** [3] - 3:9, 41:22, 50:2
**air** [2] - 21:25, 22:2
**air-conditioning** [1] - 21:25
**ALBRITTON** [1] - 1:9
**Alex** [1] - 3:24
**Alito** [1] - 14:9
**Alito's** [1] - 14:3
**allow** [4] - 25:6, 29:25, 44:20, 57:3
**allowed** [8] - 5:19, 38:25, 39:1, 39:6, 47:17, 47:22, 52:1, 57:8
**allows** [1] - 20:25
**almost** [3] - 16:5, 30:5, 51:22
**alone** [1] - 5:1
**alter** [1] - 43:6
**alternative** [2] - 16:24, 19:20
**amended** [1] - 37:8
**Amendment** [25] - 7:11, 10:5, 12:19, 12:22, 13:20, 15:25, 17:2, 18:17, 20:5, 22:19, 28:9, 32:12, 44:18, 44:19, 48:3, 50:19, 52:4, 52:8, 53:3, 53:7, 53:18, 53:25, 63:7, 63:18, 67:3
**America** [1] - 41:9
**American** [1] - 41:9
**amount** [1] - 61:5
**analog** [1] - 30:5
**analysis** [1] - 66:25
**analyze** [1] - 45:6
**announcement** [1] - 12:24
**answer** [11] - 17:7, 19:14, 24:21, 27:13, 32:18, 35:7, 41:23, 58:12, 64:20, 67:19
**answered** [1] - 64:21
**answers** [1] - 20:13
**antacid** [1] - 44:18
**anti** [3] - 7:14, 32:14, 36:18
**anti-Israel/pro-Palestinian** [1] - 32:14
**anti-Semitism** [2] - 7:14, 36:18
**antidiscrimination** [2] - 44:11, 44:12
**anytime** [1] - 22:16
**apparent** [1] - 8:22
**appeal** [1] - 27:17
**appealed** [1] - 27:16
**appearances** [1] - 3:3
**APPEARANCES** [1] - 1:20
**appearing** [1] - 59:25
**applaud** [1] - 38:14
**applied** [5] - 20:17, 31:8, 31:15, 34:15, 35:5

**apply** [2] - 18:8, 22:13
**approach** [4] - 14:12, 14:13, 30:16, 52:20
**approached** [1] - 14:8
**appropriate** [1] - 24:20
**approval** [2] - 51:1, 58:5
**approve** [1] - 51:3
**approved** [1] - 35:6
**arc** [1] - 45:8
**area** [2] - 18:10, 54:24
**areas** [3] - 50:12, 50:15, 54:19
**argued** [3] - 30:24, 52:20, 56:6
**argument** [7] - 12:5, 14:15, 15:3, 16:21, 57:12, 57:23, 59:13
**arguments** [3] - 14:25, 26:6, 59:20
**arose** [1] - 9:19
**arrangements** [1] - 23:13
**art** [3] - 8:22, 13:13, 60:14
**article** [1] - 10:23
**Article** [1] - 54:14
**articulable** [2] - 27:5, 29:4
**articulation** [1] - 60:19
**artistic** [2] - 9:19, 15:11
**arts** [2] - 13:14, 47:3
**aside** [3] - 12:23, 13:7, 24:20
**aspect** [1] - 53:24
**aspects** [3] - 18:3, 40:8, 40:10
**assemble** [1] - 26:2
**assertion** [1] - 15:6
**associate** [1] - 49:21
**associated** [3] - 47:13, 48:14, 49:20
**associates** [1] - 34:4
**Association** [1] - 10:4
**association** [5] - 47:1, 47:7, 47:18, 49:19, 57:24
**assume** [2] - 34:13, 40:4
**assuming** [2] - 31:18, 42:22
**athletics** [1] - 43:22
**atmosphere** [2] - 6:2, 6:17
**attempt** [3] - 12:20, 15:4, 55:7
**attend** [3] - 11:20, 23:3, 43:4
**attending** [1] - 5:11
**attends** [1] - 10:24
**attention** [5] - 10:21, 21:3, 21:5, 23:18, 64:19
**attire** [1] - 16:15
**Attorney** [1] - 2:6
**audience** [9] - 5:13, 5:16, 6:9, 6:19, 23:17, 23:25, 46:2, 65:19
**audiences** [1] - 6:8
**Austin** [1] - 2:8
**authored** [1] - 59:14
**authoritative** [1] - 13:25
**availability** [5] - 16:24, 19:20, 19:22, 22:8, 22:9
**available** [3] - 23:10, 58:17, 58:23
**Avenue** [1] - 2:2
**avert** [3] - 10:20, 15:13, 61:22
**avoid** [1] - 56:2

**aware** [4] - 4:19, 4:22, 11:25, 62:20
**awful** [1] - 19:13

## B

**BAGGETT** [1] - 1:9
**balance** [1] - 46:1
**ban** [9] - 38:19, 44:3, 47:20, 47:25, 48:2, 48:16, 48:22, 57:24, 64:13
**banned** [2] - 26:15, 33:22
**banning** [4] - 38:2, 38:6, 40:8, 67:14
**bans** [2] - 48:20
**based** [10] - 7:20, 8:3, 16:1, 17:12, 18:5, 21:18, 25:14, 57:3, 66:10, 66:25
**basic** [1] - 63:7
**basis** [5] - 16:2, 40:8, 58:18, 61:12, 63:5
**BCs** [1] - 54:2
**beautiful** [2] - 15:11, 29:10
**beauty** [5] - 33:14, 33:16, 41:6, 41:7, 41:10
**became** [1] - 32:22
**become** [2] - 32:9, 62:20
**becomes** [2] - 8:21, 63:23
**BEFORE** [1] - 1:17
**begins** [1] - 32:12
**begrudge** [1] - 15:9
**behalf** [1] - 3:23
**behavior** [3] - 16:15, 49:24, 51:16
**behind** [1] - 10:12
**belabored** [1] - 64:18
**believes** [2] - 11:18, 48:12
**BELLINGER** [1] - 1:9
**benefit** [3] - 49:14, 58:17, 58:23
**BERG** [140] - 2:5, 3:10, 25:7, 25:9, 25:16, 26:7, 26:14, 26:18, 27:13, 27:17, 27:23, 28:2, 28:21, 28:25, 29:5, 29:14, 29:16, 29:22, 30:2, 30:17, 30:20, 31:1, 31:6, 31:10, 31:18, 31:25, 32:5, 32:8, 32:17, 32:21, 33:1, 33:4, 33:7, 33:11, 33:13, 33:16, 33:20, 34:11, 34:22, 34:24, 35:3, 35:10, 35:12, 35:14, 35:23, 36:2, 36:9, 36:12, 36:14, 36:17, 36:20, 36:24, 37:3, 37:7, 37:13, 37:21, 38:5, 38:16, 38:20, 38:22, 39:2, 39:7, 39:10, 39:13, 39:17, 39:22, 40:1, 40:6, 40:10, 40:13, 40:18, 40:20, 40:25, 41:3, 41:7, 41:11, 41:14, 41:21, 41:24, 42:15, 43:1, 43:7, 43:11, 44:15, 45:2, 45:8, 45:11, 46:5, 46:7, 46:9, 46:18, 46:24, 47:19, 48:4, 48:6, 48:9, 48:19, 48:22, 49:2, 49:8, 49:10, 49:18, 50:2, 50:4, 50:7, 50:9, 50:22, 51:1, 51:5, 51:7, 51:11, 51:15, 51:22, 52:3, 52:7, 52:9, 52:11, 52:18, 53:6, 53:12, 54:5, 55:3, 55:6, 55:9, 55:13, 55:15, 55:18, 55:23, 64:23, 64:25, 65:7, 65:10, 65:16, 65:21, 66:4, 66:6, 66:20, 66:22, 67:4, 68:4
**Berg** [1] - 3:10
**best** [4] - 31:25, 41:24, 52:21, 68:10

**best-situated** [1] - 52:21
**between** [9] - 13:4, 13:6, 14:2, 14:7, 24:17, 42:23, 46:1, 53:1, 53:21
**beyond** [1] - 31:4
**bill** [2] - 25:20, 30:9
**Bill** [1] - 30:10
**biological** [5] - 13:16, 33:24, 42:20, 42:22, 46:12
**biologically** [1] - 13:8
**bit** [6] - 7:3, 44:9, 49:20, 50:9, 53:15, 54:5
**blanking** [1] - 17:14
**Board** [7] - 8:15, 13:24, 31:19, 32:7, 32:21, 38:13, 53:13
**board** [17] - 19:1, 19:12, 25:10, 33:20, 39:15, 40:21, 41:5, 42:2, 42:4, 45:11, 45:25, 46:4, 46:12, 46:16, 60:20, 60:21
**board's** [5] - 38:2, 38:14, 38:18, 46:22, 62:6
**Bob** [1] - 57:6
**body** [2] - 34:3, 40:23
**books** [2] - 8:12, 9:22
**bottom** [1] - 35:12
**bought** [1] - 23:25
**Box** [1] - 2:7
**box** [1] - 24:9
**brief** [3] - 25:1, 56:2, 64:25
**briefed** [1] - 56:6
**briefing** [4] - 3:15, 26:24, 34:25, 52:20
**briefly** [1] - 55:25
**briefs** [1] - 3:16
**bring** [3] - 6:5, 6:10, 6:18
**broad** [1] - 59:11
**broader** [2] - 30:9, 64:13
**BROOKS** [1] - 1:10
**Brown** [1] - 10:3
**build** [2] - 7:2, 62:24
**burden** [2] - 25:2, 57:22
**burn** [1] - 66:10
**burning** [1] - 66:9
**but..** [1] - 67:10
**button** [1] - 59:10
**buy** [1] - 65:12

## C

**CAGE** [1] - 1:11
**campus** [52] - 5:25, 6:2, 6:23, 7:6, 7:11, 7:22, 9:9, 9:16, 10:24, 11:18, 13:22, 13:23, 17:1, 19:23, 20:7, 20:9, 20:10, 21:12, 22:16, 25:5, 25:23, 25:24, 30:6, 30:7, 32:11, 33:8, 35:20, 38:8, 38:24, 42:2, 42:3, 47:4, 47:11, 47:17, 48:14, 48:15, 48:17, 49:1, 50:12, 52:15, 54:19, 56:18, 56:21, 58:8, 58:15, 59:25, 61:19, 61:21, 65:4
**Campus** [1] - 14:22
**campuses** [4] - 12:21, 26:2, 32:13, 42:5
**cancel** [1] - 67:15

canceling [1] - 67:15
capacities [1] - 1:13
Capitol [1] - 2:7
case [30] - 4:14, 4:15, 4:23, 5:1, 13:3, 13:17, 17:8, 17:15, 27:10, 27:15, 29:5, 29:17, 29:21, 30:5, 30:16, 30:23, 30:24, 30:25, 31:1, 31:3, 31:19, 34:25, 50:11, 52:9, 52:12, 53:13, 54:20, 66:9
cases [19] - 4:19, 4:22, 5:16, 9:13, 17:13, 17:17, 27:16, 29:23, 29:24, 30:3, 50:14, 51:17, 51:19, 51:22, 52:18, 52:24, 53:1, 53:20, 54:21
catch [1] - 36:24
catchall [1] - 18:8
categories [4] - 17:4, 42:1, 59:7, 59:11
category [1] - 18:8
celebration [1] - 18:16
celebrity [1] - 36:4
censor [3] - 57:3, 58:2, 63:9
censorship [2] - 63:1, 63:9
central [1] - 21:23
certain [4] - 34:16, 34:18, 37:7, 48:4
certainly [20] - 6:7, 6:19, 7:6, 22:8, 22:14, 28:13, 30:2, 34:22, 34:24, 36:2, 37:23, 38:17, 40:22, 41:1, 43:2, 45:2, 49:5, 53:6, 54:7, 55:9
CERTIFICATE [1] - 68:8
certify [1] - 68:10
challenged [1] - 52:12
chance [1] - 6:5
change [3] - 7:14, 7:15, 33:25
changed [2] - 32:4, 32:7
chapter [1] - 15:19
characterization [1] - 7:4
characterizing [1] - 50:25
charged [1] - 11:20
check [1] - 5:3
Cher [1] - 41:4
Chief [1] - 59:13
child [3] - 6:1, 6:18, 30:12
childproof [1] - 6:4
children [9] - 5:17, 5:21, 5:23, 6:20, 65:9, 65:12, 65:13, 65:20, 65:21
choice [2] - 11:9, 65:14
choose [1] - 11:20
circuit [1] - 29:24
Circuit [7] - 12:21, 17:15, 29:17, 50:11, 50:16, 51:23, 52:24
cities [5] - 53:1, 53:5, 53:9, 53:21
citizens [2] - 45:1, 53:21
city [2] - 20:1, 53:20
Civil [1] - 43:12
civil [1] - 30:12
civilization [1] - 54:2
clad [1] - 41:5
clarity [1] - 7:12
Class [1] - 30:13
class [2] - 61:21
classes [1] - 22:25

classic [1] - 67:17
classification [1] - 17:8
clear [6] - 20:5, 25:18, 42:8, 42:10, 44:4, 59:1
clearer [1] - 31:3
clients [1] - 15:7
cliffs [1] - 36:6
clock [1] - 24:14
close [2] - 43:24, 45:15
clothed [3] - 39:9, 39:14, 39:16
clothes [1] - 39:23
clothing [7] - 16:15, 33:25, 39:17, 40:4, 40:7, 46:13
club [1] - 21:1
code [6] - 12:20, 14:11, 14:21, 49:8, 51:16, 58:14
Cohen [1] - 10:18
coherent [1] - 29:2
Colleague [2] - 43:14, 43:20
colleagues [1] - 27:11
college [12] - 5:25, 6:2, 7:6, 8:20, 9:8, 12:21, 13:22, 13:23, 18:15, 22:23, 43:22, 58:4
colleges [1] - 13:1
Columbia [2] - 44:11, 63:17
combine [1] - 28:5
comic [1] - 9:22
coming [1] - 19:2
commemorated [1] - 36:6
commercial [1] - 30:11
commitment [2] - 32:13, 55:18
committed [3] - 34:15, 47:12, 53:2
communities [1] - 7:2
community [9] - 6:24, 6:25, 7:4, 23:6, 23:7, 52:19, 64:3, 64:4
compelling [2] - 45:17, 54:11
complex [1] - 47:3
complicated [1] - 58:2
complied [1] - 8:6
comply [3] - 44:3, 54:11
complying [1] - 45:18
compulsory [1] - 5:11
computer [1] - 1:25
concede [1] - 17:8
concern [3] - 5:17, 25:24, 65:21
concerned [1] - 47:14
concerns [1] - 65:18
concerts [1] - 59:9
conclusion [2] - 40:15, 42:17
conditioner [1] - 22:2
conditioning [1] - 21:25
conduct [53] - 4:16, 4:17, 4:18, 4:21, 25:10, 25:11, 25:16, 25:17, 25:18, 26:10, 28:5, 28:6, 28:7, 28:12, 28:19, 28:21, 31:5, 34:5, 34:6, 34:9, 38:6, 39:20, 46:15, 47:21, 47:22, 47:25, 48:1, 48:5, 48:6, 48:9, 48:12, 49:23, 51:14, 52:19, 53:17, 53:25, 54:6, 55:10, 57:5, 60:12, 62:7, 62:8, 62:14, 66:17, 66:18,

66:22, 66:25, 67:2, 67:5
conduct-based [1] - 66:25
conducted [1] - 4:8
conflict [2] - 44:5, 45:12
conflicting [1] - 44:21
Congress [1] - 63:17
connected [1] - 49:23
consenting [1] - 5:10
conservative [11] - 6:23, 6:24, 10:24, 11:1, 19:2, 33:12, 33:13, 33:14, 34:16, 38:12, 63:21
consider [1] - 60:6
considered [2] - 33:21, 54:17
consist [1] - 57:7
consistent [6] - 25:18, 38:17, 38:19, 39:6, 43:17, 53:25
Constitution [1] - 54:14
constitutionally [1] - 27:6
content [11] - 7:25, 8:3, 8:17, 8:18, 17:13, 18:5, 25:14, 25:15, 31:17, 48:11, 51:18
content-based [2] - 8:3, 18:5
context [5] - 5:4, 43:22, 60:6, 60:7, 63:3
continue [2] - 23:9, 45:8
continues [1] - 33:16
contrary [4] - 14:20, 44:20, 61:2, 62:1
contrasts [1] - 29:19
contribute [4] - 14:17, 23:6, 64:2, 64:3
contributed [1] - 39:19
controlling [1] - 31:2
controversy [1] - 24:18
convey [1] - 26:20
conveyed [1] - 40:24
conveying [1] - 6:23
conveys [2] - 6:12, 6:13
core [1] - 46:23
cornerstone [1] - 47:3
correct [10] - 7:18, 18:25, 37:8, 37:13, 39:9, 39:16, 40:5, 46:5, 67:3, 68:10
correctly [1] - 59:14
costumes [1] - 40:23
Cougars [1] - 17:13
Council [2] - 3:23, 4:1
COUNCIL [1] - 1:4
country [1] - 19:18
county [1] - 9:24
County [1] - 50:16
course [3] - 29:15, 30:22, 33:3
COURT [207] - 1:1, 3:3, 3:8, 3:12, 3:20, 4:2, 4:7, 4:14, 5:2, 5:10, 5:15, 6:11, 6:13, 7:3, 7:7, 7:15, 8:5, 8:17, 9:1, 9:5, 9:7, 9:13, 11:1, 11:4, 11:12, 11:14, 11:24, 12:5, 12:10, 12:14, 13:2, 13:13, 14:14, 15:2, 16:20, 17:5, 18:14, 18:20, 18:24, 19:7, 20:14, 20:20, 21:9, 22:11, 23:23, 24:1, 24:3, 24:5, 24:8, 24:22, 24:24, 25:4, 25:8, 25:15, 25:17, 26:13, 26:16, 27:4, 27:14, 27:22, 28:1, 28:17,

28:23, 29:3, 29:12, 29:15, 29:21, 29:23, 30:15, 30:18, 30:22, 31:4, 31:7, 31:14, 31:23, 32:2, 32:7, 32:10, 32:20, 32:25, 33:3, 33:5, 33:9, 33:12, 33:14, 33:19, 34:8, 34:13, 34:23, 35:2, 35:8, 35:11, 35:13, 35:22, 35:24, 36:8, 36:11, 36:13, 36:15, 36:19, 36:21, 37:1, 37:4, 37:11, 37:14, 38:1, 38:14, 38:17, 38:21, 39:1, 39:4, 39:8, 39:11, 39:14, 39:21, 39:25, 40:3, 40:7, 40:12, 40:17, 40:19, 40:21, 41:2, 41:4, 41:10, 41:12, 41:20, 41:22, 42:12, 42:22, 43:5, 43:10, 44:13, 44:17, 45:4, 45:10, 46:2, 46:6, 46:8, 46:11, 46:21, 47:11, 47:25, 48:5, 48:8, 48:18, 48:20, 48:24, 49:4, 49:9, 49:11, 50:1, 50:3, 50:5, 50:8, 50:21, 50:23, 51:3, 51:6, 51:10, 51:12, 51:19, 51:25, 52:5, 52:8, 52:10, 52:12, 53:2, 53:8, 54:3, 55:1, 55:4, 55:7, 55:12, 55:14, 55:17, 55:22, 56:10, 56:14, 56:16, 56:19, 57:7, 57:11, 57:23, 58:13, 58:25, 61:24, 62:3, 62:5, 64:21, 64:24, 65:6, 65:8, 65:11, 65:18, 66:3, 66:5, 66:16, 66:21, 67:2, 67:7, 67:11, 67:20, 67:23, 67:25, 68:3, 68:5
**Court** [23] - 2:10, 2:10, 2:11, 3:22, 10:3, 10:18, 15:17, 16:6, 27:9, 28:10, 29:4, 56:6, 56:7, 57:3, 58:3, 59:17, 61:4, 64:11, 64:12, 66:9, 68:9, 68:13
**court** [2] - 3:2, 4:23
**Court's** [3] - 10:21, 28:18, 64:18
**courts** [2] - 29:24, 44:14
**covered** [1] - 52:13
**create** [5] - 14:16, 50:20, 54:22, 57:19, 62:19
**created** [1] - 30:13
**creating** [2] - 17:20, 47:9
**Creative** [2] - 59:15, 59:20
**creativity** [1] - 13:10
**credibility** [3] - 63:21, 63:22, 63:24
**critical** [3] - 25:20, 44:24, 45:4
**criticized** [1] - 40:23
**cross** [1] - 10:16
**CRR** [2] - 2:10, 68:9
**Csoros** [1] - 3:10
**CSOROS** [1] - 2:6
**CSR** [2] - 2:10, 68:9
**culture** [3] - 27:1, 47:4, 53:23
**cup** [2] - 19:3, 63:11
**Curators** [1] - 53:13
**cure** [1] - 35:15
**current** [2] - 18:17, 18:24

**D**

**date** [2] - 8:12, 37:10
**dated** [1] - 7:10
**DAVID** [1] - 1:9
**Davis** [1] - 61:4
**days** [2] - 8:12, 22:23

**DC** [1] - 2:3
**de** [1] - 14:10
**dealt** [1] - 5:16
**Dear** [2] - 43:14, 43:20
**debate** [1] - 25:22
**decision** [1] - 38:6
**decisions** [1] - 45:6
**declare** [1] - 14:11
**decline** [1] - 40:21
**dedicated** [1] - 37:16
**dedication** [1] - 19:1
**deeper** [1] - 60:14
**defend** [3] - 11:8, 19:4, 63:23
**defendant** [1] - 14:15
**DEFENDANT** [1] - 2:5
**defendants** [9] - 1:14, 3:11, 5:3, 24:8, 24:25, 26:7, 31:20, 42:1, 49:22
**defendants'** [1] - 38:10
**Defendants'** [1] - 35:10
**defending** [1] - 42:19
**defense** [4] - 7:10, 32:12, 32:14, 54:4
**define** [3] - 40:17, 49:6, 57:5
**defined** [2] - 40:19, 45:21
**definitely** [1] - 26:14
**definition** [7] - 4:21, 16:10, 49:7, 49:12, 50:24, 51:14, 52:16
**definitions** [3] - 49:11, 52:14, 52:17
**deliberations** [1] - 25:22
**demean** [1] - 14:19
**demeaned** [1] - 46:16
**demeaning** [12] - 14:16, 15:3, 15:7, 34:6, 34:9, 34:17, 34:21, 41:12, 62:7, 62:9, 66:17, 66:19
**demeans** [2] - 34:6, 49:23
**democracy** [1] - 44:24
**Democratic** [1] - 15:19
**denied** [1] - 31:16
**denies** [1] - 49:13
**Dennis** [3] - 27:19, 27:24, 27:25
**deny** [2] - 56:8, 58:17
**Department** [1] - 43:13
**describe** [1] - 13:9
**describes** [1] - 47:3
**describing** [2] - 13:16, 63:3
**description** [1] - 28:18
**designated** [4] - 17:10, 17:20, 18:2, 50:18
**determination** [1] - 52:22
**develop** [1] - 45:5
**development** [1] - 37:17
**dictate** [2] - 13:21, 14:13
**difference** [2] - 18:13, 42:23
**differences** [1] - 30:4
**different** [14] - 13:15, 13:16, 14:8, 15:9, 17:22, 28:22, 28:25, 29:1, 33:10, 34:24, 43:3, 59:7, 60:24, 66:13
**differently** [1] - 27:14
**diminished** [1] - 43:13
**directed** [1] - 5:25

**directive** [1] - 7:14
**directly** [1] - 47:6
**disagree** [3] - 15:8, 17:9, 50:6
**disagreed** [1] - 18:10
**disappear** [1] - 8:20
**discovery** [1] - 55:24
**discriminate** [2] - 7:20, 7:24
**discrimination** [9] - 16:6, 16:16, 17:11, 45:19, 54:13, 62:15, 62:16, 66:2, 66:8
**discriminatory** [4] - 8:2, 18:3, 48:12, 66:10
**discuss** [2] - 4:4, 65:17
**discusses** [1] - 13:17
**discussion** [1] - 50:14
**dispose** [1] - 66:11
**dispute** [1] - 31:5
**disrupt** [1] - 11:6
**disruptive** [1] - 51:16
**distinction** [9] - 13:2, 13:6, 14:2, 14:7, 26:8, 46:24, 53:1, 53:19, 56:1
**distinctions** [1] - 51:23
**distinguished** [2] - 30:24, 37:15
**distinguishing** [1] - 13:4
**district** [1] - 4:23
**District** [6] - 2:11, 2:11, 4:15, 4:23, 68:9
**DISTRICT** [3] - 1:1, 1:1, 1:17
**DIVISION** [1] - 1:2
**document** [3] - 25:6, 52:16, 59:5
**documents** [2] - 37:21, 37:22
**done** [4] - 3:15, 7:23, 23:8, 47:21
**down** [7] - 4:10, 9:23, 20:3, 20:25, 21:1, 38:7, 60:24
**drafted** [1] - 5:19
**drag** [57] - 4:4, 4:17, 12:6, 14:15, 15:6, 16:7, 16:9, 16:10, 18:11, 20:19, 25:9, 26:11, 27:2, 27:11, 29:7, 29:18, 30:7, 33:17, 33:21, 33:22, 35:5, 35:14, 35:19, 38:9, 38:10, 38:24, 39:1, 39:2, 42:8, 42:13, 43:2, 43:5, 43:9, 43:24, 44:3, 44:5, 45:12, 45:14, 45:21, 45:24, 46:2, 48:13, 48:16, 48:20, 51:19, 52:1, 52:25, 54:6, 55:1, 60:9, 60:11, 61:1, 61:9, 61:14, 61:18
**Draggieland** [7] - 6:14, 6:22, 10:25, 20:8, 31:22, 39:8, 60:8
**drama** [1] - 13:14
**draw** [3] - 10:14, 10:17, 10:21
**draws** [1] - 21:4
**dressed** [1] - 38:9
**dresser** [1] - 41:18
**dressing** [3] - 33:24, 41:16, 46:13
**drinking** [1] - 63:10
**due** [1] - 36:18
**during** [4] - 31:21, 36:21, 59:15, 63:3
**duty** [1] - 11:20
**Dylan** [1] - 57:6
**dynamic** [1] - 44:9

## E

Earl [1] - 36:3
earned [1] - 15:14
easy [4] - 10:9, 10:10, 19:9, 44:19
ED [1] - 43:16
edition [3] - 37:11, 37:12
editions [1] - 36:17
educating [1] - 44:23
education [4] - 25:21, 25:25, 26:2, 54:15
Education [1] - 43:13
educational [6] - 45:18, 49:15, 53:4, 53:9, 53:10, 54:12
effect [1] - 21:4
effects [1] - 43:15
efforts [3] - 10:2, 11:4, 11:5
either [9] - 5:2, 7:24, 11:24, 20:2, 27:16, 39:2, 43:4, 60:13, 67:8
elaborate [1] - 40:22
element [2] - 29:11, 48:15
elements [5] - 34:11, 35:6, 35:20, 45:25, 46:19
elsewhere [1] - 65:3
Elvis [4] - 9:22, 40:22, 41:1, 41:15
embraced [2] - 44:22, 47:16
emphasizes [1] - 37:15
Empowerment [2] - 3:23, 4:1
EMPOWERMENT [1] - 1:4
empty [1] - 59:17
encourages [1] - 37:19
end [3] - 8:1, 11:2, 64:11
ended [1] - 32:24
endorse [1] - 58:1
enforce [3] - 43:17, 53:16, 53:25
engage [2] - 59:11, 64:9
Engelhardt [1] - 27:25
enrolled [1] - 25:23
ensure [2] - 24:14, 25:21
enterprises [1] - 30:12
Entertainment [1] - 10:4
entertainment [2] - 28:7, 60:13
entire [1] - 20:6
entitled [1] - 68:11
entity [1] - 50:20
environment [10] - 14:17, 42:4, 45:19, 47:9, 54:12, 57:19, 60:21, 61:5, 62:19, 62:21
equal [1] - 34:19
era [1] - 9:18
especially [6] - 9:14, 13:22, 20:6, 41:25, 47:1, 58:10
essence [1] - 5:10
essential [2] - 44:23, 53:4
essentially [2] - 17:20, 54:23
esteemed [1] - 27:11
eugenics [1] - 47:15
event [14] - 23:19, 24:6, 24:12, 28:19, 30:7, 32:9, 47:8, 49:22, 51:4, 65:2,

66:13, 67:15, 67:20
events [9] - 14:16, 33:10, 33:22, 35:14, 35:25, 45:22, 51:8, 54:6, 55:8
evidence [2] - 28:11, 42:16
evidenced [1] - 39:12
evolved [2] - 32:8, 60:22
evolving [1] - 32:21
exact [3] - 5:13, 16:16, 45:23
exactly [2] - 19:5, 28:23
exaggerated [2] - 34:1, 34:2
exaggerating [1] - 46:14
example [1] - 10:19
examples [1] - 27:2
exchange [5] - 13:25, 14:13, 37:19, 53:3, 53:8
excused [1] - 68:5
Executive [1] - 43:21
executive [12] - 12:6, 12:10, 12:23, 14:23, 42:6, 42:9, 42:18, 43:8, 43:16, 43:19, 60:23, 61:2
exercise [2] - 23:10, 65:14
Exhibit [2] - 10:22, 35:10
exhibit [1] - 35:8
exhibits [1] - 10:22
exists [1] - 22:15
expect [5] - 6:1, 21:16, 58:6, 58:7, 61:22
expecting [1] - 4:12
experienced [1] - 27:11
explain [6] - 32:16, 35:22, 60:9, 62:9, 66:16, 66:21
explained [1] - 51:10
explaining [1] - 13:24
explanation [3] - 28:15, 34:12, 60:12
explanatory [2] - 28:8, 28:11
exposed [8] - 5:18, 32:9, 32:22, 44:20, 65:8, 65:13, 65:14
exposes [1] - 61:25
exposure [2] - 19:7, 44:22
express [12] - 4:12, 19:23, 19:24, 19:25, 20:2, 28:8, 29:8, 48:13, 60:2, 60:12, 62:8, 66:18
expressed [5] - 4:4, 38:9, 58:20, 60:20, 62:1
expressing [3] - 26:25, 29:6, 60:13
expression [17] - 6:4, 7:8, 7:19, 8:15, 9:20, 13:14, 13:16, 15:11, 15:16, 15:24, 21:22, 25:13, 25:20, 42:25, 53:5, 56:24, 62:14
Expression [1] - 2:2
expressions [1] - 13:11
Expressive [1] - 14:21
expressive [54] - 4:8, 4:10, 4:16, 4:18, 4:21, 4:24, 6:22, 9:9, 11:15, 11:18, 20:20, 25:5, 25:17, 26:3, 26:4, 26:13, 26:15, 26:16, 27:3, 27:12, 28:5, 28:6, 28:12, 28:19, 29:11, 29:19, 31:5, 32:11, 32:15, 34:11, 36:16, 36:22, 37:5, 38:6, 47:21, 47:22, 47:25, 48:1, 48:5, 48:6, 48:9, 48:15, 52:15, 52:25, 54:6, 54:7,

54:9, 58:14, 58:20, 60:1, 60:14, 67:2, 67:5
extent [2] - 49:22, 53:24
extra [1] - 60:12
extremism [1] - 42:20
eyes [3] - 10:20, 15:13, 61:22

## F

face [2] - 16:7, 32:13
facilitate [1] - 22:10
fact [5] - 16:25, 28:10, 35:18, 38:2, 61:24
facto [1] - 14:10
factor [7] - 25:10, 33:21, 33:23, 35:17, 38:21, 38:23, 46:17
factors [10] - 35:9, 35:15, 39:3, 41:16, 45:13, 47:24, 60:19, 61:7, 66:14, 66:23
facts [5] - 28:13, 30:18, 30:23, 31:2, 31:19
factually [1] - 30:4
fail [2] - 41:16, 58:2
FAIR [8] - 28:4, 28:7, 28:10, 59:13, 59:15, 59:23, 60:11, 60:16
fair [1] - 18:18
fall [1] - 59:10
false [1] - 13:19
familiar [1] - 41:17
familiarity [1] - 40:25
families [1] - 5:23
far [2] - 7:16, 8:8
Faulkner [1] - 17:16
favor [2] - 11:5, 63:23
favoring [1] - 47:15
FBI [1] - 9:24
featured [1] - 46:12
federal [4] - 14:24, 42:20, 44:11, 44:12
female [3] - 13:8, 34:1, 34:3
feminine [1] - 16:14
few [1] - 42:16
fields [1] - 13:14
fifth [1] - 35:17
Fifth [7] - 12:21, 17:15, 29:17, 50:11, 50:16, 51:23, 52:24
Fifties [1] - 9:21
figure [1] - 6:9
file [1] - 11:19
filed [2] - 11:22, 56:5
filing [1] - 12:1
fill [1] - 18:7
financial [1] - 55:18
fine [1] - 61:14
finest [1] - 47:4
finish [4] - 32:18, 41:22, 49:5, 52:23
first [22] - 4:4, 7:23, 13:19, 22:24, 26:9, 26:16, 26:18, 26:20, 27:20, 28:21, 32:18, 33:24, 36:15, 36:24, 38:5, 54:6, 55:18, 55:19, 56:17, 56:20
First [25] - 7:11, 10:5, 12:19, 12:22,

13:20, 15:25, 17:2, 18:17, 20:5, 22:19, 28:9, 32:12, 44:18, 44:19, 48:3, 50:19, 52:4, 52:6, 53:3, 53:7, 53:18, 53:25, 63:7, 63:18, 67:3

**first-come** [1] - 7:23
**first-serve** [1] - 7:23
**fit** [1] - 28:13
**fits** [1] - 66:23
**five** [22] - 18:12, 24:18, 25:10, 31:23, 32:3, 33:21, 33:23, 35:9, 35:15, 35:19, 38:21, 38:23, 39:3, 40:13, 40:14, 45:13, 47:24, 55:12, 55:14, 57:8, 66:14, 66:23
**five-factor** [5] - 25:10, 33:21, 33:23, 38:21, 38:23
**flag** [3] - 66:9, 66:10, 66:11
**Florida** [1] - 9:22
**focus** [1] - 3:17
**follow** [2] - 43:11, 59:5
**following** [2] - 32:23, 43:15
**FOR** [2] - 1:21, 2:5
**fora** [1] - 30:1
**forbid** [1] - 38:15
**foregoing** [1] - 68:10
**foremost** [1] - 22:24
**form** [7] - 8:22, 12:18, 18:5, 18:7, 44:3, 59:6, 62:25
**formative** [1] - 53:24
**forms** [4] - 8:24, 13:13, 13:15, 42:16
**forth** [3] - 11:8, 61:3, 63:13
**forum** [34] - 8:1, 16:21, 17:3, 17:8, 17:9, 17:10, 17:18, 17:20, 17:23, 18:2, 18:4, 35:16, 35:21, 35:22, 35:25, 38:9, 39:3, 39:5, 45:23, 45:24, 47:5, 48:16, 49:19, 49:24, 50:3, 50:4, 50:18, 50:20, 50:25, 54:25, 56:25, 65:5, 65:25, 66:5
**forums** [3] - 16:25, 50:14, 50:15
**forward** [1] - 22:18
**Foundation** [1] - 2:1
**founded** [1] - 21:22
**four** [1] - 46:19
**framework** [1] - 22:12
**free** [34] - 7:19, 9:16, 10:9, 10:10, 10:12, 11:21, 15:10, 18:15, 18:22, 19:1, 19:9, 19:21, 25:22, 36:22, 37:19, 37:23, 38:3, 38:4, 38:18, 48:25, 49:2, 53:3, 53:8, 54:22, 54:25, 56:15, 56:18, 56:21, 58:10, 63:9, 63:10, 63:13, 64:9
**Freedom** [1] - 25:20
**freedom** [5] - 7:8, 19:17, 25:25, 37:20, 53:5
**front** [2] - 36:14, 37:21
**fully** [3] - 39:9, 39:16, 56:5
**fully-clothed** [1] - 39:9
**fund** [1] - 51:4
**fundamental** [1] - 26:1
**funded** [4] - 21:11, 32:24, 32:25, 55:19
**funding** [9] - 12:20, 21:10, 21:13, 21:18, 22:4, 22:6, 22:7, 47:6
**funds** [4] - 14:24, 21:11, 21:14, 33:5
**futility** [1] - 12:4

**future** [2] - 33:18, 63:24

## G

**gallery** [1] - 3:25
**games** [3] - 8:25, 10:3, 10:5
**gender** [11] - 13:5, 13:6, 14:3, 14:7, 14:8, 14:24, 25:13, 27:1, 42:19, 43:3, 43:18
**genders** [4] - 12:7, 13:17, 42:23, 43:6
**general** [2] - 22:7, 61:19
**General's** [1] - 2:6
**generally** [4] - 50:13, 56:1, 58:17, 58:23
**generation** [1] - 8:22
**generations** [1] - 8:23
**generations'** [1] - 9:19
**Gertz** [1] - 13:20
**given** [3] - 28:18, 30:18, 62:17
**Gonce** [1] - 3:24
**governing** [1] - 53:17
**government** [6] - 10:16, 12:18, 13:21, 15:23, 42:21, 50:19
**government's** [1] - 12:17
**governor's** [2] - 7:13, 12:10
**graduate** [1] - 23:2
**GRAHAM** [1] - 1:10
**granted** [1] - 44:7
**grants** [1] - 44:10
**great** [2] - 26:22, 31:11
**grew** [1] - 9:7
**grievance** [2] - 11:19, 12:1
**grievances** [1] - 11:22
**grinding** [1] - 40:24
**group** [6] - 15:20, 20:6, 30:6, 34:14, 63:14
**groups** [5] - 11:8, 11:9, 20:16, 31:7, 54:18
**growth** [1] - 54:1
**Guardian** [1] - 50:16
**guess** [1] - 41:22
**guidance** [1] - 61:3

## H

**hairdos** [1] - 40:5
**half** [1] - 35:17
**hand** [1] - 29:23
**handbook** [1] - 59:2
**hanging** [1] - 64:7
**happy** [3] - 64:20, 67:9, 67:18
**harassment** [3] - 21:2, 49:12, 61:5
**hard** [2] - 15:14, 60:24
**hard-earned** [1] - 15:14
**harder** [1] - 20:9
**harm** [1] - 22:17
**Harvard** [1] - 63:17
**Hays** [1] - 50:16
**Healey** [1] - 9:14

**health** [1] - 27:19
**Healy** [4] - 15:18, 19:22, 53:14, 58:3
**hear** [3] - 24:24, 45:6, 67:12
**HEARD** [1] - 1:17
**heard** [7] - 12:2, 12:3, 27:18, 56:18, 56:20, 56:21, 56:25
**hearing** [1] - 56:3
**HEARING** [1] - 1:16
**heartburn** [2] - 44:16, 44:17
**heckle** [1] - 11:5
**held** [2] - 15:16, 55:1
**help** [1] - 54:1
**helpful** [3] - 67:7, 67:10, 68:5
**hereby** [1] - 68:10
**HERNANDEZ** [1] - 1:11
**hero** [1] - 36:5
**hide** [1] - 21:5
**higher** [5] - 25:21, 25:25, 26:2, 37:18
**hips** [1] - 9:23
**history** [3] - 9:10, 9:11, 37:23
**hit** [1] - 35:19
**hits** [1] - 10:11
**Hittner** [2] - 30:15, 60:10
**Hittner's** [1] - 30:23
**Ho** [1] - 27:23
**hold** [9] - 8:12, 8:14, 15:9, 18:9, 23:11, 30:7, 33:17, 54:7, 61:14
**holders** [1] - 5:22
**holding** [1] - 25:4
**Honor** [17] - 3:21, 4:3, 7:18, 25:7, 36:12, 36:25, 37:13, 40:6, 44:15, 45:8, 55:23, 56:9, 57:2, 64:23, 64:25, 67:6, 68:4
**HONORABLE** [1] - 1:17
**honoring** [1] - 11:21
**hope** [4] - 20:13, 20:23, 21:6, 45:2
**horror** [1] - 45:9
**host** [6] - 20:17, 31:8, 31:15, 34:14, 34:15, 46:9
**hosted** [4] - 33:9, 35:1, 35:20, 55:8
**hostile** [6] - 14:17, 47:9, 57:19, 61:5, 62:19, 62:20
**hosting** [1] - 58:7
**HOUSTON** [2] - 1:2, 1:8
**Houston** [1] - 2:13
**human** [4] - 10:7, 13:9, 13:17, 54:1
**hurdles** [1] - 8:10
**hypothetical** [1] - 35:4

## I

**i's** [1] - 8:10
**idea** [1] - 13:19
**ideas** [6] - 12:18, 14:13, 27:3, 37:19, 53:3, 53:8
**identified** [1] - 12:16
**identify** [2] - 43:3, 60:4
**identity** [1] - 27:1
**ideological** [1] - 58:19

**ideology** [5] - 14:24, 16:3, 16:4, 42:19, 43:18
**II** [1] - 36:5
**III** [2] - 1:11, 1:12
**illegal** [1] - 49:12
**illustration** [1] - 66:7
**imagination** [1] - 13:9
**imagine** [1] - 37:22
**immune** [1] - 53:18
**impediment** [1] - 8:14
**impersonated** [1] - 43:22
**implement** [1] - 44:3
**implicating** [1] - 12:22
**implications** [1] - 12:19
**importance** [1] - 25:20
**important** [1] - 22:9
**impose** [5] - 12:20, 17:18, 18:5, 22:16, 63:13
**imposes** [1] - 14:11
**imposing** [2] - 16:1, 63:4
**improve** [1] - 23:6
**include** [2] - 41:8, 65:20
**includes** [1] - 40:5
**including** [7] - 5:23, 26:3, 29:24, 31:23, 33:12, 39:15, 65:8
**incomplete** [1] - 51:8
**incorrect** [1] - 7:17
**indecent** [1] - 51:16
**indicated** [1] - 44:2
**indicates** [2] - 32:4, 32:5
**indication** [1] - 60:25
**Individual** [1] - 2:1
**individual** [3] - 10:15, 10:17, 37:17
**infer** [1] - 27:8
**information** [1] - 21:9
**informed** [1] - 8:10
**inherent** [1] - 29:11
**inherently** [4] - 27:3, 28:8, 28:12, 29:18
**injunction** [3] - 56:3, 56:8, 64:12
**injunctive** [1] - 44:6
**injury** [1] - 56:2
**instances** [1] - 31:11
**instead** [1] - 19:1
**instinct** [1] - 10:8
**institution** [4] - 15:21, 25:21, 37:18, 53:10
**institution's** [1] - 14:20
**institutions** [3] - 14:23, 25:25, 53:9
**intended** [4] - 6:3, 6:8, 56:1, 66:24
**intending** [1] - 60:2
**intent** [4] - 5:9, 5:22, 26:20, 29:8
**interest** [4] - 45:17, 54:11, 60:20, 62:2
**interesting** [2] - 35:4, 51:25
**interests** [1] - 46:1
**intermediate** [1] - 66:6
**interpret** [1] - 27:7
**interrupt** [2] - 32:2, 56:15
**interview** [1] - 26:10

**intuitively** [1] - 13:15
**involve** [2] - 50:15, 53:1
**involved** [5] - 46:14, 46:15, 55:11, 56:7, 59:15
**involves** [5] - 33:24, 34:4, 34:5, 41:4, 49:23
**involving** [2] - 32:14, 51:19
**irrelevant** [2] - 66:15, 66:25
**irreparable** [2] - 22:17, 56:2
**Israel** [2] - 21:1, 44:9
**Israel-Palestinian** [1] - 44:9
**Israel/pro** [1] - 32:14
**issuance** [1] - 56:3
**issue** [17] - 4:7, 4:17, 13:7, 22:4, 25:4, 27:19, 28:12, 31:4, 33:2, 38:13, 39:23, 40:2, 44:13, 50:8, 56:6, 64:12, 64:16
**issued** [7] - 32:10, 36:15, 42:12, 43:14, 58:14, 61:2
**issues** [1] - 3:16
**issuing** [1] - 64:11
**itself** [16] - 4:10, 6:11, 12:16, 12:24, 22:17, 33:7, 34:6, 36:3, 43:9, 44:25, 48:11, 48:16, 49:20, 53:10, 62:9, 66:19
**IX** [11] - 43:17, 43:18, 43:23, 44:12, 45:9, 45:12, 45:18, 54:12, 61:1, 61:15, 61:17

## J

**J.T** [1] - 3:7
**JAMES** [1] - 1:10
**James** [1] - 53:14
**JAY** [1] - 1:10
**job** [1] - 3:15
**jobs** [1] - 23:3
**JOHN** [2] - 1:9, 1:12
**Johnson** [2] - 26:19, 66:8
**JT** [1] - 2:1
**Judge** [9] - 14:3, 14:9, 27:19, 30:15, 30:21, 30:23, 34:24, 60:10, 65:19
**judge** [6] - 9:22, 25:14, 27:14, 29:21, 41:25, 66:22
**JUDGE** [1] - 1:17
**judged** [1] - 16:22
**judgments** [3] - 15:22, 15:24, 16:1
**jump** [1] - 24:12
**June** [1] - 11:16
**Justice** [4] - 17:16, 50:10, 57:25, 59:14
**justification** [1] - 19:23
**justifies** [1] - 24:16

## K

**Kacsmaryk** [2] - 27:14, 30:21
**Kacsmaryk's** [2] - 29:21, 65:19
**keep** [1] - 19:2
**Keeping** [1] - 43:20
**Keyishian** [1] - 13:23
**kind** [5] - 5:16, 5:22, 17:1, 20:20, 44:22
**kinds** [2] - 11:6, 29:25

**Kingsmen** [1] - 9:24
**knowledge** [2] - 4:25, 6:7

## L

**label** [1] - 7:5
**labels** [1] - 35:24
**lack** [2] - 38:14, 46:17
**lacked** [1] - 45:25
**laid** [3] - 25:10, 30:18, 33:20
**landings** [1] - 36:7
**language** [2] - 7:14, 40:23
**Lanie** [3] - 2:10, 68:9, 68:13
**last** [8] - 6:2, 18:12, 22:11, 27:18, 31:23, 32:18, 36:8, 38:20
**laundry** [2] - 54:16, 56:12
**law** [10] - 4:15, 11:9, 12:1, 13:3, 13:17, 44:12, 59:15, 66:9, 66:12
**lawyers** [1] - 3:4
**learn** [4] - 6:3, 13:24, 14:1, 45:6
**learned** [1] - 21:7
**learning** [1] - 37:18
**least** [2] - 6:1, 41:16
**leave** [1] - 6:9
**led** [1] - 36:5
**LEE** [1] - 1:17
**left** [1] - 23:5
**length** [1] - 31:21
**less** [1] - 11:17
**lesson** [1] - 19:13
**Letter** [2] - 43:14, 43:20
**level** [1] - 45:20
**lewd** [14] - 34:5, 39:19, 40:17, 40:19, 41:20, 46:15, 49:6, 51:14, 51:16, 51:17, 52:14, 52:17, 52:19, 57:4
**LGBTQ** [2] - 6:24, 26:25
**life** [4] - 9:1, 11:8, 34:17, 47:13
**Life** [1] - 17:13
**lights** [1] - 22:3
**likely** [3] - 5:21, 14:16, 64:8
**limitation** [2] - 8:3, 17:12
**limitations** [1] - 17:19
**limited** [21] - 16:21, 17:10, 18:2, 34:18, 35:16, 35:21, 39:3, 39:5, 45:24, 46:2, 47:5, 48:16, 49:19, 49:24, 50:4, 50:20, 50:25, 54:25, 65:5, 65:25, 66:5
**limits** [3] - 49:14, 63:13
**line** [3] - 51:17, 52:18, 57:16
**lines** [3] - 10:15, 10:17, 37:23
**Lines** [1] - 59:20
**link** [1] - 59:5
**list** [3] - 41:8, 54:16, 56:12
**listen** [1] - 26:3
**lists** [1] - 35:8
**literal** [1] - 28:15
**litigated** [1] - 54:20
**live** [2] - 44:19, 44:23
**local** [1] - 20:1
**location** [1] - 47:2

**locations** [1] - 48:14
**logistical** [1] - 8:9
**logistics** [1] - 22:21
**look** [21] - 6:17, 7:21, 9:18, 14:3, 14:4, 15:10, 15:12, 17:15, 18:4, 18:11, 28:22, 33:20, 42:4, 53:20, 58:6, 59:1, 59:6, 60:20, 62:12, 63:16, 66:8
**looked** [2] - 31:10, 52:15
**looking** [5] - 11:14, 49:9, 49:11, 58:13, 61:7
**lose** [1] - 19:14
**Louie** [2] - 9:25
**love** [4] - 10:9, 10:10, 10:12, 15:11
**lower** [1] - 16:23
**lyrics** [1] - 9:25

**M**

**MAHOMES** [1] - 1:8
**main** [2] - 56:23, 67:13
**maintain** [1] - 67:4
**makeup** [3] - 34:2, 40:5, 46:13
**male** [1] - 13:7
**males** [2] - 33:24, 46:13
**mandates** [1] - 54:14
**manner** [3] - 7:23, 17:1, 62:22
**map** [1] - 31:2
**March** [2] - 44:8, 44:9
**MARCH** [1] - 1:14
**Mark** [1] - 3:10
**MARK** [2] - 1:12, 2:6
**Matal** [1] - 62:12
**matter** [4] - 8:2, 16:2, 25:24, 68:11
**matters** [1] - 18:1
**mean** [9] - 32:2, 38:24, 39:14, 43:2, 45:22, 49:16, 53:9, 58:7, 58:8
**meaning** [2] - 34:3, 57:16
**meaningful** [1] - 33:7
**means** [8] - 11:10, 14:9, 16:9, 26:11, 26:12, 62:10, 62:12, 66:21
**meant** [4] - 34:2, 44:18, 62:8, 66:18
**mechanical** [1] - 1:24
**meet** [3] - 28:19, 61:3, 65:22
**meets** [1] - 4:20
**member** [1] - 4:1
**members** [5] - 6:24, 20:17, 23:24, 31:8, 64:4
**Men** [1] - 43:20
**men** [4] - 34:20, 43:21, 44:23, 44:25
**Merchants** [1] - 10:4
**merits** [1] - 65:25
**message** [12] - 20:11, 20:12, 26:21, 26:22, 27:5, 27:7, 27:9, 29:2, 29:4, 60:14, 61:11, 66:24
**messages** [3] - 28:22, 28:25, 29:1
**met** [2] - 22:13, 27:12
**mic** [1] - 3:8
**MICHAEL** [2] - 1:10, 1:11
**microphone** [1] - 45:15

**might** [18] - 6:5, 14:3, 21:1, 21:24, 23:3, 27:2, 34:11, 39:15, 43:2, 47:17, 57:4, 58:4, 62:18, 62:19, 62:20, 62:21, 62:22, 63:5
**military** [2] - 59:16, 59:24
**million** [1] - 44:10
**mind** [1] - 22:22
**minimum** [1] - 48:10
**ministerial** [1] - 59:3
**minor** [1] - 17:19
**minute** [3] - 14:4, 64:23, 65:17
**mirror** [1] - 8:21
**misdeeds** [1] - 54:17
**misdemeanor** [1] - 30:13
**mishear** [1] - 34:10
**Miss** [1] - 41:9
**miss** [2] - 15:4, 42:15
**missed** [1] - 42:14
**missing** [1] - 16:18
**mission** [7] - 20:7, 21:21, 21:23, 37:18, 46:22, 53:4
**Missouri** [1] - 53:14
**mockery** [1] - 14:18
**mocking** [2] - 16:11, 61:10
**model** [1] - 19:6
**modeling** [1] - 19:1
**Mole** [1] - 19:21
**moment** [2] - 12:9, 17:16
**money** [2] - 15:14, 23:15
**moral** [1] - 15:23
**morning** [2] - 3:21, 11:8
**MORRIS** [2] - 2:1, 3:7
**Morris** [1] - 3:7
**most** [7] - 7:12, 36:18, 37:22, 51:19, 52:25, 60:13, 62:25
**MOTION** [1] - 1:16
**motivated** [1] - 65:19
**move** [2] - 15:15, 16:25
**movements** [1] - 63:3
**movie** [1] - 41:3
**MR** [210] - 1:21, 2:1, 2:5, 2:6, 3:5, 3:7, 3:10, 3:19, 3:21, 4:3, 4:9, 4:25, 5:4, 5:13, 5:24, 6:12, 6:14, 7:6, 7:12, 7:16, 8:8, 8:18, 9:4, 9:6, 9:11, 9:14, 11:3, 11:7, 11:13, 11:23, 11:25, 12:8, 12:11, 12:15, 13:12, 13:18, 15:1, 15:4, 17:3, 17:6, 18:18, 18:21, 18:25, 19:8, 20:19, 20:22, 21:14, 22:14, 23:24, 24:2, 24:4, 24:6, 24:9, 24:23, 25:3, 25:7, 25:9, 25:16, 26:7, 26:14, 26:18, 27:13, 27:17, 27:23, 28:2, 28:21, 28:25, 29:5, 29:14, 29:16, 29:22, 30:2, 30:17, 30:20, 31:1, 31:6, 31:10, 31:18, 31:25, 32:5, 32:8, 32:17, 32:21, 33:1, 33:4, 33:7, 33:11, 33:13, 33:16, 33:20, 34:11, 34:22, 34:24, 35:3, 35:10, 35:12, 35:14, 35:23, 36:2, 36:9, 36:12, 36:14, 36:17, 36:20, 36:24, 37:3, 37:7, 37:13, 37:21, 38:5, 38:16, 38:20, 38:22, 39:2, 39:7, 39:10, 39:13, 39:17, 39:22, 40:1, 40:6, 40:10,

40:13, 40:18, 40:20, 40:25, 41:3, 41:7, 41:11, 41:14, 41:21, 41:24, 42:15, 43:1, 43:7, 43:11, 44:15, 45:2, 45:8, 45:11, 46:5, 46:7, 46:9, 46:18, 46:24, 47:19, 48:4, 48:6, 48:9, 48:19, 48:22, 49:2, 49:8, 49:10, 49:18, 50:2, 50:4, 50:7, 50:9, 50:22, 51:1, 51:5, 51:7, 51:11, 51:15, 51:22, 52:3, 52:7, 52:9, 52:11, 52:18, 53:6, 53:12, 54:5, 55:3, 55:6, 55:9, 55:13, 55:15, 55:18, 55:23, 56:12, 56:15, 56:17, 56:20, 57:10, 57:14, 57:25, 58:24, 59:1, 62:1, 62:4, 62:11, 64:23, 64:25, 65:7, 65:10, 65:16, 65:21, 66:4, 66:6, 66:20, 66:22, 67:4, 67:9, 67:13, 67:22, 67:24, 68:2, 68:4
**music** [2] - 8:24, 60:15
**must** [2] - 43:16, 58:8

**N**

**name** [5] - 3:5, 3:22, 6:11, 9:15, 17:14
**named** [1] - 36:3
**narrow** [2] - 27:5, 47:12
**narrowly** [7] - 38:23, 40:16, 45:22, 47:20, 48:10, 54:10, 54:16
**nationally** [1] - 42:5
**natural** [1] - 10:7
**nature** [4] - 4:4, 13:16, 31:17, 35:22
**Nazis** [1] - 47:16
**Nazism** [1] - 47:16
**necessarily** [5] - 27:8, 39:17, 42:8, 43:9, 44:4
**necessary** [1] - 28:11
**need** [14] - 3:8, 22:19, 23:11, 23:12, 23:14, 23:15, 23:18, 23:20, 25:11, 25:12, 60:9, 60:12, 66:23
**needs** [1] - 63:22
**negative** [1] - 16:12
**neutral** [1] - 66:3
**never** [2] - 12:2, 56:25
**new** [2] - 3:16, 23:19
**newspaper** [1] - 10:24
**next** [1] - 43:20
**Nineties** [1] - 10:2
**no-free-speech** [2] - 56:18, 56:21
**nobody** [1] - 63:20
**non** [1] - 28:5
**non-expressive** [1] - 28:5
**none** [1] - 30:13
**Normandy** [1] - 36:6
**north** [1] - 9:15
**Northern** [2] - 4:15, 4:23
**not-conservative** [1] - 33:14
**noted** [1] - 29:19
**notes** [1] - 56:12
**nothing** [7] - 5:11, 5:24, 21:8, 23:1, 31:14, 32:3, 60:8
**notion** [6] - 15:15, 46:22, 58:1, 58:4, 62:13, 62:18
**notions** [1] - 63:7

nudity [1] - 39:11
Number [1] - 18:15
number [1] - 36:17
numbered [1] - 68:11
numerous [1] - 54:17

## O

O'Connor [1] - 57:25
objectification [1] - 14:18
objectifying [2] - 15:3, 61:10
objective [1] - 57:21
objectively [3] - 49:13, 57:22, 61:6
obligation [1] - 61:16
obligations [1] - 61:17
obscene [1] - 9:25
observe [1] - 26:3
observer [1] - 27:8
obviously [3] - 5:18, 51:17, 56:7
occupy [1] - 34:16
occur [2] - 57:9, 67:20
occurs [1] - 63:2
OCR [2] - 43:12, 43:16
odd [1] - 41:8
OF [2] - 1:1, 1:16
offend [1] - 12:6
offended [3] - 46:23, 57:18, 63:6
offense [3] - 57:20, 57:21, 62:16
offensive [15] - 39:15, 39:18, 40:8,
41:12, 44:21, 49:13, 57:13, 57:17,
57:22, 61:6, 62:14, 62:15, 62:19, 63:7
Office [2] - 2:6, 43:12
office [1] - 24:9
official [1] - 1:13
Official [4] - 2:10, 2:10, 68:9, 68:13
officially [1] - 25:25
officials [1] - 15:9
often [2] - 40:23, 44:21
old [1] - 66:11
older [2] - 5:19, 8:19
once [3] - 57:6, 58:1, 63:10
one [35] - 7:7, 7:9, 8:21, 10:20, 10:22,
11:10, 11:12, 11:17, 12:9, 12:11, 16:21,
27:10, 29:6, 33:8, 35:6, 35:19, 39:2,
40:10, 40:11, 45:25, 46:17, 47:4, 49:4,
51:13, 51:22, 51:23, 58:13, 58:16,
59:10, 61:8, 62:5, 63:14, 64:23, 65:1,
65:18
online [1] - 6:16
open [8] - 17:17, 34:3, 46:3, 46:19,
46:21, 50:12, 61:14, 61:19
opened [1] - 17:23
opens [1] - 35:18
operating [1] - 59:2
opinion [6] - 14:3, 15:10, 59:15, 64:14,
65:19, 67:25
opportunity [1] - 25:1
opposed [2] - 38:11, 65:11
opposite [2] - 5:13, 54:24

oral [1] - 59:19
Order [1] - 43:21
order [25] - 3:2, 12:6, 12:10, 12:16,
12:23, 14:23, 18:7, 22:20, 24:14, 24:16,
28:9, 42:6, 42:9, 42:13, 42:18, 43:9,
43:16, 43:17, 43:19, 44:3, 44:5, 60:23,
61:2, 61:4, 64:9
organization [8] - 18:19, 22:15, 38:7,
58:17, 58:20, 58:21, 59:7, 64:5
organizations [4] - 17:18, 38:8, 58:18,
58:23
oriented [1] - 30:10
original [1] - 42:18
otherwise [2] - 14:11, 45:2
outdoor [2] - 50:12, 50:17
outfit [1] - 26:12
outfits [1] - 40:2
outlier [1] - 5:1
outside [8] - 17:24, 50:15, 51:22,
52:24, 55:1, 61:23, 61:24, 65:6
overnight [1] - 64:15
overseas [1] - 63:3
owe [1] - 61:15
own [6] - 7:8, 10:15, 12:17, 12:18,
38:18

## P

P.O [1] - 2:7
PA [1] - 1:22
Page [2] - 35:12, 59:20
pageant [4] - 16:14, 41:6, 41:7, 41:10
pageants [2] - 33:15, 33:16
paid [2] - 23:23, 24:5
Palestinian [3] - 21:2, 32:14, 44:9
panel [2] - 27:23, 27:24
panels [2] - 27:18, 27:22
panics [1] - 9:19
Papish [4] - 9:15, 53:13, 53:15
parades [2] - 52:1, 52:3
parents [1] - 65:12
parodies [1] - 16:8
parody [2] - 14:19, 34:2
part [10] - 15:5, 16:18, 26:14, 26:16,
26:18, 28:21, 36:24, 54:6, 58:13, 62:5
participate [3] - 44:24, 47:13, 49:14
participating [1] - 47:10
particular [4] - 5:8, 7:22, 35:16, 49:22
particularized [1] - 26:21
parties [3] - 18:10, 24:17, 56:5
parts [4] - 27:13, 28:14, 28:19, 32:17
party [2] - 12:1, 52:21
pass [1] - 54:10
passed [1] - 56:4
passes [1] - 61:11
past [9] - 20:16, 31:8, 31:15, 36:1,
37:5, 50:23, 55:10, 57:8, 63:22
paying [3] - 21:25, 22:5, 23:18
peaceably [1] - 26:2

pen [1] - 9:24
penalties [1] - 30:12
pending [1] - 56:2
pendulum [3] - 11:7, 63:12, 63:15
Pennsylvania [1] - 2:2
people [30] - 5:5, 5:9, 6:14, 7:2, 10:7,
10:11, 10:15, 13:5, 14:7, 20:10, 31:11,
31:12, 31:20, 39:15, 40:1, 42:2, 43:4,
47:7, 49:16, 49:20, 57:13, 57:16, 57:17,
58:6, 61:20, 61:25, 62:16, 63:5, 65:13
people's [1] - 15:24
per [1] - 7:13
perfectly [2] - 43:9, 61:13
perform [6] - 5:9, 24:15, 35:5, 40:22,
43:4, 54:18
performance [40] - 4:20, 4:24, 5:8,
5:12, 5:17, 6:11, 6:21, 8:7, 8:13, 9:3,
18:9, 20:20, 21:10, 22:20, 22:22, 23:13,
24:19, 25:6, 26:11, 26:17, 28:14, 28:15,
28:16, 28:22, 29:7, 29:9, 29:11, 31:17,
33:6, 34:7, 34:10, 38:2, 38:3, 39:5,
40:9, 46:23, 46:25, 49:21
performances [21] - 6:16, 20:17,
20:19, 20:21, 26:9, 27:12, 29:25, 30:1,
30:11, 31:9, 31:16, 32:22, 40:24, 51:20,
52:5, 55:5, 55:10, 55:11, 59:9, 60:7,
60:11
performative [1] - 6:2
performer [2] - 29:8, 66:24
performers [5] - 34:12, 39:9, 43:2,
43:6, 60:7
perhaps [5] - 30:20, 35:12, 48:15,
55:24, 61:17
period [1] - 66:15
permissible [2] - 15:18, 63:2
permission [1] - 31:16
permit [1] - 40:21
permitted [9] - 15:17, 16:15, 17:2,
26:1, 31:9, 41:5, 55:12, 55:14
permitting [1] - 31:23
pernicious [1] - 62:25
person [4] - 4:10, 11:18, 26:1, 27:7
person's [1] - 49:14
personal [1] - 37:16
personally [1] - 29:9
persuasions [1] - 35:1
persuasive [1] - 43:15
pervasive [1] - 61:6
pervasively [1] - 49:13
phase [1] - 26:10
phases [1] - 26:9
phenomenon [1] - 21:3
Philadelphia [1] - 1:22
philosophical [1] - 58:19
philosophy [2] - 15:16, 15:20
physical [1] - 46:14
physiognomies [1] - 46:14
pick [1] - 26:12
place [3] - 6:3, 17:1

**places** [2] - 6:1, 54:18
**plaintiff** [6] - 3:6, 3:7, 3:17, 3:23, 38:7, 56:5
**Plaintiff** [1] - 1:5
**PLAINTIFF** [1] - 1:21
**plaintiff's** [3] - 26:5, 26:24, 34:25
**plaintiffs** [9] - 8:6, 26:8, 29:17, 46:7, 50:5, 50:10, 54:18, 54:20, 55:10
**PLANK** [1] - 1:11
**plants** [1] - 13:5
**play** [1] - 19:20
**plazas** [1] - 50:13
**plenty** [1] - 43:3
**poetry** [2] - 13:14, 60:15
**point** [24] - 3:24, 4:6, 12:3, 12:15, 20:5, 21:20, 24:11, 26:18, 28:4, 28:23, 28:24, 30:3, 51:13, 52:14, 52:23, 53:7, 60:10, 60:18, 62:5, 63:8, 64:1, 65:24, 67:13, 67:18
**points** [5] - 3:18, 14:6, 28:2, 60:24, 64:25
**poison** [1] - 63:11
**policies** [4] - 18:4, 18:22, 18:24, 38:18
**policy** [3] - 7:21, 12:25, 16:7
**political** [1] - 58:18
**portrayed** [1] - 34:18
**position** [8] - 29:12, 41:25, 42:7, 42:9, 44:4, 47:16, 51:20, 62:6
**positions** [2] - 31:21, 34:16
**possible** [5] - 12:2, 21:7, 45:19, 54:13, 59:25
**possibly** [1] - 34:22
**post** [1] - 6:16
**pot** [1] - 21:15
**potential** [1] - 44:6
**potentially** [3] - 33:17, 35:19, 45:12
**preamble** [2] - 25:19, 37:14
**preceding** [1] - 8:23
**precise** [1] - 34:15
**predated** [1] - 37:6
**preexisting** [1] - 37:8
**preface** [1] - 3:14
**preliminary** [3] - 56:3, 56:8, 64:12
**premises** [2] - 30:11, 50:17
**preparing** [1] - 44:25
**prerogative** [1] - 53:16
**presence** [2] - 7:11, 30:12
**present** [3] - 5:21, 26:21, 30:23
**presentation** [1] - 3:14
**presentations** [1] - 3:15
**presented** [1] - 16:14
**preserve** [2] - 24:16, 56:1
**president** [7] - 15:18, 36:3, 36:4, 36:8, 36:11, 42:3, 58:8
**President** [2] - 14:10, 43:17
**Presley** [1] - 40:22
**press** [1] - 51:12
**presumptively** [1] - 5:18
**pretty** [2] - 42:10, 43:23

**prevent** [1] - 11:6
**preventing** [1] - 59:24
**previous** [1] - 28:2
**previously** [1] - 32:24
**Pride** [7] - 27:10, 27:21, 27:24, 29:16, 30:5, 30:9, 31:3
**prides** [2] - 44:25, 53:10
**primarily** [2] - 6:3, 12:17
**prime** [1] - 33:8
**principle** [1] - 13:19
**private** [2] - 46:9, 46:25
**pro** [3] - 11:8, 11:9, 21:1
**Pro** [1] - 17:13
**pro-choice** [1] - 11:9
**pro-Israel** [1] - 21:1
**Pro-Life** [1] - 17:13
**pro-life** [1] - 11:8
**problem** [4] - 18:23, 18:25, 46:4, 46:12
**procedure** [1] - 59:3
**proceed** [1] - 52:2
**Proceedings** [1] - 1:24
**PROCEEDINGS** [1] - 1:16
**proceedings** [2] - 68:6, 68:11
**proceeds** [1] - 22:17
**process** [2] - 51:2, 51:8
**produced** [1] - 1:25
**productive** [1] - 45:1
**professional** [1] - 37:17
**program** [1] - 49:15
**prohibit** [2] - 32:3, 51:18
**prohibited** [3] - 16:10, 17:11, 33:21
**prohibiting** [1] - 14:23
**prohibits** [1] - 35:14
**prominent** [1] - 48:14
**promote** [1] - 38:3
**promoting** [2] - 14:24, 16:4
**Promotions** [2] - 19:22, 67:17
**property** [1] - 30:11
**proposed** [1] - 20:24
**proposition** [1] - 29:18
**prosthetics** [2] - 34:2, 46:13
**protect** [7] - 37:20, 38:1, 38:4, 63:9, 63:15, 63:19, 63:25
**protected** [9] - 4:8, 4:21, 10:5, 19:11, 27:6, 61:22, 63:18, 63:21, 67:3
**protecting** [3] - 37:23, 38:18, 62:16
**protection** [4] - 7:19, 28:9, 28:13, 52:8
**protections** [1] - 52:4
**protest** [6] - 10:25, 19:3, 38:15, 40:1, 56:22, 66:12
**protested** [1] - 34:17
**protests** [4] - 9:8, 36:23, 37:1, 47:23
**provide** [2] - 21:17, 34:12
**provided** [1] - 59:2
**provides** [1] - 33:1
**providing** [3] - 45:18, 54:12, 59:16
**provisions** [2] - 11:17, 58:16
**provocative** [1] - 41:18
**public** [50] - 6:20, 7:1, 9:9, 14:12, 17:9,

17:10, 17:20, 18:2, 20:17, 21:4, 21:15, 22:6, 23:24, 25:21, 25:24, 30:11, 31:8, 34:3, 35:16, 35:21, 38:8, 39:3, 39:5, 45:23, 45:24, 46:3, 46:19, 46:25, 47:5, 48:16, 49:19, 49:24, 50:3, 50:4, 50:14, 50:15, 50:18, 50:20, 50:25, 54:25, 58:11, 61:15, 61:20, 63:5, 65:5, 65:25, 66:5
**publicize** [1] - 18:14
**pulled** [1] - 44:10
**punish** [1] - 63:1
**purchasing** [1] - 5:8
**pure** [3] - 26:10, 30:5, 60:13
**purely** [4] - 25:9, 25:14, 53:21, 66:25
**push** [2] - 7:3, 20:9
**put** [6] - 10:11, 21:15, 22:12, 22:20, 22:21, 24:19
**putting** [1] - 13:6

**Q**

**quad** [1] - 61:19
**qualify** [1] - 28:9
**Queer** [2] - 3:23, 4:1
**QUEER** [1] - 1:4
**questions** [5] - 16:20, 17:5, 64:19, 64:22, 67:19
**quite** [3] - 8:24, 31:13, 54:5
**quo** [3] - 24:16, 24:17, 56:2
**quote** [1] - 58:4
**quotes** [1] - 53:14

**R**

**raft** [1] - 4:19
**raise** [1] - 65:22
**raised** [1] - 5:17
**raises** [1] - 4:16
**range** [2] - 42:24, 55:5
**rare** [1] - 20:23
**rather** [1] - 46:3
**rational** [1] - 61:11
**reach** [2] - 20:10, 45:21
**reached** [1] - 37:4
**Reagan** [1] - 36:6
**really** [6] - 3:17, 8:2, 8:23, 22:1, 34:23, 43:1
**rearview** [1] - 8:21
**reason** [2] - 31:12, 60:21
**reasonable** [2] - 27:7, 53:17
**reasons** [2] - 51:10, 51:11
**receiving** [1] - 11:2
**recent** [5] - 7:13, 12:6, 36:18, 36:19, 41:3
**recently** [3] - 36:20, 43:14, 58:14
**recognition** [1] - 18:19
**recognize** [3] - 5:6, 14:9, 25:25
**recognized** [2] - 8:20, 13:8
**recognizes** [1] - 11:19
**recognizing** [4] - 11:21, 12:7, 42:23,

42:24

record [25] - 5:20, 5:24, 9:25, 11:22, 20:15, 21:8, 21:9, 31:14, 32:3, 32:5, 32:23, 39:12, 41:14, 42:13, 49:7, 51:6, 51:7, 51:13, 52:15, 55:7, 55:9, 55:23, 58:25, 60:25, 68:11
recorded [1] - 1:24
records [2] - 31:10, 35:8
recruiter [1] - 59:16
recruiters [1] - 59:24
reflects [1] - 20:16
refund [2] - 24:3, 24:7
refunds [1] - 23:23
refusal [2] - 38:2, 51:3
refused [1] - 20:18
regarding [1] - 11:15
regardless [2] - 62:8, 66:17
regent [1] - 44:1
Regents [5] - 13:24, 31:20, 32:7, 32:21, 38:13
Regents' [1] - 8:15
register [1] - 31:11
registration [2] - 8:7, 51:8
regulating [2] - 16:2, 16:3
regulation [1] - 17:2
rehearsal [2] - 8:13, 67:24
reject [1] - 20:24
rejected [2] - 21:6, 60:11
related [1] - 38:7
relationship [2] - 24:17, 53:21
relevance [1] - 22:2
relevant [3] - 58:5, 59:23, 60:17
relief [1] - 44:6
religious [1] - 58:19
remarks [1] - 22:11
remember [1] - 37:1
remove [1] - 64:16
removing [1] - 59:24
rent [1] - 23:15
repeat [1] - 37:14
Reporter [4] - 2:10, 2:10, 68:9, 68:13
REPORTER'S [1] - 68:8
reprehensible [1] - 15:13
request [3] - 3:12, 51:4, 59:8
require [1] - 39:5
required [2] - 5:14, 38:17
requirements [2] - 8:6, 22:13
requires [4] - 25:21, 28:7, 37:19, 44:19
research [1] - 37:16
resell [1] - 23:20
reservation [2] - 8:11, 59:6
reservations [1] - 7:22
reserve [1] - 58:22
resisted [1] - 11:5
resolution [13] - 15:25, 25:11, 35:14, 45:11, 46:20, 47:20, 48:23, 48:24, 48:25, 54:15, 62:7, 66:1, 66:17
respect [1] - 19:19
respectfully [1] - 66:11

respond [6] - 25:2, 28:2, 62:21, 67:9, 67:11, 67:14
response [2] - 55:13, 56:11
responsibilities [1] - 22:25
responsible [1] - 42:3
rest [1] - 54:25
restoring [1] - 42:20
restraint [9] - 22:16, 62:24, 62:25, 63:2, 63:4, 65:1, 65:2, 67:14, 67:17
restrict [3] - 11:4, 34:20, 55:8
restricted [2] - 30:10, 54:19
restriction [2] - 25:9, 65:16
restrictions [2] - 16:22, 18:5
result [2] - 13:10, 19:17
returned [1] - 23:20
revised [3] - 7:9, 7:10, 11:16
rights [9] - 11:10, 11:19, 12:22, 19:4, 22:19, 23:10, 32:15, 37:20, 64:5
Rights [2] - 2:2, 43:12
rise [1] - 45:21
risk [1] - 44:6
RMR [2] - 2:10, 68:9
road [2] - 10:11, 20:4
ROBERT [1] - 1:9
Roberts [1] - 59:14
robust [7] - 7:10, 7:19, 9:10, 9:13, 25:22, 32:12, 32:14
rocky [1] - 15:25
roles [3] - 34:18, 34:19
Ronald [1] - 36:6
Room [1] - 2:12
rooms [2] - 59:16, 59:17
Rosenberg [2] - 16:6, 21:19
ROSENTHAL [1] - 1:17
roster [1] - 36:14
rubber [1] - 10:11
Rudder [5] - 35:5, 35:21, 36:3, 47:2, 47:3
Rule [1] - 14:22
rule [6] - 11:9, 25:5, 25:19, 48:25, 56:8, 58:14
rules [9] - 7:8, 11:15, 36:15, 36:22, 37:5, 37:8, 37:9, 53:5, 53:17
Rumsfeld [5] - 28:4, 59:13, 59:22, 60:11, 60:16
Rumsfield [1] - 59:23
run [1] - 21:15
runs [1] - 15:25
Rusk [1] - 2:12

## S

S-A-X-E [1] - 14:4
salient [1] - 20:6
SAM [1] - 1:11
satisfied [1] - 46:18
satisfy [5] - 35:15, 45:14, 54:16, 66:14, 67:5
saw [1] - 41:3

SAWYERS [1] - 1:12
Saxe [1] - 14:4
scantily [1] - 41:5
scheduled [1] - 67:20
schools [3] - 53:24, 53:25, 59:15
scrutiny [7] - 8:4, 16:23, 17:21, 17:25, 54:10, 66:6, 67:5
SE [1] - 2:2
seated [2] - 3:4
second [7] - 16:24, 19:19, 23:12, 26:14, 33:4, 43:19, 65:24
section [1] - 52:16
security [1] - 23:14
see [15] - 5:9, 8:9, 9:18, 9:25, 25:19, 31:19, 37:24, 42:13, 47:19, 47:23, 52:17, 53:19, 60:25, 61:25
seeing [1] - 66:22
seeking [1] - 43:6
seem [1] - 29:25
selection [1] - 13:25
selectively [1] - 21:17
semantic [1] - 13:7
Semitism [2] - 7:14, 36:18
Senate [1] - 30:10
sending [1] - 61:10
sends [2] - 20:10, 20:11
sense [1] - 65:15
sentence [1] - 66:16
separate [2] - 39:23, 48:11
serve [1] - 7:23
set [5] - 9:13, 11:14, 24:20, 53:4, 61:3
setting [1] - 12:23
Seventies [2] - 9:8, 9:18
several [1] - 38:7
severe [2] - 49:13, 61:5
sex [5] - 13:5, 13:6, 13:8, 14:2, 14:7
sexes [1] - 13:4
sexual [9] - 13:10, 13:13, 13:14, 13:15, 29:10, 40:19, 40:23, 42:24, 46:15
sexualized [2] - 34:5, 39:19
sexually [1] - 30:10
SHARP [1] - 1:12
ship [1] - 24:12
shores [1] - 15:25
shortly [1] - 44:2
shout [1] - 20:25
Show [1] - 41:4
show [33] - 4:18, 12:6, 14:15, 16:8, 16:9, 16:10, 18:11, 32:1, 32:4, 32:23, 33:17, 33:22, 34:25, 35:5, 35:14, 35:19, 39:2, 40:8, 45:22, 45:23, 45:24, 46:2, 46:9, 46:18, 48:20, 48:21, 55:1, 60:9, 61:9, 61:14, 61:18, 63:6, 64:17
shown [2] - 4:18, 57:20
shows [20] - 14:19, 15:6, 25:9, 29:18, 33:22, 38:23, 38:24, 39:1, 42:8, 42:13, 43:4, 43:5, 45:12, 45:14, 45:22, 48:16, 52:25, 57:7, 60:11, 61:1
shrinking [2] - 55:15

**shrunk** [1] - 55:17
**shuts** [1] - 20:25
**side** [3] - 7:17, 11:24, 67:8
**sides** [5] - 3:15, 7:7, 19:7, 64:21
**sidewalks** [1] - 50:13
**significance** [1] - 21:13
**similar** [3] - 27:18, 27:25, 29:24
**simple** [1] - 7:5
**sinks** [2] - 11:10
**situated** [2] - 31:25, 52:21
**Sixties** [2] - 9:7, 9:17
**skeptical** [1] - 54:9
**small** [3] - 54:19, 54:22, 54:24
**Smith** [3] - 2:10, 68:9, 68:13
**Society** [1] - 15:19
**society** [2] - 15:10, 15:19
**solitary** [1] - 8:9
**someone** [7] - 6:5, 6:10, 6:16, 17:23, 27:2, 60:9
**somewhat** [2] - 36:4, 43:13
**somewhere** [1] - 22:20
**sorry** [7] - 16:18, 25:16, 36:24, 40:18, 45:15, 50:2, 56:19
**sort** [11] - 6:2, 9:15, 12:11, 26:10, 27:7, 39:10, 39:22, 39:23, 42:1, 52:19, 60:5
**sorts** [2] - 13:13, 36:2
**sought** [1] - 17:24
**sounds** [1] - 37:13
**source** [2] - 21:10, 21:13
**Southeastern** [2] - 19:21, 67:17
**SOUTHERN** [1] - 1:1
**southern** [1] - 2:11
**Southern** [1] - 68:9
**Southwick** [2] - 27:23, 27:25
**space** [8] - 6:25, 18:8, 18:11, 18:12, 22:5, 23:10, 24:19, 59:8
**spaces** [4] - 7:22, 9:9, 22:8, 22:9
**speaker** [5] - 20:25, 34:15, 47:11, 47:14
**speakers** [7] - 20:21, 21:6, 33:12, 33:13, 33:14, 35:1, 36:2
**speaking** [1] - 9:17
**special** [1] - 52:3
**specific** [5] - 15:3, 27:8, 29:3, 30:8, 37:21
**specifically** [2] - 14:15, 17:23
**specifics** [1] - 37:7
**Spectrum** [8] - 27:15, 27:20, 27:23, 29:20, 30:4, 30:6, 30:25, 31:2
**speculation** [6] - 57:4, 57:11, 57:12, 57:15, 62:23
**speculative** [2] - 57:14, 62:18
**speech** [64] - 9:16, 10:6, 10:8, 10:9, 10:10, 10:12, 10:16, 10:19, 11:4, 11:21, 12:17, 12:20, 14:11, 14:21, 16:2, 18:16, 18:22, 19:1, 19:9, 19:10, 19:14, 19:15, 19:18, 19:21, 20:9, 21:3, 21:16, 22:10, 22:16, 26:1, 28:9, 28:11, 34:12, 37:20, 37:24, 38:3, 38:4, 38:18, 49:1, 49:3,

54:22, 54:23, 56:18, 56:21, 58:7, 58:10, 61:23, 62:14, 62:18, 62:19, 62:20, 63:1, 63:9, 63:10, 63:13, 63:14, 63:18, 63:22, 63:23, 64:9, 64:10, 67:15
**speeches** [1] - 11:6
**spend** [1] - 15:14
**Sports** [1] - 43:21
**square** [4] - 60:19, 60:24, 61:8, 61:17
**squarely** [1] - 4:20
**squares** [1] - 46:22
**stage** [7] - 4:12, 9:1, 16:16, 18:4, 18:6, 26:9, 47:14
**stalking** [1] - 9:24
**stamp** [1] - 58:4
**stand** [2] - 5:1, 26:7
**stand-alone** [1] - 5:1
**standard** [6] - 16:23, 59:2, 65:22, 65:23, 66:1, 67:1
**standards** [2] - 52:19, 61:3
**stars** [1] - 9:15
**start** [10] - 4:3, 4:5, 5:4, 5:5, 13:18, 15:6, 17:3, 20:3, 23:13, 63:10
**started** [2] - 48:23, 51:9
**starting** [4] - 4:5, 9:21, 12:15, 43:23
**starts** [3] - 12:20, 12:22, 16:7
**State** [2] - 50:17, 53:15
**state** [11] - 3:3, 15:9, 21:14, 21:21, 22:4, 22:6, 22:8, 23:8, 24:2, 45:17, 52:1
**state's** [1] - 54:11
**statement** [2] - 25:19, 32:11
**statements** [1] - 28:3
**STATES** [2] - 1:1, 1:17
**States** [4] - 2:11, 14:10, 18:15, 68:9
**statewide** [1] - 25:24
**Station** [1] - 2:7
**status** [3] - 24:16, 24:17, 56:2
**Steinbaugh** [2] - 3:5, 3:22
**STEINBAUGH** [67] - 1:21, 3:5, 3:19, 3:21, 4:3, 4:9, 4:25, 5:4, 5:13, 5:24, 6:12, 6:14, 7:6, 7:12, 7:16, 8:8, 8:18, 9:4, 9:6, 9:11, 9:14, 11:3, 11:7, 11:13, 11:23, 11:25, 12:8, 12:11, 12:15, 13:12, 13:18, 15:1, 15:4, 17:3, 17:6, 18:18, 18:21, 18:25, 19:8, 20:19, 20:22, 21:14, 22:14, 23:24, 24:2, 24:4, 24:6, 24:9, 24:23, 25:3, 56:12, 56:15, 56:17, 56:20, 57:10, 57:14, 57:25, 58:24, 59:1, 62:1, 62:4, 62:11, 67:9, 67:13, 67:22, 67:24, 68:2
**stenography** [1] - 1:24
**step** [4] - 26:19, 48:10, 59:4
**step-by-step** [1] - 59:4
**steps** [2] - 44:2, 46:1
**stereotypical** [2] - 16:14, 46:14
**still** [22] - 8:4, 8:11, 25:18, 26:7, 28:17, 32:10, 33:1, 38:25, 44:15, 46:16, 47:22, 48:13, 48:24, 48:25, 50:20, 51:12, 54:10, 60:8, 61:22, 62:15, 65:22
**stone's** [1] - 4:11
**stood** [1] - 36:7

**stop** [2] - 20:1, 63:1
**stopped** [1] - 51:9
**stormed** [1] - 36:5
**story** [1] - 45:9
**straight** [1] - 43:3
**Street** [1] - 1:21
**Streisand** [1] - 21:4
**strict** [5] - 16:23, 17:21, 17:25, 54:10, 67:5
**stringent** [1] - 45:20
**strong** [3] - 28:11, 29:10, 43:15
**struggle** [1] - 62:11
**student** [24] - 3:25, 10:24, 15:16, 17:18, 19:2, 19:10, 20:16, 21:11, 21:22, 22:10, 22:15, 30:6, 31:7, 32:25, 34:14, 49:8, 51:4, 51:15, 53:17, 55:8, 58:17, 58:18, 58:23, 59:7
**student-funded** [2] - 21:11, 32:25
**student-hosted** [1] - 55:8
**students** [40] - 5:18, 6:7, 6:16, 6:23, 8:11, 11:1, 11:5, 12:22, 13:24, 14:1, 17:21, 17:23, 19:5, 19:13, 19:14, 20:7, 20:25, 21:2, 22:5, 22:18, 22:23, 22:24, 23:3, 23:4, 24:6, 24:11, 24:15, 24:20, 25:23, 31:15, 38:12, 45:5, 46:3, 46:11, 46:21, 48:13, 50:13, 51:4, 61:16, 64:1
**Students** [1] - 15:19
**students'** [1] - 17:25
**subject** [4] - 8:4, 14:2, 16:22, 58:2
**subjective** [4] - 15:8, 15:22, 16:2, 57:20
**succinctly** [1] - 27:5
**suggests** [2] - 5:21, 37:9
**suing** [1] - 30:7
**suitable** [2] - 18:11, 18:12
**Suite** [2] - 1:22, 2:3
**sum** [1] - 22:11
**summer** [1] - 7:13
**super** [1] - 41:17
**super-familiar** [1] - 41:17
**Supple** [1] - 50:17
**support** [3] - 10:25, 13:4, 26:25
**supported** [3] - 38:9, 38:10, 51:20
**supporting** [1] - 52:11
**supports** [3] - 48:25, 50:24
**supposed** [2] - 7:23, 7:24
**suppress** [6] - 10:3, 10:8, 19:15, 19:16, 21:3, 62:13
**suppressing** [1] - 54:23
**suppression** [1] - 9:22
**Supreme** [10] - 10:3, 10:18, 15:17, 16:5, 27:9, 28:18, 29:4, 58:3, 61:4, 66:9
**surprisingly** [1] - 30:20
**surrender** [2] - 22:19, 64:9
**surrounded** [1] - 37:2
**susceptible** [1] - 7:4
**swings** [2] - 11:7, 63:15
**swivel** [1] - 9:23
**system** [1] - 36:4

## T

**t's** [1] - 8:11
**tailored** [7] - 38:23, 40:16, 45:22, 47:20, 48:10, 54:10, 54:16
**talks** [1] - 51:16
**Tam** [1] - 62:13
**target** [1] - 6:19
**targeting** [1] - 12:25
**targets** [2] - 62:7, 66:17
**taught** [1] - 13:5
**tea** [1] - 19:4
**teaches** [1] - 45:4
**teaching** [1] - 19:13
**tends** [1] - 21:2
**terms** [2] - 9:2, 49:7
**terrible** [1] - 19:17
**terror** [1] - 43:12
**test** [9] - 25:10, 26:19, 27:4, 27:12, 28:20, 33:21, 33:23, 38:21, 38:23
**tests** [1] - 23:1
**Texas** [22] - 2:6, 2:8, 2:11, 2:13, 3:25, 4:15, 11:15, 18:22, 26:19, 29:20, 30:4, 30:6, 30:10, 31:2, 44:1, 47:8, 50:12, 50:17, 54:14, 66:8, 68:10
**TEXAS** [3] - 1:1, 1:4, 1:8
**THE** [209] - 1:17, 1:21, 2:5, 3:3, 3:8, 3:12, 3:20, 4:2, 4:7, 4:14, 5:2, 5:10, 5:15, 6:11, 6:13, 7:3, 7:7, 7:15, 8:5, 8:17, 9:1, 9:5, 9:7, 9:13, 11:1, 11:4, 11:12, 11:14, 11:24, 12:5, 12:10, 12:14, 13:2, 13:13, 14:14, 15:2, 16:20, 17:5, 18:14, 18:20, 18:24, 19:7, 20:14, 20:20, 21:9, 22:11, 23:23, 24:1, 24:3, 24:5, 24:8, 24:22, 24:24, 25:4, 25:8, 25:15, 25:17, 26:13, 26:16, 27:4, 27:14, 27:22, 28:1, 28:17, 28:23, 29:3, 29:12, 29:15, 29:21, 29:23, 30:15, 30:18, 30:22, 31:4, 31:7, 31:14, 31:23, 32:2, 32:7, 32:10, 32:20, 32:25, 33:3, 33:5, 33:9, 33:12, 33:14, 33:19, 34:8, 34:13, 34:23, 35:2, 35:8, 35:11, 35:13, 35:22, 35:24, 36:8, 36:11, 36:13, 36:15, 36:19, 36:21, 37:1, 37:4, 37:11, 37:14, 38:1, 38:14, 38:17, 38:21, 39:1, 39:4, 39:8, 39:11, 39:14, 39:21, 39:25, 40:3, 40:7, 40:12, 40:17, 40:19, 40:21, 41:2, 41:4, 41:10, 41:12, 41:20, 41:22, 42:12, 42:22, 43:5, 43:10, 44:13, 44:17, 45:4, 45:10, 46:2, 46:6, 46:8, 46:11, 46:21, 47:11, 47:25, 48:5, 48:8, 48:18, 48:20, 48:24, 49:4, 49:9, 49:11, 50:1, 50:3, 50:5, 50:8, 50:21, 50:23, 51:3, 51:6, 51:10, 51:12, 51:19, 51:25, 52:5, 52:8, 52:10, 52:12, 53:2, 53:8, 54:3, 55:1, 55:4, 55:7, 55:12, 55:14, 55:17, 55:22, 56:10, 56:14, 56:16, 56:19, 57:7, 57:11, 57:23, 58:13, 58:25, 61:24, 62:3, 62:5, 64:21, 64:24, 65:6, 65:8, 65:11, 65:18, 66:3, 66:5, 66:16, 66:21, 67:2, 67:7, 67:11, 67:20,

67:23, 67:25, 68:3, 68:5
**Theater** [4] - 35:5, 35:21, 47:2, 47:3
**theater** [16] - 4:4, 4:9, 5:6, 5:7, 8:25, 22:1, 36:3, 47:2, 50:24, 52:5, 55:4, 55:5, 58:22, 59:3, 60:15, 65:11
**theaters** [1] - 4:11
**themselves** [4] - 22:18, 24:11, 26:8, 45:6
**then-Judge-Alito's** [1] - 14:3
**therefore** [5] - 4:8, 14:20, 16:22, 56:8, 61:25
**they've** [4] - 32:8, 57:8, 61:13
**thinking** [3] - 9:21, 44:25, 45:4
**thinks** [3] - 42:8, 42:10, 61:1
**thorough** [1] - 3:16
**threatened** [1] - 63:23
**three** [2] - 32:17, 41:16
**threshold** [2] - 4:7, 25:4
**throughout** [1] - 52:1
**throw** [1] - 4:11
**ticket** [3] - 5:8, 5:22, 65:12
**tickets** [3] - 23:20, 23:23, 24:7
**ticking** [1] - 24:14
**tie** [1] - 26:5
**ties** [1] - 43:9
**Title** [11] - 43:17, 43:18, 43:23, 44:12, 45:9, 45:12, 45:18, 54:12, 61:1, 61:15, 61:17
**today** [2] - 52:21, 56:6
**today's** [1] - 9:2
**together** [1] - 38:8
**took** [3] - 46:1, 48:11, 60:21
**top** [3] - 22:22, 23:2, 23:4
**TORN** [1] - 1:11
**tough** [2] - 23:1
**tradition** [1] - 54:1
**traditional** [1] - 39:4
**traditionally** [1] - 44:22
**transactional** [1] - 53:22
**TRANSCRIPT** [1] - 1:16
**transcript** [3] - 1:25, 59:19, 68:10
**treated** [1] - 66:13
**trial** [1] - 59:19
**tried** [1] - 31:11
**trigger** [1] - 57:24
**TRO** [8] - 3:13, 22:13, 24:16, 56:4, 56:8, 64:1, 64:12, 64:16
**TRO/PI** [1] - 55:25
**troop** [1] - 63:3
**troops** [1] - 36:5
**TROs** [1] - 56:1
**trouble** [1] - 47:8
**true** [2] - 51:19, 68:10
**Trump** [9] - 12:24, 42:6, 42:10, 42:12, 44:1, 44:10, 45:9, 60:25, 62:22
**Trump's** [1] - 43:17
**trust** [1] - 19:16
**truth** [4] - 13:21, 14:1, 42:20, 42:22
**try** [2] - 3:19, 10:8

**trying** [8] - 9:24, 12:12, 21:5, 23:5, 23:6, 64:2, 64:3
**turmoil** [1] - 32:13
**turn** [3] - 22:2, 22:3, 64:15
**twice** [1] - 23:11
**two** [20] - 8:12, 9:16, 12:7, 13:4, 16:20, 17:5, 26:9, 26:19, 27:13, 28:2, 28:14, 38:5, 42:1, 42:23, 51:23, 55:19, 60:24, 64:25, 65:5, 66:13
**two-step** [1] - 26:19
**type** [6] - 4:20, 4:24, 18:9, 19:14, 34:3, 35:25
**types** [1] - 60:14

## U

**U.S** [1] - 59:21
**unbounded** [1] - 53:16
**uncertainty** [2] - 64:7, 64:16
**unclear** [1] - 51:11
**uncomfortable** [1] - 44:21
**uncrossed** [1] - 8:11
**undefined** [1] - 14:21
**under** [5] - 6:5, 12:1, 13:20, 16:10, 50:19
**underlying** [1] - 60:14
**understood** [3] - 26:22, 53:23, 57:12
**undotted** [1] - 8:10
**unfettered** [1] - 21:22
**uninhibited** [1] - 25:22
**unit** [1] - 36:7
**United** [4] - 2:11, 14:10, 18:15, 68:9
**UNITED** [2] - 1:1, 1:17
**universities** [14] - 7:1, 12:16, 12:25, 41:24, 43:15, 44:22, 53:2, 53:6, 53:16, 54:15, 58:1, 58:6, 59:24, 63:16
**University** [5] - 3:25, 44:1, 44:11, 50:11, 53:14
**university** [40] - 6:20, 14:12, 15:18, 16:13, 17:22, 17:24, 20:24, 21:6, 21:16, 21:20, 21:21, 32:8, 32:24, 33:1, 33:5, 34:14, 34:20, 35:1, 37:15, 37:16, 37:20, 44:6, 44:16, 44:17, 47:1, 47:10, 48:11, 49:21, 51:18, 52:21, 55:19, 55:20, 58:9, 58:11, 58:16, 60:1, 62:21, 63:5, 63:22, 64:2
**University's** [1] - 50:17
**university's** [2] - 11:15, 55:18
**university-funded** [1] - 32:24
**unless** [1] - 24:23
**unlikelihood** [1] - 26:21
**unquote** [1] - 58:4
**unrelated** [1] - 29:6
**up** [14] - 9:7, 9:23, 15:16, 17:15, 20:4, 22:11, 23:15, 25:4, 27:20, 30:13, 35:18, 43:11, 53:20, 55:24
**updated** [1] - 11:14
**uses** [1] - 21:12
**UT** [1] - 44:2

## V

**value** [1] - 53:6
**values** [3] - 14:20, 46:23, 53:3
**variety** [5] - 13:10, 30:1, 33:9, 34:19, 36:2
**various** [2] - 13:15, 32:13
**venue** [9] - 21:12, 23:12, 23:14, 30:8, 33:2, 33:7, 34:4, 35:16, 49:20
**venues** [5] - 19:20, 23:15, 23:16, 33:8, 47:4
**version** [2] - 7:13, 41:9
**versus** [6] - 10:4, 13:23, 17:16, 30:4, 59:13, 62:13
**vet** [1] - 23:14
**via** [1] - 1:25
**video** [3] - 8:25, 10:3, 10:4
**videos** [1] - 6:16
**Vietnam** [2] - 36:21, 37:2
**view** [8] - 12:11, 16:12, 21:13, 32:5, 32:21, 34:16, 41:12, 60:16
**viewed** [1] - 26:23
**viewpoint** [26] - 7:20, 7:24, 8:2, 8:17, 8:18, 16:1, 16:6, 16:16, 17:11, 18:3, 20:12, 21:18, 22:3, 25:12, 58:19, 62:9, 62:15, 62:16, 66:2, 66:3, 66:8, 66:10, 66:13, 66:15, 66:18, 66:24
**viewpoint-based** [1] - 16:1
**viewpoint-discriminatory** [1] - 8:2
**viewpoints** [1] - 12:18
**views** [12] - 13:25, 14:1, 14:8, 21:1, 32:14, 44:21, 47:12, 47:15, 48:14, 60:22, 62:5
**violate** [4] - 12:6, 42:9, 48:2, 61:1
**violating** [1] - 44:11
**violation** [3] - 43:23, 66:12, 66:15
**violent** [1] - 10:3
**visual** [1] - 13:14
**volunteered** [1] - 63:6
**volunteering** [1] - 5:11
**vote** [1] - 5:19
**VS** [1] - 1:7
**vulgar** [8] - 34:5, 39:19, 41:20, 46:15, 49:6, 51:14, 52:14, 52:17

## W

**wait** [3] - 34:8
**waiting** [1] - 27:19
**walk** [3] - 4:11, 5:5, 5:7
**walking** [2] - 4:10, 6:21
**Walnut** [1] - 1:21
**wander** [1] - 6:1
**wandering** [1] - 61:21
**wants** [3] - 4:4, 12:18, 45:5
**War** [2] - 36:5, 37:2
**warned** [1] - 6:8
**warrants** [1] - 28:13
**wartime** [1] - 63:3

**Washington** [1] - 2:3
**ways** [3] - 34:19, 38:5, 66:13
**wear** [1] - 48:13
**wearing** [1] - 34:1
**website** [2] - 18:14, 18:17
**weekend** [1] - 43:25
**Welch** [1] - 13:20
**welcome** [2] - 20:11, 20:12
**WELSH** [1] - 1:12
**West** [4] - 29:20, 30:4, 30:6, 31:2
**western** [1] - 54:2
**Whac** [1] - 19:21
**Whac-A-Mole** [1] - 19:21
**whereas** [1] - 52:20
**whole** [7] - 33:9, 42:4, 42:24, 54:1, 55:5, 60:21, 62:23
**wholeheartedly** [1] - 9:2
**wholly** [1] - 63:7
**Widmar** [1] - 21:19
**WILLIAM** [2] - 1:8, 2:5
**wind** [2] - 9:23, 20:4
**wish** [1] - 46:9
**withdraw** [1] - 21:18
**woman** [1] - 41:16
**women** [28] - 14:16, 14:17, 14:18, 15:3, 15:7, 16:8, 16:11, 16:12, 16:14, 34:6, 34:9, 34:16, 34:18, 34:21, 41:4, 41:13, 42:19, 43:22, 44:23, 44:25, 46:16, 47:9, 47:12, 49:23, 61:9, 61:10
**women's** [2] - 33:25, 46:13
**Women's** [1] - 43:21
**wonderful** [1] - 53:10
**Woodlands** [7] - 27:10, 27:21, 27:24, 29:16, 30:5, 30:9, 31:3
**word** [3] - 10:11, 16:5
**word-for-word** [1] - 16:5
**words** [1] - 14:19
**works** [1] - 58:10
**World** [1] - 36:5
**world** [2] - 9:2, 44:24
**worse** [1] - 61:18
**write** [1] - 64:15
**writing** [1] - 64:14

## Y

**year** [6] - 11:16, 11:17, 27:18, 32:10, 36:8, 55:17
**years** [10] - 8:20, 18:12, 24:18, 31:24, 32:1, 32:3, 55:12, 55:14, 55:19, 57:8
**young** [2] - 44:23, 44:25
**younger** [1] - 9:19
**yourself** [4] - 19:23, 19:24, 19:25, 20:2

## Z

**ZACHARY** [1] - 2:5
**Zachary** [1] - 3:10
**zone** [2] - 56:18, 56:21
**zones** [2] - 54:22, 56:22

## "

**"BILL"** [1] - 1:8
**"MIKE"** [1] - 1:10
**"RANDY"** [1] - 1:10